# ATTACHMENT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

MARK ZAVISLAK, )
)
Plaintiff, )
)
vs. ) No. 5:21-cv-01811-EJD
)
NETFLIX, INC., )
)
Defendant. )
)
)

DEPOSITION OF MARCIA S. WAGNER

April 18, 2022

Via Videoconference

REPORTED BY: Valerie L. Torgerson, CCR, RPR
License No. 2036

APPEARANCES - (Via Videoconference)

For the Plaintiff:

O. Shane Balloun
Bryan Repetto
Balloun Law
355 Harris Avenue
Suite 201
Bellingham, WA 98225-7068
360.318.7778
360.483.5960 Fax
o.shane@ballounlaw.com

For the Defendants:

Rani Reddy
Christopher Rillo
Christina Romak
Baker Botts
101 California Street
Suite 3200
San Francisco, CA 94111
415.291.6265
415.291.6365 Fax
rani.reddy@bakerbotts.com

Also present:

Alex Olsen



EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Balloun | 4 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 80 | 67-page Defendant Netflix, Inc.'s Designation of Marcia Wagner as Trial Expert. | 5 |
| Exhibit No. 81 | 4-page printout from Wagner Law Group website. | 14 |
| Exhibit No. 82 | 5-page article titled "Court Decision Highlights Importance of Complying with ERISA's 'Other Instruments Rule' for Document Disclosure." | 57 |
| Exhibit No. 83 | 23-page Contract Amendment No. 1 Group No. 20164. | 67 |
| Exhibit No. 84 | 2-page letter to Ken Paff from John J. Canary dated 4/10/1997. | 88 |




BE IT REMEMBERED that on Monday, April 18, 2022, Via Zoom, at 9:28 a.m., before Valerie L. Torgerson, CCR, RPR, appeared MARCIA S. WAGNER, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MARCIA S. WAGNER, having been first duly sworn remotely by the Certified Court Reporter, testified as follows:

EXAMINATION

BY MR. BALLOUN:

Q Thanks for being here, Ms. Wagner. I enjoyed our little colloquy before we started. So let's just get right into it since you have many years of experience practicing law and also testifying as an expert in various cases.
I'd like to introduce your report in this case that you produced for Netflix as what I'm going to number as Exhibit 80, and then I'd like you to confirm that it is your expert report.

**A Okay.**

Q Okay. I'm going to put it in the chat. Let me know when



you receive it.

MR. BALLOUN: Also, obviously same as for you, Ms. Reddy.

(Exhibit No. 80 marked for identification.)

**A Okay. I'm entering the chat room right now. Well, this is going to sound pathetic, but I think it's right. I just don't know how to open it. If it would be okay with you, I can get a hard copy in my home, which I promise you is perfectly fine --**

Q (By Mr. Balloun) That's fine. I'm sure we'll be able to track. You can -- I think you have to download it in order to be able to view it.

**A I'm sure I do. I don't think --**

MS. REDDY: I've got it, O. Shane.

**A I don't think you understand. I have many secretaries and people that do all of the technology.**

Q (By Mr. Balloun) Sure.

**A So I do apologize, but I -- I can get a hard copy downstairs if that would be better for you.**

Q That's fine. And then for future exhibits I'll just display them on the screen for you.

**A Okay. So I will be right back.**

Q Okay.

**A If you want to go off record or whatever, it will take me**

**A two minutes to get my expert report, if that's okay.**
Q We'll wait, yeah.
**A Thank you. And I apologize for my technological inabilities, but I will be right back.**
(Pause in proceedings.)
**A Okay. I have a hard copy here.**
Q (By Mr. Balloun) Okay. Great. And I am going to, at Ms. Reddy's astute suggestions, also email you. Not that you don't already have your hard copy, but I can do that with the other exhibits as well.
**A Okay.**
Q All right. I'm just reorganizing my desktop. Thank you for waiting.
All right. So could you confirm -- well, it's hard to confirm the electronic document, but we'll assume that the electronic document that I have noted as Exhibit 80 is the same as your expert report.
Could you tell me how you became associated with Netflix in this case?
**A I believe Mr. Rillo called me, and we chatted about this briefly. I performed a conflict check, and given that there were no conflicts and that I thought this was a case that I could do a good job on that was within my wheelhouse, so to speak, I accepted happily the engagement.**



Q How long have you known the attorneys at Baker Botts on this case?
**A I've just recently got to know Ms. Reddy, and I'm very happy that I did. I'm sure we'll speak to each other for years and years from now, and I'll watch her career grow and develop. And I've known Mr. Rillo for decades. I don't know exactly when and how, but I've -- he's a person I've known for a while.**
Q Do you understand what this case is about?
**A I think so, yes.**
Q I notice that in Appendix D of the expert report you name the court documents that you referenced to prepare for this case.
**A Yes.**
Q Is it in fact true that you reviewed the protective order in this case?
**A I cannot recall sitting here right now.**
Q Okay. Isn't it in fact true that this is the only court order that you reviewed in this case?
**A Whatever's listed on Appendix D is what I reviewed.**
Q Okay. Isn't it in fact true that you reviewed Netflix's motion to dismiss or any alternative for summary judgment?
**A I did review that, yes.**
Q And I also notice that you name the seven documents



Netflix produced to Mr. Zavislak on February 24th, 2021, throughout your expert report. Is that right?
**A True.**
Q And you reviewed them, of course, in preparation of your report and the provision of your expert opinions?
**A Yes.**
Q Are you not aware that Netflix filed these seven documents as exhibits in support of its original motion to dismiss, which was converted to a motion for summary judgment with the court?
**A I am aware of that, I believe, yes.**
Q You must then also be aware that despite having these seven documents on the record, the court still denied Netflix's motion to dismiss?
**A I believe it did, yes.**
Q We haven't discussed on the record your qualifications yet, but you are certainly aware of 29 U.S.C. Section 1102, aren't you?
**A I believe I am, yes.**
Q In fact, your expert report cites to this statute?
**A Yes.**
Q On -- let's look at Page 5, if we could.
**A Sure.**
MR. BALLOUN: Which for Ms. Reddy is electronic Page 9.



Q (By Mr. Balloun) So we see on -- at the bottom of Page 5 footnotes to 29 U.S.C. 1102(a) and (b); correct?
**A I believe so, yes.**
Q And in Paragraph 14, you have listed the requirements of an ERISA-governed benefits plan, have you not?
**A I have.**
MR. BALLOUN: Hello, Mr. Rillo.
Q (By Mr. Balloun) You are licensed to practice in Massachusetts and Washington, D.C.; correct?
**A Yes.**
Q Anywhere else?
**A No.**
Q So not licensed to practice in California?
**A No. Some of my partners and associates are licensed in California, but I myself am not.**
Q You're not admitted to practice in the northern district of California?
**A Again, I think some of my partners and associates are, but I myself am not.**
Q And not -- you're not admitted to practice in any jurisdiction governed by the law of the ninth circuit, are you?
**A No.**
Q But to be --
THE REPORTER: Can I just -- I just

wanted to make sure. I saw Ms. Reddy dropped off, so I just wanted to make sure. Should we wait for her?

MR. BALLOUN: Let's wait.

(Pause in proceedings.)

MS. REDDY: Apologies. I'm back. Please continue.

Q (By Mr. Balloun) But to be fair, Ms. Wagner, the Employee Retirement Income Security Act of 1974, ERISA, is a federal law that applies nationwide, including in Massachusetts and the District of Columbia; correct?

**A Correct. And ERISA does pre-empt most state laws.**

(Reporter clarification.)

**A And ERISA does pre-empt most state laws regarding pension plans and welfare benefit plans.**

Q (By Mr. Balloun) So isn't it in fact true that nothing in your report indicates that any of your opinions about this case would change if the case were brought in any other jurisdiction, such as the district of Massachusetts or the District of Columbia or, say -- I don't know -- the northern district of Illinois or the district of Utah or anywhere else?

**A Yes, that is true.**

Q Okay. So from my records, I have determined -- and please correct me if I'm wrong -- that you founded the Wagner Law Group in 1996 but under a different name?



**A I founded it in August of '96 under the name Marcia S. Wagner Esquire & Associates, P.C. We were very small then. It was me, an associate, and a secretary. When we hit maybe 20 employees, I felt that that was not an appropriate name, and I changed it.**

Q And your law firm entity is domesticated in Massachusetts, isn't it?

**A Yes. We are a Massachusetts firm, but we do have offices in many other states.**

Q And you're the registered agent in Massachusetts for your law firm; isn't that right?

**A I am the registered agent.**

Q And you are the president of your law firm?

**A I would say I'm the president, CEO, chief bottle washer, everything.**

Q And that means you're also the sole director of your law firm corporation?

**A I am the sole director, yes.**

Q Would it be fair to say that the Wagner Law Group is your law firm?

**A Well, that's interesting. I would say in form it sure does look that way, but in -- clearly as a Sub Chapter S corporation, I'm the sole shareholder. So if your question is very simple, then the answer is yes. However, in substance I've had partners for more than 20**



**years, and some of them were senior people in the industry, and I very much considered them my partners and my friends, and we make significant decisions jointly.**

**I would say that my partners are more partners than most partners are in major law firms that I've been associated with, so it really depends on your definition and whether form or substance is governing.**

Q I appreciate the -- yeah, the clarification. It must be nice to have such a collegial working relationship with your partners. I think that's great.

I do wonder as a matter of form whether you are the ultimate authority in deciding what actions your law corporation takes.

**A The buck stops with me.**

Q Buck stops with you. Including, for example, which clients to represent?

**A I guess if push came to shove that's true, but if clients would pass the conflict process that we have in place, and if there is no overriding reason that we wouldn't take the case, then I don't really get involved in that and nor should I.**

Q Isn't it in fact true that the Wagner Law Group's practice focuses on ERISA and employee benefits?

**A We're very well-known and I think top flight in ERISA, employee benefits, and in executive compensation.**



**Because I've had a lot of clients for 35 years, for a very long time, we now have a personal law department for clients that for whatever reason want me to be their administrator of their estate or et cetera, and our estate planning practice has grown and really grown significantly, as has our family law practice. We also have a very good, if small, employment law practice to deal with the employment and labor law issues that come up that spin off of a basic ERISA practice.**

Q Yeah. That makes sense, right, because you have --

**A Yes.**

Q -- powerful clients who then trust you for the work that you do, and they don't necessarily want to go to a different firm, and so you've established small boutique practices inside of your practice adjacent to an ERISA and employee benefits; is that fair to say?

**A Extremely fair. And it's one of the hugest compliments to me that so many clients that I've had forever -- I like -- I really hope they live forever, but when people start dying, I'm going to become an estate expert. So it's -- to me it's a great compliment and really an honor. I hope I believe that 20 years from now, but I'm really honored by that.**

Q That's great.

Your firm's website, it's Wagnerlawgroup.com; right?

**A Wagnerlawgroup.com. Yes, I believe it is.**
Q And you're familiar generally with the contents of your website?
**A I'm not -- generally. I don't maintain the website. I don't really look at it that much, but I'm generally familiar with it.**
Q If I showed you the about page, would you be familiar with that page?
**A Why don't you call it up?**
Q I will.
**A I would assume so, but -- I hope it says that we do our best for employee benefits and executive compensation, but, you know, let me see.**
MR. BALLOUN: All right. I'm going to mark -- well, I have marked for the deposition entry into the record Exhibit 81.
Ms. Reddy and Ms. Wagner and Madam Court Reporter, I'm uploading it to the chat, and I will, as a matter of course here, display the web page live.
**A Good. Thank you. Again, apologies for my technological -- you know, lack of prowess or lack of confidence.**
Q (By Mr. Balloun) Oh, that's fine.
(Exhibit No. 81 marked for identification.)



Q (By Mr. Balloun) Excellent.
Okay. All right. Do you see the website as shared?
**A Yes.**
Q So the first sentence in substance says, "The Wagner Law Group is a nationally recognized practice in the areas of ERISA and employee benefits" --
**A Yes.**
Q -- which includes a whole list of subtopics.
And then if we scroll down, this is you in the photo, is it not?
**A Yes.**
Q Excellent.
So this about page is your firm's about page?
**A Yes. Yes. Absolutely.**
Q Okay.
**A I should update that photo, but other than that, it's me. It's not the best picture.**
Q That's okay.
All right. So you've testified as an expert several times in cases relating to the -- to ERISA, have you not?
**A I have.**
Q However, isn't it in fact true that none of those cases involved you testifying as to what documents comprise a plan for the purposes of disclosure under 29 U.S.C. Section 1024(b)(4) as requested by a participant or



beneficiary?
**A That's fair.**
Q And is it in fact true that none of the descriptions of the cases that you provide in your expert report speak to plan document production under 29 U.S.C. 1024(b)(4)?
**A I think that's fair.**
Q And isn't it in fact true that none of the summaries of the cases that you provide in your report site to 29 U.S.C. 1024(b)(4)?
**A Yes.**
Q Or in name Section 104(b)(4) of ERISA?
**A I'm not sure if they might name it somewhere, but I don't think it's been significantly in any of the cases that I've dealt with.**
Q Okay. And isn't it in fact true that none of the descriptions of the cases that you provide in your expert report use the phrase "plan document" or mention the word "document"?
**A In other words, are you asking me if the descriptions of the expert witness work that I've done have the words "plan document" in them? Of this, I'm not sure.**
Q Okay. Isn't it also in fact true that you're not aware of any cases where an expert has been qualified by a court to testify as to what documents comprise a plan for the purposes of disclosure under 29 U.S.C. Section



1024(b)(4) as requested by a participant or beneficiary?
**A I am not aware of any as I sit here now, which doesn't mean there aren't any. I'm just not aware of any.**
Q I appreciate the clarification.
Isn't it in fact true that none of the descriptions of the cases that you provide in your expert report speak to the operation of a plan in accordance with a written instrument that's required by 29 U.S.C. Section 1102(a)(1)?
**A 102(a)(1) [sic]? I think that's correct.**
Q Okay. And isn't it in fact true that none of the summaries of the cases you provide in your expert report cite 29 U.S.C. 1102(a)(1) directly?
**A I think that's likely correct.**
Q Okay. Or for Section 402(a)(1) of ERISA?
**A 402(a)(1) of ERISA? I think that's probably correct.**
Q Right. Which is the counterpart, of course, to the United States code.
And is it in fact true that none of the summaries of the cases you provide in your expert report mention the word "instrument" or the word phrase "written instrument"?
**A Likely.**
Q And isn't it in fact also true that you're not aware of any cases where an expert has been qualified by a court

to testify as to whether a plan has been or is being operated in accordance with documents it discloses under 29 U.S.C. 1102(a)(1)?
**A I just haven't done the survey, so I'm not aware of one way or the other.**
Q Isn't it in fact true that you've given three opinions in this case?
**A It's one expert report, and yes, I would say it's three opinions.**
Q And if we look at those three opinions, isn't it true that the only analytical support you have for these three opinions in your analysis section -- that is Section 7 from Paragraphs 42 to 62 --
**A Mm-hm.**
Q I think I malformed my question.
Isn't it true that your analysis is only enveloped in Paragraphs 42 to 62?
**A I think that you have to take the --**
MS. REDDY: Objection. Form.
**A -- expert witness document as a whole, look at it holistically. The analysis section would have the reasons for the opinions, but the opinions themselves are also mentioned, I believe, on "Summary of Opinions," which would be on Page 4, Paragraph No. 12. And the rationale for the analysis would be on Pages 4 through**



**15, so I do think you need to look at the entire point holistically.**
Q (By Mr. Balloun) I appreciate that.
Isn't it in fact true that you have no other opinions besides those three opinions about this case at this time?
**A That is true.**
Q Because if you did have any other opinions, you would have disclosed them in the expert report?
**A That would be true.**
Q But you didn't?
**A Yes.**
Q And isn't it in fact true that Appendix D lists all documents you considered for the purposes of this report?
**A I think that's fair.**
Q Even if they were not ultimately referred to in your expert opinion?
**A Yes, and that's typical.**
Q Sure.
Isn't it in fact true that you obtained all the facts from this case from those documents?
**A Yes.**
Q Did you speak with counsel for Netflix about the facts of this case?
**A Really, no. Very, very little. No. I mean very, very,**



**very, very minor.**
Q Very minor.
Isn't it in fact true that you did not rely on counsel for Netflix and their representations about any of those facts?
**A That would be fair.**
Q And you confirmed those facts yourself by reference to the documents you reviewed; isn't that correct?
**A I did.**
Q Your expert report lists all methodologies you used to formulate your three opinions, doesn't it?
**A Mm-hm. Yes.**
Q Do you understand that when I use the term "methodology," I am including any of your reasoning and expertise that you use to form your opinions?
**A Yes.**
Q Utilizing that summary definition of methodology, your expert report lists all methodologies you used to formulate your three opinions then, does it not?
**A I'm not sure that the expert report really lists methodologies that I've utilized, but the methodologies I've utilized are what I always utilize. I look at the record. I know the industry standards, the norms, what is normative, reasonable, and customary, and I form my opinion based on that.**



Q Thank you.
MR. BALLOUN: Move to strike the last answer.
Q (By Mr. Balloun) Let's go to your first opinion in Page 15.
**A Okay.**
Q Now this is Section A. It reads, "The seven Plan documents that Netflix provided to the Plaintiff sufficiently disclosed his rights, benefits, and obligations under the Plan."
**A You've read that correctly, yes.**
Q Thank you.
In Paragraphs 42, 43, and 44, you provide the analytical support for your first opinion; isn't that correct?
**A Yes.**
Q Isn't it in fact true that you provide no specific methodology for determining whether a set of documents provided to a beneficiary sufficiently or comprehensively discloses the beneficiary's rights, benefits, and obligations under an ERISA-governed benefits plan?
**A I guess that's where we differ. I think that my experience and knowing industry standards, this would provide sufficient information and documentation to fully apprise the plan participant or the plan beneficiary of**

**his rights and benefits and obligations under the plan.**
Q Okay. Well, let's read your report sentence by sentence then.
So in Paragraph 42 it states, "As explained above, on February 24th, 2021, Netflix provided the Plaintiff with seven documents that governed the high deductible health plan, vision plan and dental plan under which he was a beneficiary."
Is there a statement of methodology in that sentence?
**A You mean a methodology for that sentence? It's merely that I got that from the record. I'm not sure if that's methodological or not, but that is how I arrived at that sentence.**
Q Okay. And then in the next sentence is there a -- there's -- is there a specific methodology listed in the sentence ending in Footnote 54?
**A I don't -- again, these are just documents that I looked over and that were provided to me.**
Q Okay.
**A So the methodology would be quite simply reading what was provided and determining what they stated.**
Q But does the report actually state that you read the documents and what they stated?
**A Oh, I see what you're saying. Now I'm seeing where**



**you're going. No, it doesn't explicitly; however, I think that's implicit. And in fact, if you look at the first full sentence on Page 16, it says, "Based on my review, the seven documents furnished to the Plaintiff are the only documents that a participant or beneficiary of the Plan would need to interpret and understand where they stand with respect to benefits under the Plan."**
**So the introductory clause, based on my review, I think would stand for the proposition that I read the documentation.**
Q Okay. Then based on that sentence ending in Footnote 56 which you just read, isn't it in fact true that that sentence provides no methodology for your review?
**A I think that the review is merely reviewing -- reading the documentation and then marrying that up to my experience as to what that type of documentation customarily provides.**
Q So however, though, you do not explicitly state a methodology for stating "...are the only documents that a participant or beneficiary of the Plan would need to interpret and understand"?
MS. REDDY: Objection. Asked and answered.
**A I think that the concept of being an expert means that you have the ability -- or one has the ability to read --**



**or as I wrote here, review -- documentation and then put that into perspective of what's reasonable, what's normative, what is customary, and that is what I did.**
Q (By Mr. Balloun) But you don't state anywhere in the report that you evaluated what is reasonable, normative, and customary, do you?
**A You know, I think during the report I do state that. In fact -- huh. In fact, if you look at 44, the last sentence, I think I wrote, "In my opinion, these plan documents are superior to other plan documents that I have reviewed."**
**And I believe that throughout my report I will mention industry standards or what I -- or how I interpret what I've seen based on the industry standards that I have become familiar with over the years.**
Q But at the risk of beating a dead horse, you don't actually say whether you determined that the documents were normal, customary, or reasonable?
**A That the documents were? Well, if you look at Paragraph 63, I write, "In summary, it is my expert opinion, based on my experience advising welfare benefit plan fiduciaries, that the Defendant satisfied the prevailing and customary standard of care by disclosing information" -- et cetera, et cetera.**
**So I think I do state that. I further go on to**



**state, "It is also my opinion that Defendant's process of maintaining the written Plan document was consistent with prevailing industry standards." So I sort of do say that.**
Q Isn't it in fact true that you provide no test in your report for whether a disclosure of the plan terms and benefits as well as its claims and appeals procedure are extent?
MS. REDDY: Objection. Vague and ambiguous.
**A Are what? I'm sorry. Sorry. What -- are what?**
MS. REDDY: Objection. Vague.
Q (By Mr. Balloun) I'll reread. I'll reread.
Isn't it in fact true that there is no test included in your report for whether there has been a disclosure of the plan terms and benefits as well as its claims and appeals procedures?
MS. REDDY: Objection to the term "test."
**A A test?**
MS. REDDY: Vague and ambiguous.
**A I think that these documents were provided. So wouldn't the answer to the test be were the documents provided? I believe they were provided electronically, so that would be passing the provision of documents test.**

Q (By Mr. Balloun) Okay. Isn't it in fact true that there is no test included in your expert report for whether the information in a summary plan description or in evidence of coverage apprises beneficiaries of -- sorry. Let me rephrase.
Isn't it in fact true that there is no test included in your expert report for whether the information in a summary plan description or evidence of coverage apprises beneficiaries --
**A I see what you're saying.**
Q -- of is important?
I don't know why I wrote my question that way, but do you understand my question or shall I rephrase?
**A I do understand your question. I think that I can answer --**
(Cross-talk.)
(Reporter clarification.)
MS. REDDY: Objection. Vague and ambiguous, the term "test."
**A Yes. I believe that I have footnoted the requirements of what an SPD needs. I think I've also stated in more general terms in the -- in the document itself what terms an SPD needs in order to apprise a plan participant or beneficiary of his or her rights, obligations, et cetera.**
**And I've read the SPDs, and I have come to the**



**professional expert opinion that in fact they do apprise the participant of his benefits, his rights, the features of the plan's responsibilities, et cetera.**
Q (By Mr. Balloun) Isn't it in fact true that your expert report provides no test for the sufficiency or comprehensiveness of disclosure about applicable claims and appeals procedures available to a beneficiary?
**A Again, the issue is with the word "test." This is a -- very much a facts and circumstances type of issue. The claims procedures are set forth very much in regulations promulgated by the Department of Labor. From what I've seen, these very much comply with those particular regulations and, more importantly, with the standards that I've become accustomed to in the industry. So from my perspective, the procedures are quite clear and laid out, again within -- well within the parameters of what I'm used to seeing.**
Q Let's go to --
THE REPORTER: I think Ms. Reddy might be frozen. I just wanted to double-check.
MR. BALLOUN: Oh, yeah, she is.
THE REPORTER: Okay. Are you back with us, Ms. Reddy? It looked like you were frozen for a second.
MS. REDDY: Yeah. Can you all hear me



now?
THE REPORTER: Okay. Yes.
MR. BALLOUN: Yes.
MS. REDDY: Thank you.
MR. BALLOUN: As a matter of courtesy, Ms. Reddy, did you want to object to my use of the word "test" in that last question as well?
MS. REDDY: Yes. I'll repeat the same objection. Thank you.
MR. BALLOUN: Sure.
Q (By Mr. Balloun) Okay. Let's go to your second opinion, Ms. Wagner, noted as Heading B on Page 16. "The Plan's confidential Administrative Service Agreements do not contain any further information that would inform a participant or beneficiary of their benefits."
**A Yes.**
Q And again, just like in the previous opinion, Paragraphs 45 to 52 provide the analytical support for your second opinion; isn't that right?
**A Yes, I believe so.**
Q And isn't it in fact true that you provide no specific methodology for determining whether an Administrative Service Agreement in general would contain any further information that would -- that would inform a participant or beneficiary of his benefits?



**A Well, no, not necessarily. In fact, if you look through Paragraph 46, I think I go into some level of detail. So for the VSP, the Vision and Service Plan, I think that the ASA, the Administrative Service Agreement, has under the EOC, the Evidence of Coverage, almost exact replica of what the benefits are to the plan participant with two very minor and inapplicable differences.**
**I think with respect to Delta Dental, the benefits booklet, which is part of the ASA -- I think the second part of the ASA is exactly what is provided to plan participants and beneficiaries, and with respect to Collective Health, the ASA has nothing that it -- really at all with respect to benefits, except maybe a checklist as to what is provided, but that is clearly provided in much greater detail in the SPD. So my methodology for making that statement would have been to look at what was provided to the plan participant versus what the ASAs provide.**
Q Thank you for re-positing what you wrote in 46. I realize where our disconnect is now.
So I appreciate that you've talked about the facts and have applied something of a reasoning to those facts in order to reach a conclusion, but in terms of just the strict methodologies that you used, is it in fact true that there is no specific methodology that you have

outlined for determining whether an Administrative Service Agreement in general would contain any further information that would inform a participant or beneficiary about his benefits?
MS. REDDY: Objection. Asked and answered.
MR. BALLOUN: Yeah. Ms. Reddy, I appreciate the objection, but I don't think she actually answered my question the first time.
**A I think that you and I are having a problem on the definition of methodology. I know I agreed with your definition initially, but would you mind restating it?**
Q (By Mr. Balloun) Right. So methodology includes -- and this is circular -- methodology that you would use in order to evaluate a set of facts and circumstances. It also includes your expertise and your reasoning.
**A I see. So I guess that -- where I state in Paragraph 46, "Based on my review of the Plan's claims administration agreements, it is my observation they do not provide any additional information," et cetera, et cetera, I think the methodology is quite simply reviewing.**
Q All right. Well, let's go to your third opinion --
**A Okay.**
Q -- which reads in Section -- or heading C, "The Plan was operated in accordance with the written" -- "its written



documents. In particular, based on prevailing industry standards, Netflix's changes to the Plan's summary plan description: (i) would not be considered Plan amendments; and (ii) reflect normal plan operations."
**A Yes.**
Q Your analytical support for this opinion lies in Paragraphs 53 to 62; is that not correct?
**A Yes.**
Q And we'll go round again. Isn't it in fact true that you do not explain why the plan is being operated in accordance with a written instrument?
**A I believe I explained that in detail. This is a -- I'm just rereading this, please.**
Q Sure.
**A Actually, I think I go into detail as to the fact that this is -- these are written documents governing the plan and why the minor issues that the plaintiff has raised does not undercut the fact that this is a valid plan document.**
Q Well, let's read the last sentence of Paragraph 53.
**A All right.**
Q It says, "For the following reasons, the Plaintiff has no bases to claim that the Plan was not maintained pursuant to a written plan document."
**A Yes.**



Q So is it in fact true that you are opining here that plaintiff has -- that when you are opining here that plaintiff has no bases to claim that the plan was not maintained pursuant to a written plan document that you are not opining that the plan is actually being operated according to a written instrument?
**A I think I am opining that the plan is being operated in accordance with a written instrument. I see the distinction you're trying to draw, but I'm not sure that's a distinction that makes much of a difference.**
MR. BALLOUN: Move to strike the last answer.
Q (By Mr. Balloun) Isn't it in fact true though that you don't state that the -- that you do not opine that the plan is actually being maintained according to a written instrument?
**A I don't think so. I believe the plan is very much -- yes. If you look at my last -- look at Page -- look at Paragraph 63, last sentence. To quote me, "It is also my opinion that the Defendant's process for maintaining the written Plan document was consistent with prevailing industry standards."**
**That's about as clear as one can get that it's a written plan document being maintained pursuant to industry standards. So I think I do opine on that**



**clearly.**
Q But you don't actually state anywhere in this report that the plan is being operated according to a written instrument.
**A I guess I have to beg to differ. In fact, 54, the Plaintiff himself acknowledged that he received a copy of the plan's Wrap document. Now, unless that's written in the air -- it's clearly -- it's clearly reduced to writing.**
**Paragraph 55, the erroneous scrivener's errors do not in my opinion, or really in anyone else's opinion that I've ever really run across, obviate the fact that a plan is maintained and operated in accordance with its terms.**
**Paragraph 56, you can't say something isn't provided in writing if it doesn't exist, such as nonexistent insurance policies, et cetera, et cetera. And we can go through it if you'd like, but no, I think I'm under the firm opinion that this is a written plan document which is maintained appropriately as a written plan document in administrative accordance with its terms.**
MR. BALLOUN: With respect, I'm going to move to strike the part of the answer that talks about the opinions of others.
Q (By Mr. Balloun) So again --

A **May I -- may I rephrase the opinions of others then and substitute, therefore, with respect to the industry standards with which I am familiar, I am unaware of anyone -- I'm unaware of the industry believing that scrivener's errors that are corrected somehow obviate the fact that a plan document was written and administered in accordance with its terms.**
Q So I think what's happening here, Ms. Wagner, is that we're begging the question; right? So there is a written plan -- a written Wrap plan, a Wrap document, which may or may not be evidence of the full plan. It may be, but it may not be. And to the extent that it may not be, there's no definite statement in your report that the Wrap plan is unto itself the full plan and that it is being operated -- that the Netflix plan is being operated in accordance with a written instrument.
A **I think we --**
MS. REDDY: Objection. Vague and compound.
A **I think we might be splitting hairs. I do believe the seven documents that were provided comprise the plan document. And by the way, in the welfare benefit industry, it's quite typical that documents be wrapped together, hence Wrap plan, for a functioning written document to administer welfare benefit arrangements.**



Q (By Mr. Balloun) Can you point to a place in your report where you provide a specific methodology for determining whether a document is a written instrument under which an ERISA-governed benefits plan is maintained in general?
A **Can I point to where I state that an -- sure. Hold on a second.**
**I really think all of Paragraph C, 21 to 25, is about the fact that this is a written plan document.**
**Maybe you can help me. What -- are you looking for citation on what is a written plan document? I'm really not sure. And I do want to be helpful. I'm just really not sure what you're looking for.**
**From my experience dealing with welfare benefit plans for 35 -- actually more at this point -- years, this is a written plan document for sure, without doubt --**
Q I suppose --
A **-- in my opinion.**
Q Thank you. Thank you.
I suppose what I'm getting at is, other than the conclusory statement that it is for sure a written document in your opinion, what methodology did you use to test or to come up with --
A **Oh, I see. I see. I see. So --**
MS. REDDY: The same objection as



previously, the term "test."
A **ERISA Section 104(b)(4) --**
(Reporter clarification.)
MS. REDDY: The same objection as previously, the term "test." Objection. Vague.
A **ERISA Section 104(b)(4), which I do reference throughout the document, clearly provides that what must be -- what must be provided to plan participants are the current operating versions of the plan document. So I guess I get to the fact that the Wrap document is that through my interpretation through industry standards of this essential foundational requirement of ERISA.**
Q (By Mr. Balloun) Is there anyplace in this report where you state that methodology in general?
A **You mean where I marry 104(b)(4) requirements of providing documentation to the plan participant with the fact that the documentation itself is valid written documentation? I think the whole report is premised on that.**
Q Let's go to Page 16 of your report.
A **Okay.**
MR. BALLOUN: Electronic Page 20, Ms. Reddy.
Q (By Mr. Balloun) At the top of the page, you say -- after Footnote 55 -- "Based on my review, the seven



documents that Netflix furnished to the Plaintiff are the only documents that a participant or beneficiary of the Plan would need to interpret and understand where they stand with respect to benefits under the plan."
Is that correct?
A **Yes.**
Q Isn't it in fact true that this report does not state which plan documents you believe are not necessary for a beneficiary to interpret and understand where he stands with respect to benefits under the Netflix plan?
MS. REDDY: Objection. Vague.
A **Well, why would that be at all relevant? I stated what is necessary. Anything beyond that would by definition not be necessary.**
Q (By Mr. Balloun) Isn't it in fact true that in this report in Paragraphs 42 through 44 you do not express any opinion about whether the seven documents named fiduciaries who jointly or severally have authority to control and manage the operation and administration of the plan?
A **I think we'd have to go to the documents themselves, but they were defined who the named fiduciary would be, which would -- so I think the documents themselves would provide that information.**
Q But isn't it in fact true that the report itself does not

express any opinion about whether those seven documents name fiduciaries as -- or, yeah, name fiduciaries?
A **Well, no. I mean, the Wrap plan is going to name Netflix as the named fiduciary. Again, we can go to the document, but every document under -- any plan document under ERISA has got to state who the named fiduciary is, absolutely, and some of those documents would and do.**
Q And assuming arguendo that what you're saying is true in general, isn't it in fact true that your report itself does not state -- does not express any opinion about whether the seven documents name fiduciaries who jointly or separately have authority to control and manage the operation/administration of the plan?
A **I think on Paragraph 14 I state that ERISA requires that the documents must name fiduciaries that have authority to control and manage the operation and administration of the plan. So I do state that as a requirement.**
**If you're asking me do I state who those entities are in the report, I believe it's fairly implicit that the plan sponsor is in fact the named fiduciary under the Wrap plan, and we can again check those documents to determine -- to determine if there are any other named fiduciaries, but to my knowledge and belief, the named fiduciary would be and is Netflix, Inc.**
Q And that may be true, but your report doesn't state that.



A **That could be true. That could be true, but from my experience, the plan sponsor is always the named fiduciary except in the few circumstances where it will appoint a so-called 3(16) administrator to take that role, and that is fairly atypical in the industry, at least currently.**
Q Sure. And I appreciate that.
I think what I'm getting at, Ms. Wagner, is that we have -- if we're looking at this in an IRAC format, we have the issue -- we have the rule that you stated -- you know, summarized in Paragraph 14, and we have a conclusion somewhere, but we're lacking the application of fact or law or the analysis that actually states outright that the -- well -- an analysis, i.e., your opinion about whether the seven documents actually named fiduciaries or not. It just -- as far as I can see, your report doesn't do that.
MS. REDDY: Objection. Counsel is testifying. Compound.
A **I think that all ERISA documents to be valid need to name a named fiduciary. And I'm telling you I reviewed the Wrap plan, and it clearly states that Netflix is the Capital P plan, Capital A administrator, and named fiduciary. So I know I've seen that, and I think again that's so foundational that, frankly, I didn't think it**



**was important to put that in the expert report. I do know that to be true.**
**It's almost like I don't have to tell you the sky is blue for you to believe that it's blue, for us to have a case about an airplane flying in the sky.**
Q (By Mr. Balloun) Except that an airplane can fly through the sky when the sky isn't blue; right? I mean, it can fly when it's cloudy.
A **I was actually just thinking it's probably not the world's best metaphor.**
MS. REDDY: Objection.
Q (By Mr. Balloun) I won't hold you to the metaphor.
Isn't it true that in this report in Paragraphs 42 through 44 you do not express any opinion about whether the seven documents provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of ERISA?
A **Yeah. This is a self-funded plan, so the funding policy in general says it's self-funded. When you think of funding policies in ERISA, you almost always think of them in terms of defined benefit pension plans or defined contribution plans. The funding policy here is self-funding.**
Q So that may be true, but isn't it in fact true that your



report doesn't state that?
A **Well, again, I think my report states on Paragraph 14 what is required, and I think a funding policy -- let's see. Yeah. If you look at Page 7, it says, "Under ERISA, the SPD must address the following topics" -- and I think on -- on the sixth bullet point it has "contributions and funding." So the contributions to this plan, like any other welfare benefit plan, will be from the employer and with presumptively pretax dollars pursuant to a 125 plan from the employee.**
Q Which part were you referencing?
A **I am on Page 7 of the written document, and it's fifth -- I can't count -- one, two, three --**
Q In the bullets list?
A **The fifth bullet point down.**
Q Got it. Yeah. No, I heard Paragraph 7, so then I was confused.
A **Oh, yeah. Did I say Paragraph 7?**
Q No. No.
A **Yeah, I'm sorry.**
Q You might have said page, but I don't --
A **Yeah, Page 7.**
Q It doesn't matter.
Okay. Isn't it in fact true that in this report you do not express any opinion about whether these seven

documents describe any and all procedures for the allocation of responsibilities for the operation and administration of the plan?

A **No. I think that the plan documents are really clear that Delta Dental administers dental issues, that VSP will do claims administration for vision, that Collective Health is the claims administrator for the high deductible health plan or the HSA -- I've seen it referred in both of those ways -- and that Anthem provides claims utilization information and costing of claims and provides its network.**

**So, no, I think the plan documents are pretty clear as to whom is responsible for what.**

Q And again, that may be true, but in Paragraphs 42 through 44 isn't it true that you do not actually explicitly state or make an opinion about that?

A **In other words, that I don't state that Delta Dental -- that Delta Dental does claims procedures for the dental plan?**

Q Or that the documents in general allocate responsibilities between claims administrators or other parties.

MS. REDDY: Objection. Outside the scope of the opinion.

A **Well, I do refer in Paragraph 46 to the fact that VSP is**



**the claims administrator, that Delta Dental is the claims administrator, and that Anthem and Collective Health claims administration provide no information about benefits and coverages. So I do mention that in 46.**

Q (By Mr. Balloun) Sure. But not in 42 through 44, your analytical framework for your first opinion.

A **Oh, I see. In 43 -- that the seven documents provide the plaintiff sufficient information regarding his benefits. I think that it states that the EOCs and the SBCs were provided, and by definition SPDs, EOCs, SBCs provide the information about benefits and responsibilities, including claims to which you refer.**

**I mean definitionally those documents exist for the very purpose that we're discussing here. In other words, the documents would not exist -- exist for the sole purpose of providing the information that you are discussing. These documents would not be EOCs or SBCs or SPDs if they didn't provide the information that you're saying that I didn't state. The reason not to state it is because definitionally these contracts, these documents, these pieces of paper contain that information or they would not have the title of SBC, EOC, or SPD.**

Q And at the risk of annoying you further -- and I apologize about that.

A **I'm not annoyed. I'm not annoyed. I'm just trying to, I**



**think, educate.**

Q I appreciate that. You have a lot to offer.

Does your report -- isn't it in fact true that your report does not explicitly make clear these definitional boundaries of what SPDs, EOCs, and SBCs are?

A **I think that I footnote the regulations that define what they are, and so therefore, all of that is provided in the report in footnotes. And what an SPD provides I think I went into a little bit more detail. And again, I bring you to Page 7, where I go at least a little bit into detail, but these requirements are all footnoted.**

**And just for brevity -- and even with -- and even with using footnotes -- in fact, I think I have 81 footnotes -- 82 footnotes. Even with using footnotes for brevity, I'm still at 25 pages for this expert report. So to make the report readable in general for things that are considered common knowledge, I will generally, in any expert report that I do, I will footnote the requirements.**

Q Okay. Another question. Isn't it in fact true that you do not express any opinion about whether the seven documents specify the basis on which payments are made to and from the plan?

A **The basis to which payments are made to and from the plan? I believe that I wrote that it's a self-insured**



**plan, which clearly states that benefits are paid pursuant to self-insurance, so I did state that. And I will find it for you. One minute.**

**Yes. I think I state that the question -- the benefits in question are self-funded. So I definitely state that on Paragraph 56.**

Q Isn't it in fact true that you do not express any opinion expressly in the report about whether any other document does any of these -- accomplishes any of these five topics that we just discussed: naming fiduciaries, having a funding policy, allocating responsibilities for operation and administration of a plan, providing an amendment procedure, and specifying bases for making payments to and from the plan?

A **Would you mind repeating that question?**

MR. BALLOUN: Madam Court Reporter, could you reread my question?

(Question on Page 45, Lines 7 through 14, read by the reporter.)

A **No, I don't agree with that at all. In fact, if I state that these seven documents comprise a valid ERISA plan, which I do, then clearly that which is necessary to be part and parcel of an ERISA plan would be something that I would have looked at and satisfied that the seven**

**documents in combination do so.**
Q (By Mr. Balloun) So isn't it in fact true that you do not make express in your opinion but are rather implying through your opinion that no other document accomplishes any of these five categories?
MS. REDDY: Objection. Form of the question.
A **I think that what I'm saying -- and I have stated -- that these documents, these seven documents in total, create a valid ERISA plan and a valid written plan for ERISA purposes. I have no opinion regarding any other documents because these seven documents together create a valid ERISA plan dealing with all of the requirements an ERISA plan must deal with.**
Q (By Mr. Balloun) And those requirements are the five topics that we just discussed; isn't that right?
A **Again, they are as I think I listed, but yes, that sounds right to me.**
Q I can name them for you.
A **Please.**
Q Naming fiduciaries?
A **Yes.**
Q Having a funding policy?
A **Yes.**
Q Allocating responsibilities for operation and



administration of a plan?
A **Yes.**
Q Providing an amendment procedure?
A **Yes.**
Q And specifying bases for making payments to and from the plan?
A **Yes.**
Q Let's look at Paragraph 14 again, which you've referenced several times. You state, "ERISA generally requires an employee benefit plan document to contain the following provisions" -- and then you name the following four items --
A **Yes.**
Q -- naming fiduciaries, allocating responsibilities for operation and administration of the plan, providing an amendment procedure, and specifying bases for making payments to and from the plan.
Isn't that true?
A **Yes.**
Q Thus, you are aware, given your many years of experience and expertise, of what 29 U.S.C. Section 1102(a) and (b) require in an ERISA plan?
A **I do, yes.**
Q Of course your list in Paragraph 14 is missing the funding policy requirement, isn't it?



A **Yes. I think it's missing the funding policy requirement because it was a self-funded plan. It's not as relevant, unless this were a VEBA, a Voluntary Employees Beneficiary Association, within the meaning of 501(c)(9) of the code. And given that this particular welfare benefit plan is funded by a VEBA, self-funding is really not much of an issue in this particular welfare benefit arrangement.**
Q Is any of what you just stated in this report?
A **Well, I didn't put it in there because it's really not relevant to the facts of this case.**
Q Okay. I have a hypothetical for you.
A **Sure.**
Q Let's say the seven documents that we've been discussing do not collectively contain each of these five requisite features of an ERISA plan, so just hypothetically, and let's say an eighth document is found that supplies terms describing one or more of these requisite features of an ERISA plan.
Isn't it in fact true that in this hypothetical the eighth document would be considered a plan document?
A **I would need to know --**
MS. REDDY: Objection. Incomplete hypothetical. Lacks foundation.
A **Okay. I would need to know exactly what type of**



**information isn't provided, and it's a hypothetical that I really can't answer.**
Q (By Mr. Balloun) In the abstract you can't answer the hypothetical if I say -- if I say the seven documents simply don't include all five of those categories, and an eighth one happens to include some of the missing categories of information, wouldn't that eighth document be a plan document?
A **Well, it really depends on what it is. So if one of -- I will answer your question. So if the seven documents don't state something very basic, like who is the named fiduciary, that -- and there's an eighth document that says Netflix is the named fiduciary, I do think that eighth document is fairly important, yes.**
Q And by "fairly important," do you mean a plan document?
A **Yes. I would say that ERISA requires that a named fiduciary be provided in the plan document. So if you're saying hypothetically that the seven documents do not -- although they do -- but do not hypothetically name who a fiduciary is, and if document No. 8 is entitled "The named fiduciary is Netflix," then I think that that would -- that would in the aggregate be necessary in order to have an ERISA plan.**
Q You state in your report that, quote, "The basic purpose of the disclosure required under ERISA 104(b) is to allow

both participants and beneficiaries to review the method by which their plan was administered" -- do you recall that?
A Would you like to show me the sentence?
Q Yes. It is on Page 16, midway through the first incomplete paragraph, after Footnote 56.
A Yes. Yes, I do recall writing that, and I do agree with that sentence, yes.
Q Isn't it in fact true that your expert report does not explain how any of the seven documents Netflix provided to my client on February 24th, 2021, address the method by which the plan was administered?
A No. I think the documents are pretty clear what the benefits are, what their responsibilities are, what the claims procedure is, who was the plan administrator, who were the claims administrators. I think the documents were pretty clear. They were very -- I think they were pretty well written in fact as well. Not only were they clear; they were written, I think, in a manner reasonably calculated to be understood by the average plan participant.
Q But isn't it in fact true that your report doesn't state that?
A I think it does. In other words, state that the seven documents together comport with the requirements of



104(b)?
Q No. Explain how any of the seven documents provided address the method by which the plan was administered.
A I think that's exactly what the seven plan documents do. I mean, that's what they do. That's why they exist.
Q Sure. But your report doesn't explain how they do that, does it?
A Okay. So what you're saying is --
MS. REDDY: Objection to form.
A So what you're saying is does the EOC not provide information regarding claims procedures? I would say the EOC does. If what you're saying does the HSA or HDHP document from Collective Health not provide -- not explain what benefits are, I think it does. I think that these documents viewed as a whole really put the plan participant on notice as to -- clearly as to what his benefits are and how he accesses them.
So I think that the report is really foundationally and fundamentally about do these seven documents provide sufficient information under ERISA, and I've stated many times, having reviewed them, they sure seem that way to me.
Q (By Mr. Balloun) I appreciate that that might be your opinion outside of the report, but as to the report itself, can you point to me language showing how the



seven documents that Netflix provided to my client addressed the method by which the plan was administered?
A I think --
MS. REDDY: Objection. Form of the question. Objection. Outside the scope of this report.
A I think the --
MR. BALLOUN: Ms. Reddy, I'm literally looking for whatever is inside the scope of this report.
A I think the report is really clear that the claims procedures are in the EOC, the SBC, the SPD. I think the report -- that which is necessary to be in an ERISA plan is listed on Page 14.
If I conclude that I've reviewed the documentation and, therefore, think there's a valid written document, then clearly what I consider to be necessary to be in an ERISA plan is contained therein.
Q (By Mr. Balloun) Is it in fact true, Ms. Wagner, that your expert report does not explain how any of the seven documents Netflix provided to my client arm him with the knowledge necessary to ensure compliance -- to ensure Netflix's compliance with ERISA?
A No. I think if he were to read those documents, as I stated time and time again, he would get everything he would need to understand --
Q Yes. I -- sorry to interrupt. You have stated that



emphatically, but where in your expert report does it explain how those documents do so?
A By him picking them up and reading them. Their very existence, if he were going to read them, would do that.
Q You state in Paragraph 43 of your report, "Specifically, these seven documents set forth the Plaintiff's plan benefits and coverages, including what conditions, procedures and treatments are covered, any co-payments, and appeal rights from adverse benefits determinations"; isn't that true?
A Yes. As I have stated repeatedly, I think if he were to read the documents he would receive whatever information that he would need.
Q Isn't it in fact true that your report does not discuss what you used to determine that these seven documents set forth plaintiff's plan benefits and coverages?
A Okay. And that's why I'm an expert. I've read -- oh, my God -- countless Wrap documents, countless EOCs, countless SBCs. I couldn't even venture a guess how many in my career I've seen or read. And I have come to the clear and resolute opinion that what is necessary to inform plaintiff of his rights is contained within the seven documents that comprise a fulsome welfare benefit plan within the meaning of ERISA.
Q Ms. Wagner, I believe you that you've read countless of

these documents. I couldn't possibly question that. However, does your report actually state that you are basing your opinion on the countless reports or countless documents of this kind that you've read?
**A Well, yeah. I think in the very beginning of my report we talk about my experience; right? So I go all through this. My services -- if you look at Paragraph 6, it says exactly what the services I rendered to welfare benefit plan fiduciaries have included. So I am clearly an expert in this country as to what's a welfare benefit plan. So Paragraph 6 is pretty clear, I think.**
**I also wrote for Tax Management Compensation Planning Journal the duty to welfare plan participants, "Disclosure to welfare plan participants: A Fiduciary Duty." So I think if you take into consideration Paragraph 6 and 7 together, never mind the other paragraphs, but my experience, I think they clearly set forth that I know what a welfare benefit plan needs to provide.**
Q Did your -- is there anyplace in your report where you state explicitly that you brought that knowledge and expertise to bear in the analysis of whether the seven documents set forth plaintiff's plan benefits and coverages?
MS. REDDY: Objection. Argumentative.



**A Well, you know, if I say I'm an expert, and if I say, "Hey, listen, this is the basis of my expertise," it kind of goes together. So I'm not sure I actually ever say, "In rendering my second opinion I'm relying on the fact that I've been doing this for 35 years," but I do think that that's what's in 6 and 7. So I'm not sure if I made that connection explicitly, but there's no other basis on which I can render an opinion as an expert other than the fact of what's in Paragraph 6 and 7.**
Q (By Mr. Balloun) Okay. Let's move on.
You state in Paragraph 45, "Based on my experience plan sponsors typically do not disclose the plan's ASAs, including ASAs between Plan sponsors and claims administrators."
**A Yes.**
Q When -- or by "ASA," you mean Administrative Services Agreement, do you not?
**A I do. I do. I think I define that above. If you look at the carryover sentence from Page 16 to 17, ASA is defined.**
Q Thank you. Yeah, I just wanted to put it in the deposition record.
And in Paragraph 47, you also state that "It has been my experience that plan" -- sorry -- "plan administrators rarely disclose a plan's ASA" -- or "ASAs



to participants or beneficiaries"; is that correct?
**A You're in Paragraph 47?**
Q Yes.
**A Yes. Because the proprietary information contained in ASAs, these contracts include nondisclosure provisions. Yes, that's true. And they do, as they did in this case, as they do in this case.**
Q Isn't it in fact true that the Wagner Law Group is familiar with instances where plan administrators have been found liable for failure to provide ASAs to beneficiaries who have made a Section 104(b)(4) request?
**A No. I think it's 503 issues come up when there is an appeal of an averse benefit determination. That's when sometimes these internal portions of claims procedures can be provided, but I am unaware of any case law or even commentary that this type of information needs to -- I'm trying to think. Sitting here today, I can't really recall if there is any case law in that respect. I know under 503 of ERISA there is, but I am unaware sitting here right now of any under 104(b)(4).**
Q Is it in fact true that your firm published a news article just a few months ago entitled "Court Decision Highlights Importance of Complying with ERISA's 'Other Instruments Rule' for Document Disclosures"?
**A If you want to pull it up, I'm happy to see it.**



Q Sure. Let's do that.
MR. BALLOUN: Here's Exhibit 82.
(Exhibit No. 82 marked for identification.)
Q (By Mr. Balloun) And I will -- I suppose that means I need to load up the website.
Okay. Do you see this web page in the shared screen?
**A Yes. I'm going to read this.**
Q Okay. I can scroll down whenever you're ready.
**A Okay. I'll let you know.**
MS. REDDY: Ms. Wagner has been testifying now for almost 90 minutes with no break.
**A You can scroll down if you want.**
**THE WITNESS: I just want to finish reading this. Sorry.**
MS. REDDY: Yeah.
**A Oh, wait a second. Can you scroll -- scroll up a little bit. There you go. Perfect.**
Q (By Mr. Balloun) Sure.
**A Under "Facts," that's perfect.**
Q Yeah, that's what I was getting at.
**A Great. Thank you.**
MS. REDDY: We could also take a break so Ms. Wagner could read it on break as well.

MR. BALLOUN: We could do that. Why don't we do that, everyone?
A **All right. I just -- but then I have to scroll down. Just let me --**
Q (By Mr. Balloun) Okay. Sure. Okay. Scroll down?
A **Wait. Wait. Stop. Can you go up one paragraph? I apologize.**
Q Sure. I think that's enough. I think it's showing.
MS. REDDY: O. Shane, you could put the website in the chat as well.
MR. BALLOUN: I could. Actually, I'd like to finish my questioning about this, and then we can go off the record.
I'm trying to figure out how to do a chat with this. There we go.
A **Can you -- can you go -- there you go.**
**Yeah, this is entirely different. We're dealing with the Mental Health Parity and Addiction Equity Act, and the issue here was whether certain -- how a claim can appropriately be made for certain mental health issues, and particularly that the SPD or the SBC or the EOC didn't provide that type of information sufficiently. Our contingent in this case, which is eminently distinguishable, is that all information that would have been necessary to the participant, to the plaintiff, was**



**in fact provided. So this is a distinguishable case.**
Q (By Mr. Balloun) Are you sure about that, Ms. Wagner?
A **I'm pretty sure, yeah.**
Q So let's -- I'm going to highlight a paragraph. It starts with the phrase "With respect to the second claim" -- can you see that?
A **Yes. But that's in light of the facts, and the facts are regarding the mental health claims that were going to be made and the insufficiency of the disclosure of the SPD alone.**
Q Hm.
A **So let me be clear, Mr. Balloun, that if the seven documents did not provide sufficient information to the plaintiff in this case, then I would agree additional documentation would be necessary, as in this case in Utah. However, in the particular case that we are discussing, I firmly believe that whatever information this particular plan participant would have needed to make any claim -- and he has not, to the best of my knowledge and belief received any denial of benefits -- is perfectly unnecessary. He has sufficient information; hence, the case being distinguishable.**
Q Well, let's read the second -- not the second -- let's read the paragraph about the second claim.
A **Sure.**



Q Could you read that, please?
A **You mean "With respect to the second claim"?**
Q Yes.
A **"With respect to the second claim, the court found that 'based on the plain language of ERISA and the plan itself, the facts of the case'" -- I'm saying that for emphasis -- "'demonstrate that the ASA falls within the scope of the ERISA disclosure provision.'"**
**There you go.**
Q "In particular..."
A **Oh, I'm sorry. "In particular" -- I didn't know you wanted to me to continue reading. "In particular, the court observed the ASA was required to be disclosed to the participant because it evidenced the divided administration of the plan between the plan administrator and the TPA, and that organizational structure affected the participant's rights under the plan."**
Q All right. And then if we skip a paragraph and we go down, can you read the highlighted text?
A **"Ultimately, the court concluded that the Defendants failed to satisfy their disclosure obligations and in so doing interfered with the participant's ability to understand and protect his rights under ERISA."**
Q So I will ask again, isn't it in fact true that the Wagner Law Group is familiar with instances where plan



administrators have been found liable for failure to provide ASAs to beneficiaries who have made a Section 104(b)(4) request?
A **Okay. I thought your question was am I aware of, and I don't write all of the newsletters, so I just became aware of this. Clearly some very smart lawyer -- and I have many -- at the Wagner Law Group is aware of this almost one-off case, which I think is distinguishable on its facts, though kudos to you for discovering this in our website.**
Q Thank you. I appreciate that.
MR. BALLOUN: Why don't we take a -- take a ten-minute break. Would that be enough?
**THE WITNESS: That's perfect.**
MR. BALLOUN: Okay. Thank you, everyone.
**THE WITNESS: Thank you.**
(Recess 10:55 - 11:10 a.m.)
EXAMINATION (Continuing)
BY MR. BALLOUN:
Q So we just talked about the news article on your firm's website. Is it fair to say that you had not seen that opinion out of the district of Utah before?
A **I do want to say that I don't recall having seen it; however, that is a different appellate division than that**

**which is in California. The ninth circuit takes a fairly narrow view of 104(b)(4), so that -- and the case is entirely distinguishable. That particular case did not provide in the SPD the information that would have been necessary to make a claim for mental health benefits. So really, really it's distinguishable.**

MR. BALLOUN: Motion to strike for nonresponsive.

Q (By Mr. Balloun) Isn't it true that you hadn't read the opinion, Ms. Wagner, prior to today?

**A The opinion in Utah?**

Q Yes, in the district of Utah case referenced on your website.

**A No, I don't know if that's fair. I don't. I may well have read it. In fact, I probably did. I can't tell you how much information I read just to keep up in a day, and -- you know, I had probably read it. I just didn't -- I just probably didn't put it together with this case because it's so distinguishable.**

Q For the purposes of the record, I'm referring to MS versus Premera Blue Cross, Microsoft Corporation, and Microsoft Corporation Welfare Plan. It's a case out of the District of Utah, Case No. 2:19-cv-00199-RJS-CMR.

Let's go back to your expert report and Paragraph 46, Footnote 57 on Page 17.



**A I'm sorry. Paragraph 46 --**

Q And Footnote 57 on Page 14 -- Page 17.

**A Okay.**

Q So in the footnote your report mentions the Group Vision Care Administrative Service Agreement and later mentions a VSP SPD. I'm simply going to state for the record that the documents you reference are actually the vision care -- sorry -- the Vision Service Plan group vision care plan and that VSP uses an evidence of coverage, not a summary plan description. You reference a VSP evidence of coverage elsewhere, but I wanted to note that those two items are inaccurate only for the record, not -- that's not a snipe or a criticism.

Isn't it in fact true that your report states that there are two claims provisions in the group vision care plan that are not included in the corresponding evidence of coverage?

**A I'd like to read that, and I think I mentioned that before.**

Q You did.

**A It is the time of action provision and nonmember provider claims. That is exactly what Footnote 57 provides.**

Q And do you contend that these two claims provisions are not relevant to this case?

**A I'm not aware of the plaintiff making any claims under**



**the vision plan that got denied or anything, so no, I don't think so.**

Q Isn't it in fact true that your report does not provide any support to this contention regarding the relevance of these two claims provisions to this case?

**A I read the plaintiff's deposition wherein he stated that he wears, I believe, contact lenses, or his wife wears contact lenses, but I don't believe that the VSP issue has come up, and that I believe he stated that he was going to get -- or had prescription sunglasses.**

**I do -- having read the deposition of the plaintiff, I didn't see anything where this was referenced as being problematic to him.**

Q Regardless though, isn't it in fact true that you don't actually provide any support to the contention regarding relevance; you just state it here in the footnote?

**A I think it would be in Appendix D and in the plaintiff's deposition itself, his own words.**

Q Isn't it in fact true that nonmember provider benefits are available under the Netflix plan?

**A Are nonmember benefits -- yes. Yes, indeed that is true.**

Q Isn't it also in fact true that Section 5.04 of the group vision care plan applies to the submission of nonmember provider claims?

**A I believe it is, but again, I don't believe it's relevant**



**to this individual right now. It just isn't. He stated so himself. You can use his own words.**

Q And isn't it in fact true that the terms contained in Section 5.04 of the group vision care plan are relevant to the benefits available to the plaintiff under the plan?

**A Not if the plaintiff himself says, as he did, that they're not relevant.**

Q Can you point to me where he said in his deposition that they were not relevant?

**A I think he stated -- well, those exact terms, I'm not sure, but he stated that he hasn't tried to get benefits under the VSP, hasn't had -- hasn't made a claim, hasn't had a claim denied. That, to me, is lack of relevance.**

Q And if we talk about Delta Dental, let's look at again Paragraph 46 and then Footnote 58.

**A Okay.**

Q Isn't it in fact true that your report mentions that the Delta Dental claims administration agreement actually attaches a copy of the Delta Dental SPD to provide a description of the benefits and coverages of participants and beneficiaries under the plan?

**A That is what is written.**

Q And isn't it in fact true that Netflix has amended its agreement with Delta Dental to administer benefits

Page 66

according to a second Delta Dental SPD?
**A I'm not sure.**
Q Isn't it in fact true this second Delta Dental SPD is not included in Appendix D of your report?
**A I'm not sure.**
Q And isn't it in fact true that you did not review a second Delta Dental SPD in preparation for your report?
**A I don't believe I reviewed a second Delta Dental SPD.**
Q So isn't it also in fact true that you have expressed no opinion as to whether Netflix should have produced a second Delta Dental SPD in response to an ERISA 104(b)(4) request?
MS. REDDY: Objection. Assumes facts not in evidence. There is not a second SPD.
**A There you go. That's probably why I didn't see a second SPD.**
Q (By Mr. Balloun) Okay. Well, let me point out to you Exhibit 83, which is uploading now into the chat.
**A Great. I'm going to just get another set of glasses. I will be right back. I'm using my husband's old ones.**
(Pause in proceedings.)
**A Thank you.**
Q (By Mr. Balloun) No problem.
So I'm going to display Exhibit 83.
**A Okay.**

Page 67

Q Let me know when you see it.
(Exhibit No. 83 marked for identification.)
**A I do see it.**
Q (By Mr. Balloun) Okay. And you see that the first page of this document shows Amendment 1, a contract amendment to the contract between Delta Dental of California and Netflix?
**A It says the maximum plan allowance. The reimbursement under enrollee's benefit against which Delta Dental calculates its payment and the enrollee's obligation. Subject to adjustment for extreme difficulty or unusual circumstances, the MPA for services by PPO is a lessor of the provider's fee or the PPO fee. The fee is lessor of -- yes, I do see this.**
Q Okay. I'm going to go -- so you see the amendment here on the first page?
**A I do.**
Q Do you see that it was signed by Dana Armanino at Netflix?
**A I do.**
Q Do you see the tiny little date in blue under her signature, January 26, 2022?
**A Yes.**
Q Okay. Have you ever seen this document before?

Page 68

**A I don't believe so.**
Q Okay. If I go to the next page, do you see that it is the Employee Benefit Booklet for Delta Dental with Netflix effective January 1st, 2022?
**A Yes.**
Q So isn't it in fact true that you've expressed no opinion about this document in your report?
**A If it's not in Exhibit D, then I have not seen it.**
Q Okay. And isn't it in fact true that you've expressed no opinion as to whether Netflix should have produced this second employee benefit booklet -- I said SPD, but -- employee benefit booklet in response to an ERISA 104(b)(4) request?
**A I really don't have an opinion. I didn't review this.**
Q Thank you.
Okay. Let's keep looking at Paragraph 46. Isn't it in fact true that the contract between Netflix and Collective Health specifies the terms that are used to make claims adjudication decisions under the Netflix medical plan?
**A I think I wrote on Paragraph 46 that the Anthem and Collective Health claims administration agreements don't provide information about benefits and coverage but does include terms and provisions that relate to the engagement between the two entities, and then I footnote**

Page 69

**No. 60, and that was what Sarah Fitzmaurice also stated, and so did Gregory Gaunt.**
**Is that the sentence to which you're referring?**
Q Well, I --
THE REPORTER: We've lost Ms. Reddy, so we might want to wait.
MR. BALLOUN: We'll wait.
(Recess 11:23 - 11:31 a.m.)
(Question and Answer on Page 68, Lines 17 through 25, and Page 69, Lines 1 through 3, read by the reporter.)
MR. BALLOUN: And thank you.
EXAMINATION (Continuing)
BY MR. BALLOUN:
Q My answer would be, Ms. Wagner, that in a sense I'm referring to that, but I was actually referring to the benefit services agreement between Collective Health and Netflix, which you reviewed according to Appendix D.
Is that not the case?
**A If it's in -- yes, I reviewed it, but I'm not sure I understand your question. Maybe if you could rephrase it.**
Q Sure. Give me -- I might do so.
Okay. I'll just try to state it again.

Page 70

**A I think I answered your question.**
Q Yeah.
**A I do I think answered the question.**
Q Isn't it in fact true the contract between Netflix and Collective Health specifies the terms that are used to make claims adjudication decisions of the Netflix medical plan?
**A Maybe we can pull it up so I can see exactly what you're talking about.**
Q Sure.
**A With respect to -- I mean, let me see exactly what you're talking about --**
Q Sure.
**A -- but I do stand by my prior answer, which I do believe answers this question.**
Q All right. I'm uploading Exhibit 38 from a previous deposition, which is the Collective Health Benefit Services Agreement.
**A Okay.**
MR. BALLOUN: And I'm going to share it. Ms. Reddy, let me know when you have a copy. I know you have a copy, but when you see it in the chat.
MS. REDDY: Yes, I see it in the chat and on the screen as well.
MR. BALLOUN: Okay.

Page 71

MS. REDDY: Thank you.
Q (By Mr. Balloun) All right. So you've seen this document before, Ms. Wagner?
**A I have.**
Q Okay. Let's go to -- yeah, let's go to Bates stamp Netflix_00485. And if we look at Section 8, Medical Claims Administration, and Section A -- or Subsection (a) underneath "Claim Adjudication," isn't it true that the contract here between Netflix and Collective Health specifies terms that are used to make claims adjudication decisions?
**A It states that they will engage in doing claims adjudication.**
Q Isn't it in fact true that your expert report did not take into account the deposition testimony of Collective Health 30(b)(6) representative Jessica Nelson about the terms used to make claims adjudication decisions under the Netflix medical plan?
**A I'm not sure I saw that particular deposition.**
Q Isn't it in fact true your expert report expresses no opinion about whether any documents not listed in Appendix D but identified by Ms. Nelson in her deposition contained further information that would inform a participant or beneficiary of his benefits?
**A I'm not really sure that I saw that particular**

Page 72

**deposition. I believe I did see the deposition of Ms. Bass of VSP, but that is the -- Ms. Nelson, is that her name? I don't recall that deposition.**
Q Isn't it in fact true that you did not review the Preventive Care Guide Book in preparation for your expert report?
**A I read that there is a Preventive Care Guide Book. I also read that the plaintiff received that book, but I don't recall having seen it.**
Q And isn't it therefore in fact true that your expert report expresses no opinion about whether the Preventive Care Guide Book contained further information that would inform a participant or beneficiary of his benefits?
**A Well, didn't the plaintiff receive the Preventive Care Guide Book? So he received it, so he would have received whatever information was in there had he read it. So I'm not quite sure what you're asking me, but I do recall from the documentation that I reviewed that he -- I think he inquired for it twice maybe, and I think he said -- and he was annoyed that he was on hold for 15 minutes or something in his deposition, but I do think that he stated that he received that booklet, and I believe he would have received it without cost.**
Q Sure. But that belief is not actually reflected in your report, is it?

Page 73

**A It is in the plaintiff's own words, so I don't think it has to be reflected in my report to be true.**
Q But that means that you've expressed no opinion about the Preventive Care Guide Book and how it may bear on plaintiff's benefits or not?
MS. REDDY: Well, objection. Outside the scope of the opinion.
Q (By Mr. Balloun) Okay.
**A Yeah. I'm --**
Q Let's keep looking -- let's keep looking at Paragraph 46. Isn't it in fact true that the Anthem contract specifies the documents that Anthem will use in order to administer benefit claims under the Netflix plan?
**A I believe so, but we can pull up --**
MS. REDDY: Objection. Outside the scope of the opinion. Goes to claims.
Q (By Mr. Balloun) Isn't it in fact true that the Anthem contract instructs Anthem to use its standard policies and procedures to administer benefit claims under the Netflix plan?
MS. REDDY: Same objection.
**A Would you repeat the question?**
Q (By Mr. Balloun) Isn't it in fact true that the Anthem contract instructs Anthem to use its standard policies and procedures to administer benefit claims under the

Netflix plan?
**A You'd have to bring it up so I could acquaint myself or reacquaint myself with it.**
Q Okay. Isn't it in fact true that the Anthem contract instructs Anthem to use its medical policies to administer benefits claims under the Netflix plan?
MS. REDDY: Same objection to claims. Outside of the scope of Ms. Wagner's opinion.
**A Yeah, it really is outside the scope, but, I mean, I'm happy to discuss it if you'd like to bring it up.**
Q (By Mr. Balloun) One more. Isn't it in fact true that the Anthem contract instructs Anthem to use its complaint and appeals policy to administer benefit claims under the Netflix plan?
MS. REDDY: Same objection. Outside the scope of Ms. Wagner's opinion.
Q (By Mr. Balloun) And do you have the same answer therefore, Ms. Wagner, that you would need to look at it?
**A I would.**
Q Is it that --
**A And I would have to.**
Q Sure. Is it in fact true that none of these documents are listed in Appendix D of your report?
**A I believe that's accurate.**
Q And isn't it in fact true your expert report expresses no



opinion about whether any documents not listed in Appendix D but identified by Anthem's 30(b)(6) representative, Therese Neilsen, contained further information that would inform a participant or beneficiary of his benefits?
MS. REDDY: Same objection.
**A I haven't read --**
MS. REDDY: Also, objection. Vague. Compound. It was a confusing question.
**A Moreover, I haven't read Ms. Neilsen's 30(b)(6) declaration.**
Q (By Mr. Balloun) Okay. Isn't it in fact true that you have not reviewed any benefit determinations made under the Netflix, Incorporated, health and welfare benefits plan in connection with your expert report in this case?
**A If it's not on Appendix --**
MS. REDDY: Outside -- objection. Outside the scope of Ms. Wagner's opinion. Deals with claims.
**A And the answer is if it's not on Appendix D, I didn't review it.**
Q (By Mr. Balloun) And isn't it in fact true that you really have no idea whether plaintiff has experienced any adverse benefit determinations?
**A I believe on the record he admitted in his deposition**



**that he has not experienced any adverse benefit claims determinations. I'm certain of that. That was in his deposition.**
Q But that is not disclosed in your expert report, is it?
**A That that's not disclosed in my expert report, that there's been no adverse benefit determination for him? I believe it is actually. I'm not sure the relevance of that, but I believe it is.**
**Right here. In Paragraph 39, second sentence, I write, "Plaintiff does not have any adverse claim determinations from which he has taken an appeal and he acknowledged in his deposition that such claims procedures would be produced in claims litigation from an adverse claim under ERISA Section 503 and its regulations."**
**I think I was pretty clear in Paragraph 39.**
Q Isn't it in fact true that the plans Wrap document you mention in Paragraph 54 is the only document you considered to confirm that it is the written instrument under which the plan was and is currently maintained?
**A I think there's seven documents that I list.**
Q Isn't it in fact true that you did not consider the deposition testimony of Collective Health in making that determination?
**A The depositions that I -- I do not believe I saw any**



**depositions from Collective Health.**
Q I should, for the record, restate your opinion noted as Item C or Heading C on Page 21 in which you state, "The Plan was operated in accordance with its written documents. In particular, based on prevailing industry standards, Netflix's changes to the Plan's summary plan description: (i) would not be considered Plan amendments; and (ii) reflect normal plan operations."
We've mentioned and discussed this before. Isn't it in fact true that your expert report does not at all address or attempt to reconcile the testimony from VSP, Delta Dental, Anthem, or Collective Health with regard to whether the plan was maintained according to a written instrument?
MS. REDDY: Objection. Form of the question.
**A I must say that I'm unaware of anyone saying that their EOCs and SBCs, SPDs do not together comprise a written plan document. So I'm a little confused by your question and by whatever assumptions are baked into it.**
Q (By Mr. Balloun) Let me try to recast it.
Isn't it in fact true that your report does not use the deposition testimony of VSP, Delta Dental, Anthem, or Collective Health to reconcile whether the plan was maintained according to a written instrument?

Page 78

**A I did review Ms. Bass's deposition for VSP, and I don't recall her stating anything that would in any way, shape, or form be inconsistent with the clear assertion that I'm making, that this plan is a written plan pursuant to ERISA.**

MR. BALLOUN: So move to strike the last answer.

Q (By Mr. Balloun) Isn't it in fact true that there is no part of your analytical framework, after seeing Paragraphs 53 through 62, that discusses Melissa Bass's deposition testimony for VSP and how that might reflect on or reconcile with your opinion stated in C?

**A But there's no reason to do that. There's no there there. She never stated anything that would in my opinion in any way state or imply that the ERISA plan is not an ERISA plan. So why would I ever write something that is irrelevant, that is inapplicable, that isn't CoA.**

Q Isn't in fact true that you have identified no other instrument besides the Wrap plan under which the Netflix plan is maintained?

**A I think I've made -- I think I listed seven documents that comprise the plan document.**

Q Isn't it in fact true that the plan's Wrap document contains references to insurance contracts?

**A I believe you're referring to Appendix 5, and I believe**

Page 79

**that that does reference contracts. I further believe that plaintiff has been informed that those contracts either don't exist or are no longer applicable.**

Q Isn't it in fact true that the Wrap plan document incorporated those insurance documents by reference?

**A To the extent they don't exist, I find that irrelevant.**

MR. BALLOUN: Move to strike. Nonresponsive.

Q (By Mr. Balloun) Isn't it in fact true that the Wrap plan document incorporated those insurance contracts by reference?

**A By scrivener's error reference.**

Q Isn't it in fact true that Netflix refused to produce those insurance contracts in response to plaintiff's ERISA 104(b)(4) request?

**A To the extent that a document is not in existence or inapplicable, there would be no reason or ability to produce it.**

Q So Netflix did not produce those documents?

**A One can't produce that which doesn't exist.**

Q Isn't it in fact true that your opinion that these references to what you call outdated insurance contracts did not invalidate the plan document itself?

**A Yes, of course.**

Q But isn't it in fact also true your report expresses no

Page 80

opinion about whether Netflix should have produced those insurance contracts in response to Plaintiff's 104(b)(4) request?

**A I think that I state several places if something is a scrivener's error, there's no -- there's no reason to produce it. They don't exist. They're not relevant. They're not operative.**

**The terms of a plan document are only relevant to the extent they're operational. In fact, I think that's very clear under the 102 regulations, that it's operative documents that needs to be provided to plan participants and beneficiaries. To the extent that a document is inoperative, then it doesn't have to be provided. It's, frankly, common sense.**

Q Okay. I appreciate that.

Can you point to me in your analytical framework where you did state that those insurance contracts should not have to be produced?

**A I think I mentioned scrivener's error, and -- did you read my report?**

Q I read your report word for word, Ms. Wagner.

**A All right. It seems to me we go over things that I've written several times, but it's your time.**

Q Well, except for Baker Botts' network failure.

**A Scrivener's error, I know I discussed this.**

Page 81

MS. REDDY: Paragraph 35.

**THE WITNESS: Thank you. I'm just going through.**

**A Okay. Yeah, that's where the Appendix 5 is mentioned, and I think you're asking for where I talk about scrivener's error, so just give me one second.**

MS. REDDY: And in Paragraph 56 again.

**THE WITNESS: Thank you for your help. I'm a little slower.**

**A Yes, it is Paragraph 56, and then it references Paragraph 47. So give me one moment.**

**All right. So let's see what we have here. If you look at Wrap document Appendix 5 -- okay. I'm happy to read it into the record, but the -- it's pretty clear that this substantively doesn't affect anything, but there's more. I've discussed this more. Just give me a minute.**

**Yeah. I think it's really clear in Paragraph 56, the first sentence, and I quote, "In my opinion, the reference to separate obsolete insurance policies and numbers in Appendix 5 of the 2020 Wrap Plan was an error which did not change the substance of the benefits provided under the Plan or impact the Plaintiff's substantive rights under the Plan."**

**Then I go on to state, "Moreover, the Plaintiff**

**could not have reasonably expected that outdated insurance policies errantly referenced in Appendix 5 provided his benefits under the Plan because Appendix 5 specifically explains that the benefits in question are self-funded, meaning all benefits claimed under the plans are provided by Netflix and not insurance policies."**
**I just think that's pretty clear that anything -- you can't and shouldn't have to provide that which doesn't exist.**
Q (By Mr. Balloun) I appreciate -- I appreciate you saying that, but do you understand that 56 does not actually answer my technical question?
**A Let's try --**
Q The question is --
**A Let's try it one more time. What is your technical question and --**
Q The question --
MS. REDDY: Argumentative.
MR. BALLOUN: Who is being argumentative, Ms. Reddy?
MS. REDDY: You, Mr. Balloun, with Ms. Wagner. She's repeated herself several times.
MR. BALLOUN: No, but I don't think she's answered my question.
Q (By Mr. Balloun) And here's -- let me put it to you



again this way. 56 states -- it mentions that the insurance policies are obsolete and in error which should not change the substance of benefits, and you've opined that they did not impact the plaintiff's substantive rights under the plan. And then you also stated that the plaintiff could not have reasonably expected that outdated insurance policies errantly referenced provided his benefits under the plan --
**A Yes.**
Q -- et cetera.
**A Yes.**
Q Did the report, however, opine expressly on whether Netflix should have produced them or not?
**A Well, yes. If you go to Paragraph 16, I think I'm really clear that a -- and this -- we can go to Paragraph 16 --**
Q I'm here.
**A -- the second sentence. "A scrivener's error contained in an employee benefit plan document does not invalidate the plan document and result in the plan failing to be maintained under a written instrument." And then I give a bunch of cases to that effect.**
**"Scrivener's errors found in a plan are not typically enforced when they do not reflect participants' reasonable expectations of substantive benefits." And I give other cases to that effect.**



Q All right.
**A So I think Paragraph 16 is quite clear.**
Q But isn't it also in fact true that your opinion in A, which is about the sufficiency of the seven documents, did not mention these insurance contracts one way or another?
**A I believe that my opinion that a full and complete plan document was provided was stated, and implicit in that is the fact that nonexistent documents do not have to be provided when a full and complete plan document set is provided.**
Q All right. I have a hypothetical for you. Imagine there exists a claims administration agreement between a plan sponsor who is also the plan administrator and a claims administrator that contains terms governing how the plan is established or operated, as well as a confidentiality clause prohibiting its disclosure to plan benefits and beneficiaries.
Isn't it in fact true that your opinion is that the confidentiality term of that contract must take precedence over the other substance of the claims administration agreement and should be -- and that the agreement should be withheld from plan participants and beneficiaries?
MS. REDDY: Objection. Compound and



incomplete hypothetical.
**A My opinion is that information that is required to be provided about claims procedures needs to be provided. That does not mean an entire ASA would need to be provided because it could be violative. Certain proprietary information would be violative of the contractual agreement. However, ERISA does require information regarding plan claims procedures be provided. In taking the hypothetical and making it into this instant case, that information was in fact provided.**
MS. REDDY: Objection also to the hypothetical goes outside the scope of the opinion and calls for claims information -- claims procedures. Excuse me.
Q (By Mr. Balloun) To your point, Ms. Wagner, with respect to the instant case, at the end of Paragraph 58 you say, "Consequently, this would have resulted in Netflix violating its obligations under the agreements to keep them confidential."
**A I'm sorry. Is there a question?**
Q I'm -- confirm that I'm reading that correctly to you.
**A I don't know what you're referencing in --**
Q Oh, in the paragraph --
**A The end of paragraph -- I'm sorry?**
Q Penultimate sentence in Paragraph 58, beginning with the

word "consequently."
**A Yes, I think that's true, but the sum and substance of how one would prosecute a claim is in fact in this case provided.**
Q So continuing with this hypothetical, what if the material terms about how the plan is established or operated are expressed nowhere else in the documents provided to beneficiaries? Would it be your opinion that they should still be withheld in light of the confidentiality term between the plan sponsor and the claims administrator?
**A I think we have to make a distinction between --**
MS. REDDY: Objection. Incomplete hypothetical.
Continue, Ms. Wagner.
**THE WITNESS: Thank you.**
**A I think you have to make a distinction between a 104 claim and a 503 claim, and I'm not --**
Q (By Mr. Balloun) Let's make sure -- it's a 104 claim for sure. It's not a 503 claim.
**A Okay. Then can you repeat your question?**
Q Sure.
What if the material terms about how the plan is established or operated are expressed nowhere else in the documents provided to beneficiaries other than the claims



administration agreement? Would it be your opinion that the claims administration agreement should still be withheld in light of a confidentiality term between the plan sponsor and the claims administrator in response to a 104(b)(4) request?
**A I think if the sum and substance of what a participant would need to know is provided, then there's no reason to provide the ASA. If in fact the sum and substance of what a participant needs is not provided, then there would be ways of getting that information to the plan participant without violating confidentiality.**
Q So is it your opinion that if such a hypothetical claims administration agreement contains plan operative terms, it should not be disclosed to the 104(b)(4) requesting beneficiary precisely because of the confidentiality provisions between the plan sponsor administrator and the claims administrator?
**A I think I --**
MS. REDDY: Objection. Incomplete hypothetical.
**A I think I answered the question. I really do. And I would have the court reporter read back my answer.**
Q (By Mr. Balloun) That's fine.
And even though it is, to quote 29 U.S.C. 1024(b)(4), a contract or other instrument under which



the plan has established or operated?
**A Yes. In fact -- I'm sorry. Is there an objection?**
MS. REDDY: Objection. Same objection. Incomplete hypothetical.
**A Yes. Contract doesn't mean every contract. Contract means as affects or as between the plan participant and the plan sponsor. It really does not mean business-to-business type of contracts.**
Q (By Mr. Balloun) Isn't it in fact true that your expert report favorably cites the Department of Labor advisory opinion 97-11(a) from April 10th, 1997, for determining which third-party administration contracts must be disclosed under ERISA 104(b)(4)?
**A I do refer to that in the footnote.**
Q Let's bring that up.
MS. REDDY: While you're doing that, Mr. Balloun, do you anticipate how much longer?
MR. BALLOUN: Ten minutes or less.
MS. REDDY: Okay.
MR. BALLOUN: All right. I've uploaded it for Baker Botts, and I'm displaying the Department of Labor opinion on the first page. This is marked as Exhibit 84.
(Exhibit No. 84 marked for identification.)



Q (By Mr. Balloun) And I suppose you're looking at your own paper copy, Ms. Wagner?
**A I am. And it's at Footnote 23.**
Q Mm-hm.
**A Yes, I said it in Footnote 23, and then also a case note Footnote 24.**
**May I help -- so you'd like me to read this. Okay. Give me one moment, please.**
Q Can you read out loud the highlighted text?
**A Just let me read everything before that first. Thank you.**
**Okay. So it says, "For example, if a TPA contract, or any part of the contract, establishes or amends the plan in question, establishes a claim procedure, specifies procedures, formulas" -- actually that should be formulae -- "methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement, or does any of the other things described in sections 402(b) and 402(c) of ERISA, it would have to be furnished in accordance with the terms of 104(b)(4)."**
Q Thank you. I think the thing that you said about the plural of formula is the thing that I agree with you most out of this entire deposition. I appreciated your precision on that point.

MR. BALLOUN: That's it. I have no further questions for the witness.

MS. REDDY: Netflix, we have none as well.

MR. BALLOUN: Great. Well, Ms. Wagner, thank you for your time.

(Signature reserved.)

(Deposition concluded at 12:04 p.m.)



A F F I D A V I T

I, Marcia S. Wagner, hereby declare under penalty of perjury that I have read the foregoing deposition and that the testimony contained herein is a true and correct transcript of my testimony, noting the attached corrections.

______________________________

Marcia S. Wagner

Date: ____________________



STATE OF WASHINGTON ) I, Valerie L. Torgerson, CCR, RPR,
) ss a certified court reporter
County of Pierce ) in the State of Washington, do hereby certify:

That the foregoing deposition of MARCIA S. WAGNER was taken before me and completed on April 18, 2022, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to O. Shane Balloun.

IN WITNESS WHEREOF, I have hereunto set my signature on the 22nd day of April 2022.

Valerie L. Torgerson, CCR, RPR
Certified Court Reporter No. 2036
(Certification expires 09/3/22.)



B&A Litigation Services
2208 North 30th Street, Suite 202
Tacoma, WA 98403
253.627.6401

Date: April 25, 2022

To: Rani Reddy
Baker Botts
101 California Street
San Francisco, CA 94111

Case: Zavislak v. Netflix, Inc.

Cause No.: 5:21-cv-01811-EJD

Deposition of: Marcia S. Wagner

Date Taken: April 18, 2022

The above transcript must be read and the Correction Sheet signed within 30 days of this notice or before the trial date. If the Correction Sheet is not signed within that time period, signature will be deemed waived for all purposes.

Please contact the witness and arrange a convenient time and place for reading and signing.

After the Correction Sheet is signed, please mail the signed original Correction Sheet to:

O. Shane Balloun
Balloun Law
355 Harris Avenue, Suite 201
Bellingham, WA 98225-7068

Reporter: Valerie L. Torgerson

License No.: 2036

cc:

B&A Litigation Services
2208 North 30th Street, Suite 202
Tacoma, WA 98403
253.627.6401

CORRECTION SHEET

Instructions: Please carefully read your deposition and on this correction sheet make any changes or corrections in form or substance that you feel should be made. You may add additional sheets, if necessary. After completing this form, please sign your name in the space provided.
Please do not mark the transcript. Thank you.

| PAGE # | LINE # | CORRECTION | REASON FOR CORRECTION |
|---|---|---|---|
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |
| ______ | ______ | ______________________________ | _____________________________ |

SIGNATURE OF WITNESS:___________________________________________________________

B&A LITIGATION SERVICES