UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARK ZAVISLAK,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NETFLIX, INC.,<br><br>　　　　　Defendant. | Case No.  5:21-cv-01811-EJD<br><br>**AMENDED[1] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This dispute arises under the Employee Retirement Income Security Act of 1974 ("ERISA") section 104, 29 U.S.C. § 1024(b)(4) ("Section 104").  Plaintiff Mark Zavislak, the beneficiary of Defendant Netflix, Inc.'s ("Netflix") health benefit plan, initiated this action against Netflix after he requested health and welfare plan documents from Netflix and did not receive all the Plan documents that Netflix was obligated to furnish under Section 104.  Plaintiff alleges various statutory violations, including a Section 104 violation and a separate claim that Netflix allegedly failed to operate its Plan in accordance with its written documents.

The Court heard the parties' arguments and evidence, and has also received briefing on all pending motions, as well as pre-hearing and post-hearing submissions of the parties' proposed findings of fact.  Having considered the parties' submissions and evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

---

[1] This Findings of Fact and Conclusions of Law is amended in accordance with the Court's June 7, 2024, Order granting in part Netflix's motion to amend the Court's calculation of damages. *See* Order Granting in Part and Den. in Part Mot. to Amend, Den. Mot. for Leave to File Mot. for Recon., ECF No. 249.

52(a).[2]

## I.      FACTUAL FINDINGS

### A.      The Parties

1.       Defendant Netflix is a Delaware corporation with a principal place of business in Los Gatos, California.  Am. Compl. ¶ 2, ECF No. 16.  Netflix is the Plan Sponsor and Administrator of the "Netflix, Inc. Health and Welfare Benefits Plan" ("the Plan").  Decl. of Dana Armanino ISO Netflix's Mot. to Dismiss, or in the Alt. for Summ. J. ("Armanino Decl.") ¶ 3, ECF No. 19-1.  The Plan is a self-funded[3] employee benefit plan maintained by Netflix pursuant to a written instrument and governed by ERISA.  *Id.*

2.       It is undisputed that Plaintiff Mark Zavislak ("Plaintiff" or "Zavislak") is a beneficiary of the Plan through his spouse, Chen Zheng, who is a Netflix employee.  Def.'s Separate Statement ISO Def.'s Reply MSJ; And in Opp'n to Pl.'s MSJ ("Undisputed Facts") ¶ 2; Armanino Decl. ¶ 8.

### B.      The Plan

3.       Netflix uses a third-party administrator and claims administrators (at times referred to as "carrier partners") to administer its Plan.  Decl. of O. Shane Balloun ISO Pls.' Mot. to Exclude Expert Opinion Testimony of Marcia S. Wagner and Mot. for Summ. J. ("Balloun MSJ Decl."), Ex. 11 ("Armanino Dep.") 34:25–37:6, ECF No. 144-11.  Collective Health Administrators, LLC ("Collective Health") serves as the third-party administrator of the Plan.  *Id.* at 51:11–12.  Netflix's claim administrators include Anthem Blue Cross Life & Health Insurance Company ("Anthem"), Delta Dental of California ("Delta Dental"), and Vision Service Plan ("VSP").  *Id.* at 37:5–11; 45:22–46:18.  Netflix maintains separate agreements with Collective Health, Anthem, Delta Dental, and VSP that define their obligations and services with respect to

---

[2] Any findings of fact that constitute conclusions of law shall be deemed to have been found by the Court as a matter of law.  Likewise, any conclusions of law that constitute findings of fact shall be deemed to have been found by the Court as a matter of fact.

[3] A self-funded plan is a plan in which the plan fiduciary is financially responsible for all benefits claimed under the plan.  Balloun MSJ Decl., Ex. 37 ("Wagner Report") ¶ 31, ECF No. 144-137.

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   the Plan.  *Id.* at 47:9–20; *see infra* Section I.E.1.

2       4.      Collective Health is a provider of "administrative, analytical, digital, and platform

3   services" for self-funded employee health and welfare benefit plans.  Balloun MSJ Decl., Ex. 19

4   ("BSA") 1, ECF No. 144-19.  As Netflix's third-party administrator to the Plan, Collective Health

5   acts as the intermediary for information exchange with Netflix's claims administrators, such as

6   Anthem, Delta Dental, and VSP.  *Id.* at 37:14–22 ("[Netflix] funnel[s] things to Collective Health,

7   and Collective Health distributes it to other partners for us.").  Collective Health is responsible for,

8   *inter alia*, member services, the plan administration, claims adjudication, payments,

9   communication to members concerning their claims, and care navigation.  *Id.* at 51:9–15; Balloun

10  MSJ Decl., Ex. 12 ("Nielsen Dep.") 25:3–7; 56:2, ECF No. 144-12.

11      5.      Netflix leases Anthem's network of medical providers inside and outside of

12  California, and Anthem also provides Netflix with utilization management or case management

13  services (frequently referred to as, "prior authorization").  Nielsen Dep. 16:13–19; 17:6–8.  These

14  terms are synonymous and refer to pre-review of a particular admission or procedure to determine

15  whether it is a medical necessity, in which case Anthem's medical management team approves the

16  request, and assistance to beneficiaries experiencing acute and/or chronic issues with navigating

17  the process.  *Id.* at 18:10–17; 18:25–19:3; 30:5–18; 32:2–6.  Medical necessity review consists of

18  reviewing the documentation received from the medical provider supporting the condition against

19  the clinical criteria for the medical condition as defined in Anthem's medical policy.  *Id.* at 34:4–

20  6; 34:20–23.  However, Anthem does *not* review for benefits; its review is limited only to whether

21  an admission or procedure is medically necessary—although an adverse finding as to medical

22  necessity would ultimately impact whether a beneficiary receives benefits.  *Id.* at 32:9–15.

23      6.      Anthem and Collective Health have a joint administrative arrangement ("JAA")

24  that governs the adjudication of claims under the Plan.  *Id.* at 27:3–6.  Under the JAA, Anthem is

25  responsible for pricing claims and Collective Health adjudicates the claims and administers the

26  benefits.  *Id.* at 25:14–21; 26:13–19; Balloun MSJ Decl., Ex. 13 ("Nelson Dep.") 56:24–57:2, ECF

27  No. 144-13 ("Q: And when you adjudicate or when Collective Health adjudicates, what does that

28

mean? A: So we apply the appropriate corresponding benefits for that claim.").  For example, Anthem receives beneficiaries' claims, prices them, and sends them to Collective Health to adjudicate the claim and apply the benefit.  Nielsen Dep. 16:25–17:4; *see also* Nelson Dep. 56:20–23.  After this process is complete, Collective Health sends the claim back to Anthem to pay the provider.  Nielsen Dep. at 17:5–6.

7.      In addition, Netflix provides dental benefits to its participants and beneficiaries through its agreement with Delta Dental.  Balloun MSJ Decl., Ex. 14 ("Stanek-Lowe Dep.") 14:5–16, ECF No. 144-14; *see generally* Balloun MSJ Decl., Ex. 20 ("Delta Dental Agreement"), ECF No. 144-20.

8.      Netflix also provides vision care benefits to its participants and beneficiaries through its relationship with VSP under the Group Vision Care Plan.  Balloun MSJ Decl., Ex. 15 ("Bass Dep.") 9:14–15, ECF No. 144-15; *see generally* Balloun MSJ Decl., Ex. 21 ("VSP Agreement"), ECF No. 144-21.

**C.      Plaintiff's ERISA Section 104 Request(s)**

**1.      January 1, 2021 Request**

9.      On January 6, 2021, Zavislak sent a letter addressed to "Netflix, Inc." at Netflix's corporate headquarters dated January 1, 2021 and postmarked January 4, 2021.  Am. Compl. ¶¶ 7–9; Armanino Decl., Ex. H, ECF No. 19-9, at 3; Balloun MSJ Decl., Ex. 3, ECF No. 144-4.  Among other things, Zavislak's letter requested, for each calendar year 2021 benefit plan that he was a beneficiary of, "documents governing the operation of the respective plan (e.g., formal plan document, trust agreement, insurance contract, contract of coverage, third party administration agreement, and in general, any document that the claim administrator or named fiduciary refers to when making benefit determinations under the respective plan)."  Am. Compl. ¶ 9; Armanino Decl., Ex. H at 3; Balloun MSJ Decl., Ex. 3.

10.      In January 2021, Netflix's Los Gatos office was open on a limited basis due to the COVID-19 pandemic and an order from the County of Santa Clara requiring businesses to maximize the number of personnel working remotely and encouraging citizens to stay at home as

1   much as possible.  Armanino Decl., Ex. N, ECF No. 20-4 ¶¶ 4–6.  At the time Netflix instructed

2   employees that could work from home to do so.  *Id.* ¶ 6.

3       11.     Dana Armanino, the Benefits Manager at Netflix, did not receive Zavislak's

4   Section 104 request dated January 2021.  Armanino Decl. ¶ 7.

5       12.     Zavislak did not receive a response to the January 2021 letter.  Am. Compl. ¶ 10.

6       13.     On February 11, 2021, Zavislak sent a second letter to Netflix's registered agent for

7   service of process attaching proof that Defendant received the first letter on January 6 and asking

8   if the delay was caused by matters reasonably outside the control of Defendant.  *Id.*; Balloun MSJ

9   Decl., Ex. 5, ECF No. 144-5.  In the letter, Zavislak stated for the first time that his request was

10  made pursuant to 29 U.S.C. § 1024(b)(4), and he reminded Netflix that the penalty for failing to

11  comply with his request within 30 days was $110 per day.  Balloun MSJ Decl., Ex. 5; Armanino

12  Decl., Ex. H at 1.

13      14.     On February 17, 2021, Jon Hicks, Netflix's in-house counsel, responded to

14  Zavislak's February 11 letter by email.  Balloun MSJ Decl. at 4–5, Ex. 6, ECF No. 144-6.

15  Following an email exchange, Zavislak agreed that he would receive the documents from Netflix

16  on a rolling basis because the 2021 documents were not yet available.  *Id.* at 3–4.  At the time

17  Zavislak's request was made, the 2021 documents "were still in process of being finalized."

18  Armanino Dep. 43:20–44:1.  Netflix does not provide drafts of Plan documents to participants or

19  beneficiaries.  Decl. of Dana Armanino ISO Def.'s Mot. for Summ. J. and Opp'n to Pl.'s Mot. for

20  Summ. J. ("Second Armanino Decl.") ¶ 8, ECF No. 186-6.  Netflix would, however, share a

21  section or portion of a draft Plan document if a participant or beneficiary has a specific question

22  regarding coverage or benefits.  *Id.*

23      15.     On February 24, Hicks electronically provided Zavislak with "all the documents"

24  that were pulled for 2020 and 2021, which included the following seven documents:

25          •  Netflix Inc. Health and Welfare Benefits Adoption Agreement, Plan and

26             Summary Plan Description, effective January 1, 2020 ("2020 Adoption

27             Agreement");

United States District Court
Northern District of California

1        • 2020 Collective Health Netflix HSA Summary Plan Description;

2        • 2020 Delta Dental Summary Plan Description;

3        • 2020 VSP Vision Evidence of Coverage;

4        • 2021 Netflix Collective Health + Anthem HSA Plan Summary of Benefits and

5          Coverage;

6        • 2021 Netflix Delta Dental Plan Summary; and

7        • 2021 Netflix VSP Plan Summary.

8    Balloun MSJ Decl. at 3; Armanino Decl., Exs. A-G, J.

9        16.     Appendix 5 of the Netflix 2020 Wrap Plan Document references three insurance

10   policies: (1) Collective Health + Anthem STRM: 3328649, (2) Delta Dental STRM: 3328649, and

11   (3) VSP 12130543.  Am. Compl. ¶¶ 16-17; Armanino Decl., Ex. A at 48–49.

12       17.     After Zavislak received the seven Plan documents, he requested the Collective

13   Health + Anthem STRM: 3328649, Delta Dental STRM: 3328649, and VSP 12130543 policies,

14   explaining that, because all three policies were listed in Appendix 5, they are incorporated by

15   reference into the Plan.  Armanino Decl., Ex. J at 3, ECF No. 144-6.  Zavislak requested

16   production of these documents.  *Id.*

17       18.     On February 24, 2021—the same day that Hicks received Zavislak's request for the

18   three policies referenced in Appendix 5—Hicks forwarded Zavislak's email to Armanino and

19   Carole Payne, another Netflix employee, inquiring into the undisclosed policies listed in Appendix

20   5.  Balloun MSJ Decl. at 1, Ex. 7.  Armanino replied: "I would think that the SPDs we shared are

21   the documents in question."  *Id.* at 3.

22       19.     Armanino subsequently confirmed with external counsel that the plan number

23   "3328649" listed with "Collective Health + Anthem STRM: 3328649" and "Delta Dental STRM:

24   3328649" refers to the "old" self-insured Cigna medical and dental plan Netflix had in effect in

25   2019.  *Id.* at 4; Armanino Decl. ¶ 11.  Beginning on January 1, 2020, Netflix moved to a self-

26   funded VSP plan from a fully insured VSP policy used in 2019.  Armanino Decl. ¶ 11.  The

27   "3328649" plan number should have been deleted and updated with the new 2020 plan numbers

28   Case No.: 5:21-cv-01811-EJD

for Anthem and Delta Dental, 282474 and 20164 respectively.  *Id.*; Balloun MSJ Decl. at 4, Ex. 7.  Armanino explained that the three policies listed in Appendix 5 are "out of date and not relevant."  Balloun MSJ Decl. at 4, Ex. 7.  The VSP "12130543" plan number listed in Appendix 5 remains current, but it is a plan designation and does not refer to an underlying insurance policy.  Armanino Decl. ¶¶ 11, 17.

20.     On February 26, 2021, Hicks replied to Zavislak's request for production of the three insurance policies referenced in Appendix 5.  Armanino Decl., Ex. J at 2, ECF No. 144-6.  After confirming with his team, Hicks informed Zavislak that the "documents referenced in that appendix are no longer available and not in use; and as such, we need to update the Adoption Agreement."  *Id.*  Hicks confirmed that Netflix has no other documents in their possession aside from what has already been disclosed to Zavislak.  *Id.*

21.     In response, Zavislak informed Hicks that his two children are beneficiaries of the three policies during the 2020 calendar year, and he would like to request those policies on their behalf.  *Id.*  Zavislak accused Netflix of failing to operate the Plan "in accordance with the presently adopted plan terms for 2021 benefit claims now being administered."  *Id.*

22.     Hicks confirmed that Netflix had provided all documents required by law and that "[t]here are no additional documents for disclosure."  *Id.* at 1.  Hicks also disputed Zavislak's allegations regarding Netflix's administration of the Plan.  *Id.*

### 2.     November 14, 2021 Adverse Benefit Determination

23.     On November 5, 2021, Zavislak attended an annual wellness visit with his physician.  Decl. of Mark Zavislak ISO MSJ ("Zavislak Decl."), ECF No. 147-1 ¶ 4.  During this visit, his doctor prescribed several blood tests as preventative measures.  *Id.* ¶ 5.

24.     On November 14, 2021, Zavislak received an adverse benefit determination from the Plan denying coverage of certain preventative care services.  Zavislak Decl. ¶¶ 4–7; *see* Collective Health Medical Benefits Statement ("Benefits Statement"), ECF No. 147-2; *see also* ECF 147-3.  Zavislak called Collective Health and learned from a member advocate that his "Glycosylated hemogl" test with code 83036 was denied as nonpreventative pursuant to the

1    Preventative Care Guidebook.  Zavislak Decl. ¶ 8.

2         25.    Zavislak did not receive the Preventative Care Guidebook from Netflix in response

3    to his Section 104 request.  Zavislak Decl. ¶ 9; *see infra* Section I.C.3.

4         26.    According to the statement of benefits, the Plan paid $224.80 of the $339.00 cost.

5    *See* Benefits Statement.  Zavislak had to pay $46.40.  *Id.*

### 3.    February 28, 2022 Request

7         27.    On February 28, 2022, Zavislak made a Section 104 request to Netflix for all

8    documents under which the Plan is established and operated, including the following:

> 1. Any adoption agreement
>
> 2. Any summary plan description, evidence of coverage, or employee
> benefit booklet, or the like
>
> 3. Any contract with a claims administrator, including Anthem Blue
> Cross, Collective Health, Caremark, Delta Dental, and Vision Service
> Plan
>
> 4. Any amendments, including any written amendments made to the
> dental benefits and communicated with Delta Dental
>
> 5. Any document that sets forth the preventive care that is covered as
> such
>
> 6. Any document that sets forth which claims require prior
> authorization
>
> 7. Any document that sets forth policies under which appeals may be
> taken
>
> 8. Any document that sets forth policies under which medical
> necessity may be evaluated
>
> 9. Any document that specifies under what conditions a participant or
> beneficiary may be represented by an authorized representative
>
> 10. Any document confirming or adopting any of the foregoing[.]

21   Balloun MSJ Decl., Ex. 9.

22        28.    On March 11, 2022, Armanino responded to Zavislak's February 28 request.

23   Balloun MSJ Decl. Ex. 10.  In her email, Armanino attached seven documents responsive to

24   Zavislak's request:

- 2020 Adoption Agreement;

- 2021 Collective Health Netflix HSA Summary Plan Description;

- 2021 Delta Dental Benefit Booklet;

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

8

United States District Court
Northern District of California

- 2021 VSP Vision Evidence of Coverage;
- 2021 Netflix Collective Health + Anthem HSA Plan Summary of Benefits and Coverage;
- 2022 Netflix Delta Dental Plan Summary; and
- 2022 Netflix VSP Plan Summary.

*Id.*

29.     Armanino also cc'd Cheng Zheng and informed Zavislak that his wife, as an employee of Netflix, has electronic access to all the attached documents through "Workday" and the "Employee Landing Page." *Id.* The "Workday" system is "an HRIS platform"—a human resources information system—"where [Netflix] store[s] all employee data," including plans, costs, and elections. Armanino Dep. 34:17–23.

**D.     The Furnished Plan Documents**

30.     The "Plan Document" refers to the Plan, the Adoption Agreement, and "a combination of the policies and other formal plan documents listed and incorporated by reference in Appendix 5." Armanino Decl., Ex. A ("2020 Adoption Agreement") at 4, ECF No. 19-2.

31.     The Netflix "Adoption Agreement," which is also referred to as the "Wrap Plan," is the governing document of the Plan. Armanino Decl. ¶ 14; Armanino Decl. 150:24–151:3. The Adoption Agreement informs the beneficiary that, "[i]f the terms of the insurance carriers' insurance policies, Evidences of Coverage[,] or Benefit Booklets conflict with the terms of the official 'Plan Document,' the Plan will be interpreted to give effect to the official 'Plan Document,' except as required by law." 2020 Adoption Agreement at 4.

32.     The Plan include Evidence of Coverages ("EOCs") and Summary Plan Descriptions ("SPDs"). SPDs are member-facing documents that outline what medical benefits are offered by the plan. Nelson Dep. 43:12–14. SPDs include "all benefits that are offered." *Id.* at 44:1–2. EOCs are documents provided to members as part of summary plan descriptions. Bass Dep. 49:6–10. Together, the SPDs and EOCs summarize and describe benefit welfare plans, such as benefits, rights, and the claims and appeals procedures, and they are intended to be read with

1   the other Plan documents "to make up a comprehensive set of plan Documents."  Second

2   Armanino Decl. ¶ 13.

3       33.   The Plan's SPDs and/or EOCs include: (1) the Collective Health Health Savings

4   Account SPD ("Collective Health SPD"), (2) the Delta Dental SPD, and (3) the VSP EOC.  *Id.*;

5   Exs. B, C, D.

6       34.   <u>VSP EOC</u>:  VSP prepares an EOC for their clients to distribute to their plan

7   participants and beneficiaries.  Decl. of Dan Morgan ("Morgan Decl.") ¶ 2, ECF No. 22-3.  EOCs

8   describe the benefits available to covered persons and participant responsibilities.  *Id.* ¶ 3; Bass

9   Dep. 52:14–16.  VSP refers participants to the EOC when they have questions about his or her

10  benefits.  Morgan Decl. ¶ 3.  While VSP's EOC provides a summary of the terms and conditions

11  of coverage, the exact terms and conditions are described in the VSP Agreement.  Bass Dep.

12  53:12–16.

13      35.   <u>Collective Health SPD</u>:  Collective Health's SPD "is a binding statement of Plan

14  benefits" that is furnished to participants and beneficiaries.  Lopez Decl. ¶ 4; *see generally*

15  Balloun MSJ Decl. Ex. 30 ("Collective Health SPD").  It provides preventative benefits, although

16  it does not include a complete list.  *Id.* at 44:8–12.  The SPD refers to the Preventative Care

17  Guidebook[4] for a complete list, which draws its information from the Plan Matrix, *see infra*

18  Section I.E.2.c, and is published by Collective Health and made available to members free of

19  charge.  *Id.* at 44:8–16; 104:22–105:11; 110:8–10.  Typically, however, members with inquiries

20  into preventative benefits call and speak with Collective Health's member advocates for more

21  information.  *Id.* at 44:19–22; *see* SPD ("Please contact Collective Health for more information on

22  the specific procedure and diagnoses codes that comprise your preventative benefits.").  It is

23  common for SPDs to be issued after the plan year begins.  *Id.* at 107:5–7.  Anthem also maintains

24  a "Prior Authorization List" that is incorporated by reference in the Collective Health SPD.  Decl.

25

26  ————————————
    [4] During deposition testimony, the Preventative Care Guidebook is at times referred to as the
27  Preventative Care Handbook or the Preventative Guidebook.  The Court will refer to it only as the
    Preventative Care Guidebook in this Order.

28  Case No.: 5:21-cv-01811-EJD
    AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

of Therese Nielsen ISO of Netflix Inc.'s Cross-Mot. for Summ. J. ("Nielsen Decl.") ¶ 4, ECF No. 186-9.  It provides a detailed list of services that are reviewed or prior authorized by Anthem.  *Id.*

36.     Delta Dental SPD:  The Delta Dental SPD is titled the "Employee Benefit Booklet" and provides a complete description of participants' and beneficiaries' rights.  *See generally* Balloun MSJ Decl. Ex. 31 ("Delta Dental SPD"), ECF No. 144-31.  Delta Dental refers participants to the booklet for details about their coverage.  Decl. of Sharen Stanek-Lowe ISO of Netflix Inc.'s Cross-Mot. for Summ. J. ("Second Stanek-Lowe Decl.") ¶ 2, ECF No. 186-7.

37.     The Plan also includes Summaries of Benefits and Coverages ("SBCs"), which is made up of (1) the Netflix Collective Health + Anthem HSA SBC, (2) the Netflix Delta Dental Plan Summary, and (3) the Netflix VSP Plan Summary.  *Id.* ¶ 18; Exs. E, F, G.

38.     SBCs are "true summaries" of the terms and benefits provided for in the Plan documents.  Second Armanino Decl. ¶ 14.  Health insurance companies and group plans must provide SBCs, or summaries of the full terms and benefits contained in the Plan documents, to enrollees to inform them of their benefits.  *Id.*

39.     If a participant or member has an inquiry about their benefits, Netflix consults the Adoption Agreement (WRAP Plan), the SPDs, and the EOC; Netflix does not refer to internal documents from claims administrators or third-party service providers to interpret the Plan.  *Id.* ¶ 19.

**E.     The Undisclosed Plan Documents**

40.     Zavislak premises his case on the argument that Netflix failed to furnish a number of documents pursuant to his ERISA Section 105 request, including claims administration agreements and various other documents maintained by Collective Health or Anthem.  For clarity, these documents are detailed below.

**1.     Claims Administration Agreements**

41.     Netflix maintains multiple administrative agreements (hereinafter referred to as "claims administration agreements") for claims administration and processing services with organizations to administer the Plan's benefits.  Second Armanino Decl. ¶ 17–18.  These services

include the provision of computer software integration services, plan design materials, informational materials such as plan descriptions, member call centers, and maintaining member portals. *Id.* ¶ 18. Netflix has four claims administration agreements: (1) the Administrative Services Agreement for Jointly Administered Arrangements; (2) the Collective Health Benefit Services Agreement; (3) the Delta Administrative Services Contract; and (4) the Group Vision Care Plan Administrative Services Program Agreement. *Id.* ¶ 17.

### a. Administrative Services Agreement for Jointly Administered Arrangements

42. On January 1, 2020, Netflix and Anthem entered into an administrative services agreement retaining Anthem to build and maintain a provider network ad to administer certain elements of the Plan. Balloun MSJ Decl., Ex. 18 ("Anthem Agreement") 1, 4, ECF No. 144-18. Under the agreement, "Anthem provides claims utilization review and performs appeals services to Collective Health and leases the Anthem provider network to Netflix." Nielsen Decl. ¶ 2.

43. The agreement specifically provides that "Anthem does not serve either as 'plan administrator' or as the Plan's 'named fiduciary' and is not a fiduciary of the Plan." *Id.* at 6. Rather, Netflix "retains all final authority and responsibility for the Plan and its operation" under the agreement. *Id.*

### b. Collective Health Benefit Services Agreement

44. On October 22, 2019, Netflix and Collective Health entered into the Collective Health Benefits Services Agreement ("BSA"), which became effective on January 1, 2020. Armanino Dep. at 68:4–13; *see generally* BSA. Under the BSA, Netflix retained Collective Health to provide certain services relating to claims administration that "are ministerial and/or advisory in nature" as outlined in the agreement. BSA 35. These services include but are not limited to providing informational materials to members, such as open enrollment materials, required notices and plan description documents, *id.* at 4–5; assisting members with medical plan-related inquiries for enumerated "issue categories," *id.* at 5; providing access to digital services, such as member and employer portals, *id.* at 6; medical claims administration services, such as

United States District Court
Northern District of California

1    claim adjudication and appeals, *id.* at 8–9; financial management and payment services, *id.* at 16–

2    17; and care navigation services, *id.* at 18.

3         45.    The terms and conditions of the agreement specifically provide that Collective

4    Health is not the "Plan Administrator," and that Netflix "retains final authority and responsibility

5    to develop the terms of the Plan, monitor the performance of service providers, and control the

6    Plan's assets." *Id.* at 35.

7         46.    Collective Health considers the BSA to be confidential because it contains

8    confidential pricing and service information.  Decl. of Sarah Fitzmaurice in Opp'n to Pl.'s Mot.

9    for Prelim. Injunction ¶ 5, ECF No. 22-7.

10                        **c.    Delta Administrative Services Contract**

11        47.    The Delta Administrative Services Contract ("Delta Dental Agreement") is an

12   agreement for an employee dental benefit plan between Netflix, as the Plan sponsor, and Delta

13   Dental.  The version of the Delta Dental Agreement that was available at the time became

14   effective on January 1, 2020.  Delta Dental Agreement at 9; *see also* Stanek-Lowe Dep. 16:19–21.

15   Under this agreement, Delta Dental primarily provides provider network access, processing of

16   dental claims, claim adjudication, grievance, and appeals.  *Id.* at 18:14–20; 18:23–24.

17        48.    The Delta Dental Agreement is a two-part document: the first seven pages address

18   services provided by Delta Dental under the contract and the second part attaches the Employee

19   Benefit Booklet.  Decl. of Sharen Stanek-Lowe ISO of Netflix, Inc.'s Opp'n to Pl.'s Mot. for

20   Prelim. Injunction ("Stanek-Lowe Decl.") ¶¶ 3–4, ECF No. 22-5.

21                        **d.    Group Vision Care Plan Administrative Services Program**
                             **Agreement**

22

23        49.    Netflix and VSP entered into an administrative agreement, effective January 1,

24   2020, to establish group vision care for beneficiaries.  Morgan Decl. ¶ 4; *see generally* VSP

25   Agreement.  The VSP Agreement describes the obligations of VSP with respect to VSP's

26   provision of services to the Plan.  Bass Dep. 45:15–18.  It likewise describes Netflix's obligations

27   and the obligations of covered persons with respect to VSP's provision of services.  *Id.* at 45:19–

28   Case No.: 5:21-cv-01811-EJD
     AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW
                                    13

United States District Court
Northern District of California

22; 46:5–9.  The VSP Agreement includes provisions as to plan pricing, claims administration services, and termination and renewal.  Morgan Decl. ¶ 4.

50.     Under the agreement, Netflix identifies who is eligible to be covered under the Plan, pays the claims, and distributes documents to their employees.  *Id.* at 45:25–46:4.

51.     VSP plans benefits and provides member benefit summaries of the plan.  VSP Agreement at 4.  The VSP Agreement provides the eligibility criteria for coverage, a schedule of benefits, and information regarding the exclusion and limitations of benefits.  *Id.* at 13, 21, 25.

52.     The VSP's EOC provides a summary of the terms and conditions of coverage, but the exact terms and conditions are described in the VSP Agreement.  Bass Dep. 53:12–16.  VSP will provide the VSP Agreement to a covered person upon request.  *Id.* at 54:3–8.  The EOC does not encompass all information contained in the VSP Agreement; for example, the VSP provides that covered persons who received a service but did not receive benefit authorization at the time the service was provided must submit a claim to VSP within 365 days of receiving that service, but the EOC does not include this information.  *Id.* at 58:1–11; 68:13–21.  However, the 2021 VSP EOC instructs covered persons to contact VSP's customer service department for more information regarding authorization or denial of benefits.  *Id.* at 70:20–71:6.

53.     The VSP Agreement is not provided to participants or beneficiaries.  Morgan Decl. ¶ 6.  VSP considered the pricing provisions highly confidential.  *Id.*

### 2.    Other Plan-Related Documents

#### a.    Delta Dental Employee Benefit Booklet

54.     Appendix B of the Delta Agreement includes an Employee Benefit Booklet authored by Delta Dental, which provides a summary of the group dental program.  Balloun MSJ Decl., Ex. 31 ("2020 Employee Benefit Booklet") 2, ECF No. 144-31; Stanek-Lowe Dep. 16:22–17:4; 37:17–18.  The Employee Benefit Booklet notifies the reader that "[t]his booklet is *not* a Summary Pan Description to meet the requirements of ERISA."  2020 Employee Benefit Booklet 2 (emphasis in original).  The booklet contains "all the information on benefits" that is stated in the Delta Administrative Agreement.  Stanek-Lowe Dep. 81:17–22.

United States District Court
Northern District of California

55.     The Employee Benefit Booklet is typically the resource that the representative would quote for specific benefits.  Stanek-Lowe Dep. 67:13–15.  To the extent a member is not satisfied with a representative's response, or the Employee Benefits Booklet contains incorrect information, the member would be referred to Delta Dental's grievance and appeal unit.  *Id.* at 72:1–16.  In this case, Netflix also distributes the booklet to Netflix participants of the Delta Dental Plan.  *Id.* at 81:8–14.

56.     Depending on the timing and negotiations of a client's plan design, Delta Dental *may* produce new Employee Benefit Booklets before the plan year begins but it is not necessarily common to issue a new booklet year over year.  *Id.* at 28:1–13; 39:13–15.  For example, if there is a plan design change that effects the contract and Delta Dental's obligations administering the contract, Delta Dental would reissue new Employee Benefit Booklets, but "not every single change that's in an amendment actually gets into an Employee Benefit Booklet" because some changes are "never disclosed" in the booklets.  *Id.* at 39:17–24; 79:11–17.  Delta Dental may also provide services (*e.g.*, determine benefits) prior to the production of the Employee Benefit Booklet.  *Id.* at 28:16–20.  If the booklet is not finalized or available, the information is programmed into Delta Dental's system prior to a plan year.  *Id.* at 28:24–29:5.

**b.     Collective Health's Plan Matrix and Plan Design Change Confirmations**

57.     The Plan Matrix is an internal, technical spreadsheet created and maintained by Collective Health that contains member benefit information typically in the form of codes (*e.g.*, procedure codes, CPT codes).  Nelson Dep. 8:25–9:3; 19:20–22; 21:17–21.  Collective Health creates a plan matrix for each of their clients, including Netflix.  *Id.* at 9:23–25.  The Plan Matrix is Collective Health's "system for entering plan data so we can keep track of all the benefits that the client is opting into."  *Id.* at 9:3–4 (describing the Plan Matrix as Collective Health's "source of truth of benefit information"); 9:10–12.  Collective Health also uses the information contained in the Plan Matrix "downstream," such as to input information into the claims adjudication system and to generate documents such as SPDs.  *Id.* at 21:7–12.

58.     To create a plan matrix for a client, Collective Health initially reviews the client's plan documents, such as SPDs, from their current medical provider and then copies that information into the matrix. *Id.* at 10:3–7; 11:4–15.  In Netflix's case, Collective Health inserted data from Netflix's current SPD (meaning, the plan before Netflix signed up with Collective Health) and then Netflix reviewed the data in the matrix and signed off on any benefit changes it wished to make. *Id.* at 14:21–15:14.

59.     With respect to changes to benefits, Netflix indicates when any change goes into effect (whether it is retroactive, whether it applies to the new plan year, etc.). *Id.* at 65:3–5; 65;18–22.  All changes to benefits, whether retroactive or prospective, are made using Plan Design Change Confirmation ("PDCC") forms. *Id.* at 66:9–13.  When a client like Netflix wants to change their benefits, the client would put in a request via a "Jira ticket." *Id.* at 25:16–17.  Collective Health's client success team uses the Jira ticket to fill out a PDCC form. *Id.* at 25:18–20.  The client must sign the PDCC form before any information in the Plan Matrix is changed. *Id.* at 25:22–26:5.  With the exception of mandatory regulatory changes that affect all plans, such as vaccine coverage for Covid-19, Collective Health never makes changes to the Plan Matrix without first obtaining a signature from the client. *Id.* at 16:3–20; 26:12–22.  Once the PDCC is signed and returned, the change is made to the Plan Matrix and the downstream documents and portals, such as the corresponding SPD. *Id.* at 26:2–5.  Depending on how long it takes Collective Health to process and update the downstream documents, there can be a delay between the change being made to the Plan Matrix and it being represented. *Id.* at 31:17–21.

60.     Based on changes made by Netflix and/or any regulatory updates, Collective Health generated SPDs for next year's renewals. *Id.* at 12:14–18.  If a member has not yet received an SPD reflecting benefit changes for the new year, for example, the member can either view their coverage in the member portal or call member advocates (Collective Health), who have access to the Plan Matrix which reflects any changes. *Id.* at 79:24–80:23; 86:17–22 ("So when we make a change in the matrix, that becomes the new source of truth.  So then if it is something that needs to be retroactive, our claims team is made aware of that.  And they have a list of claims that

may need to be adjusted back to that date when the coverage began.").  Unlike the matrix, which is technical and "not user-friendly to read and understand," member advocates have a system "similar to the member portal" that is "user-friendly."  *Id.* at 108:7–14.

### c.     Collective Health's Preventative Care Guide

61.     Collective Health maintains a member-friendly "Preventative Care Guidebook" that was prepared in accordance with the terms and benefits provided under the Plan to assist participants and beneficiaries with queries.  Lopez Decl. ¶ 6; Nelson Dep. 44:4–7.  It constitutes a "complete guide" to a covered person's preventive benefits, such as certain immunizations and screening tests.  Balloun MSJ Decl., Ex. 23 ("PCG") 1–2, ECF No. 144-23.  Although the Collective Health SPD does not include the preventative benefits, it refers to the Preventative Care Guidebook as a resource.  Nelson Dep. 44:8–16; 44:23–25; 104:8–10; Lopez Decl. ¶ 7 ("The PCG is incorporated by reference into Netflix's SPD.").  Participants and beneficiaries were also encouraged to call Collective Health's member advocates to discuss what services are considered preventative.  *Id.* at 44:17–22; *see* PCG 1 ("You can also reach out to the Member Advocate team to confirm your benefits.").

62.     The Preventative Care Guidebook provides diagnosis and procedure codes, which, together, determine whether a preventive service is completely covered, or whether the covered person is responsible for some or all the cost of the service.  *Id.* at 2.  Collective Health makes the guide available to participants and beneficiaries at no additional charge.  Lopez Decl. ¶ 7.

63.     Netflix does not review and approve the Preventative Care Guidebook, but Netflix reviews and approves the Plan Matrix which contains a comprehensive list of the preventative care benefits provided to covered persons.  Nelson Dep. 109:15–24.

### d.     Confirmation of Summary Plan Description

64.     Collective Health issues a Confirmation of Summary Plan Description ("CSPD") which is a one-page document bearing the plan sponsor's signature to show the plan sponsor agrees to the provisions of a plan.  Lopez Decl. ¶ 12.  It states that "Netflix, Inc. the Plan Sponsor, hereby agrees to the provisions of the plan(s) as described in the following Summary Plan

United States District Court
Northern District of California

1   Descriptions(s) . . . . In witness of the agreement, the Plan Sponsor, by its duly authorized officer,

2   has executed the plan as of January 1, 2021." Netflix's Cross-MSJ, Ex. P ("2021 CSPD"), ECF

3   No. 186-3. It does not contain any benefit information, and it is not provided to participants or

4   beneficiaries. *See generally* 2021 CSPD; Lopez Decl. ¶ 12.

5                           **e.      Anthem's Prior Authorization List**

6           65.     Anthem maintains a "Prior Authorization List" which provides a detailed list of

7   service codes that Anthem must pre-authorize. Nielsen Decl. ¶ 4. Medical procedures or services

8   that require review of medical necessity are reviewed by Anthem's medical management team.

9   Nielsen Dep. 32:2–6. Anthem pre-authorizes a service by comparing the documentation received

10  by the provider against the medical policy to determine whether the service was "medically

11  necessary," and if so, it is retroactively considered pre-authorized. *Id.* at 34:20–23; 34:25–36:2;

12  77:7–13. The list of services that require prior authorization is accessible on Anthem's website to

13  all participants and beneficiaries free of charge. *Id.* at 77:11–13. Because it is publicly available,

14  it is the primary source of information for covered persons. Nielsen Decl. ¶ 5.

15                          **f.      Anthem's Medical Management Form, Utilization Review
                                      Process Document, and Appeals Policies**
16

17          66.     Anthem's Medical Management Form is an internal document that provides a list

18  of services for prior authorization. *See generally* Balloun MSJ Decl. Ex. 26 ("MMF"), ECF No.

19  144-26. It is used by Anthem for medical necessity determinations and claims processing.

20  Nielsen Decl. ¶ 9; Nielsen Dep. 63:5–8. The form does "not establish Plan features." Nielsen

21  Decl. ¶ 9. It is not provided to participants or beneficiaries. *Id.* ¶ 6.

22          67.     Anthem also maintains a Utilization Review Process document which is used

23  during utilization review, meaning Anthem's review of service codes to determine medical

24  necessity. Nielsen Dep. 169: 6–8.

25          68.     Anthem has an "appeals policy" for members' denied claims, which comprises the

26  Grievance & Appeals for Health and Plan Members Policy and Enterprise Grievances and Appeals

27  Operational Guideline. Nielsen Decl. ¶ 6. The grievance and appeals policy provides instructions

28  Case No.: 5:21-cv-01811-EJD
    AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

on "what's considered a grievance and appeal, what the process is, the determination process, for example, with the PPO products and the timeframe for submitting an appeal."  Nielsen Dep. 159:11–15.  The grievances and appeals guideline is similar in that it also outlines Anthem's grievance and appeals process.  *Id.* at 161:19–162:1.

69.    Netflix does not possess any of these documents, as they are Anthem's internal documents largely pertaining to claims denials and adjudication of claims.  ECF No. 207 ("Def.s FFCL") at 23 ¶ 77; Nielsen Dep. 16:23–17:8.

### F.    The Claims

70.    Zavislak asserts three causes of action against Netflix for 1) violating 29 U.S.C. § 1132(a)(1)(A), (c)(1)(B) by refusing to furnish the requested information; 2) injunctive Relief under 29 U.S.C. § 1132(a)(3) compelling Netflix to provide all Plan documents pursuant to § 1024(b)(4); and 3) injunctive Relief under 29 U.S.C. § 1132(a)(3) compelling Netflix to maintain the plan according to a written instrument pursuant to 29 U.S.C. § 1102(a)(1).  *See* Am. Compl. at 7–10.  With respect to Plaintiff's first claim, Plaintiff asks the Court to award statutory money damages in the amount of $110 per day from the date of the lapse of the statutory 30-day response period after Plaintiff's request for document production until Netflix fully satisfies its obligations to Plaintiff under 29 U.S.C. § 1024(b)(4).

## II.    PROCEDURAL HISTORY

71.    On February 10, 2022, the Court set trial in this matter for January 10–12, 2023.  ECF No. 93.  After taking the parties' cross motions for summary judgment under consideration, the Court vacated the parties' trial dates for January 10–12, 2023, and instructed the parties to submit their proposed findings of fact and conclusions of law under Federal Civil Procedure 52.  This matter was fully briefed in summary judgment proceedings and submitted for decision.  *See* ECF Nos. 144, 147, 186, 195, 197, 198.

72.    A three-day bench trial was scheduled to commence before the Undersigned on January 10, 2023.  ECF No. 93.  Prior to the bench trial, the Court heard oral argument on Plaintiff's motion for summary judgment.  *See* ECF Nos. 147 ("Pl.'s MSJ"); 186 ("Netflix's

United States District Court
Northern District of California

1    Cross-MSJ"). At the hearing, the parties agreed that the briefing and argument presented were the

2    trial arguments for the case and to submit Proposed Findings of Fact and Conclusions of Law to be

3    taken under submission with the motion in lieu of a bench trial. *See* ECF Nos. 200, 204. The

4    Court subsequently vacated the bench trial. To preserve its evidentiary objections, Netflix

5    submitted motions *in limine* ("MILs") to exclude evidence offered by Plaintiff in its summary

6    judgment briefs. *See* ECF Nos. 147, 186, 195, 197. Plaintiff raised his evidentiary objections

7    alongside his motion for summary judgment in a separate *Daubert* motion (*see* ECF No. 146) and

8    his Proposed Findings of Fact and Conclusions of Law (*see* ECF No. 207), which the Court will

9    address in this Order.

10        73.    For clarity, the Court will summarize Netflix's MILs and the Court's rulings here:

11        1.    In MIL No. 1, Netflix moved to exclude statements made by an unnamed

12   Collective Health customer service representative and Zavislak's statement about his

13   physician's prescription as inadmissible hearsay. Def.'s MIL No. 1, ECF No. 209. The Court

14   overruled Netflix's objection with respect to the Collective Health customer service

15   representative, finding that Zavislak met his burden of showing that Netflix authorized the

16   statements and therefore that they are subject to the hearsay exception under Rule 801(d)(2).

17   Order re MILs 3, ECF No. 234. The Court sustained Netflix's objection with respect to

18   Zavislak's statement about his physician's prescription, noting that Zavislak may only testify

19   about the fact that he was administered a test, but he may not state the purpose or nature of the

20   test, as such statements rely on his physicians out of court statements regarding those tests. *Id.*

21   at 4.

22        2.    In MIL No. 2, Netflix moved to exclude Zavislak's Exhibit 20 because he

23   improperly merged the 2022 Delta Dental Contract Amendment and the Dental Administrative

24   Services Contract ("2022 Delta Dental Agreement") as one piece of evidence. Def.'s MIL No.

25   2, ECF No. 210; *see* Pl.'s MSJ, Ex. 20. The Court granted the motion and ordered the

26   submission of two exhibits in place of Exhibit 20. Order re MILs at 5. Pursuant to the Court's

27   Order, Zavislak refiled Exhibit 20 as Exhibits 20A and 20B at ECF No. 235.

28   Case No.: 5:21-cv-01811-EJD
     AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

United States District Court
Northern District of California

3.      In MIL No. 3, Netflix moved to exclude the Collective Health customer service representative's testimonial evidence under the Best Evidence Rule, Fed. R. Evid. 1002, because it is proffered to prove the content of the Preventive Care Guidebook and is secondary evidence. Def.'s MIL No. 3, ECF No. 211 at 1; Decl. of M. Zavislak in Supp. of MSJ ("Zavislak Decl."), ECF No. 147-1 ¶¶ 4–9.  The Court overruled Netflix's objection, finding that the requirements of Rule 1004 were satisfied and Netflix was put on notice.  Order re MILs at 6.  The Court permitted the statements of the Collective Health customer service representative and of Collective Health's designee, Jessica Nelson, and will give them whatever weight the Court deems appropriate.  *Id.*

4.      In MIL No. 4, Netflix moved to exclude evidence relating to eight additional document categories based on Zavislak's alleged failure to supplement his Interrogatory Answers, including: Anthem's Prior Authorization List, Collective Health's Preventive Care Guidebook, the Plan Matrix, Plan Design Confirmation Changes, the Confirmation of Summary Plan Description, the Medical Management Forms, Anthem's Plan-Governing Policies, and the 2021 SPD (collectively, "Eight Additional Documents").  Def.'s MIL No. 4, ECF No. 212 at 1.  The Court overruled the objection, noting that the Court will give the evidence whatever weight it feels appropriate.  Order re MILs at 7.

## III.    EVIDENTIARY ISSUES

### A.    Plaintiff's *Daubert* Motion to Exclude the Testimony of Marcia S. Wagner

74.      Zavislak moves to exclude the testimony of Netflix's proffered expert witness, Marcia S. Wagner, pursuant to Federal Rules of Evidence 104(a) and 702.  *See generally* ECF No. 146 ("*Daubert* Mot."); Wagner Report.

#### 1.    Legal Standard

75.      When faced with a proffer of expert testimony, a trial judge must make a preliminary assessment at the outset to determine "whether a witness is qualified, a privilege exists, or evidence is admissible."  F.R.E. 104(a); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).  This entails assessing "whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

76.     Courts act as gatekeepers of expert testimony to ensure that such testimony is reliable and relevant under Federal Rule of Evidence 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert*, 509 U.S. 579. The proponent of expert testimony has the burden of proving admissibility. *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted). Before an expert can offer his or her opinions, they must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Once he or she is qualified, Rule 702 permits her to testify as long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.* This multifactor inquiry is flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

## 2.     Discussion

77.     For the reasons discussed below, the Court finds that Wagner is qualified and her testimony satisfies the reliability and relevance requirements of Rule 702.

### a.     Wagner is Sufficiently Qualified.

78.     The Court first addresses Zavislak's challenge to Wagner's qualification to testify as an expert witness. *Daubert* Mot. 24–25. Zavislak specifically contends that Wagner lacks knowledge to opine on the issues in this case because she has never previously rendered a legal opinion about Section 104's requirements or a plan administrator's failure to furnish plan documents or maintain a plan according to a written instrument. *Id.* at 24. Zavislak also asserts that Wagner is not admitted to practice law in California or the Ninth Circuit. Both arguments are

United States District Court
Northern District of California

unavailing.[5]

79.    Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269 (9th Cir. 1994).  Expertise may be based on "significant knowledge of an experience within . . . [an] industry."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *id.* at 1269 (explaining that 29 years of experience in numerous job categories and for different stevedoring companies "lays at least the minimal foundation of knowledge, skill, and experience required in order to give "expert" testimony").  Although Wanger may not have previously opined on these specific sections of ERISA, she is an experienced employee benefits attorney who has spent approximately thirty-five years practicing in this field.  Wagner Report ¶¶ 2–3.  During her time as an ERISA attorney, she has represented plan sponsors, plan administrators, fiduciaries, and services providers, and she has served as an independent fiduciary for numerous employee benefit plans.  *Id.* ¶¶ 3, 5.  Her résumé lists over 40 cases nationwide in which she has testified or submitted an expert report.  *Id.* ¶ 4; *see* Wagner Report, Appendix C; *see also* Decl. of Marcia S. Wagner in Opp'n to Pl.'s Mot. in Limine ("Wagner Decl.") ¶ 8, ECF No. 188-1.

80.    With respect to Zavislak's second assertion, given that ERISA is a federal law, Wagner's bar membership is not determinative of her ability to understand and testify about ERISA.  Indeed, other district courts in California have permitted Wagner to testify as an expert witness on ERISA issues.  *See, e.g.*, *Marshall v. Northrop Grunman Corp.*, No. 16-CV-06794-AB-JCX, 2019 WL 6354371, at *2 (C.D. Cal. Oct. 16, 2019); *In re Prime Healthcare Erisa Litig.*, No. 8:20-CV-01529-JLS-JDE, 2023 WL 6787806, at *2 (C.D. Cal. Sept. 19, 2023).

81.    Accordingly, the Court is satisfied that Wagner possesses sufficient "knowledge,

---

[5] Zavislak also asserts that Wagner lacks knowledge about case law applicable to § 104(b)(4) because, when questioned about a recent case that was published on her firm's website, she "appeared to read it for the first time in deposition."  *Daubert* Mot. 24; *see* Wagner Dep. at 56:25-61:11. The Court will not indulge Plaintiff's argument that an expert is unqualified simply because they lack awareness of one recent non-precedential relevant case.  In any event, Wagner's knowledge of the case, or lack thereof, is not useful to the Court for the purpose of determining her qualification, as Wagner notes that this case is on appeal and "not settled law."  Wagner Decl. ¶ 13.

1 | skill, experience, training, or education" to opine on the issues before the Court.  F.R.E. 702.

2 | **b.      Wagner Applied Reliable and Sound Methodology.**

3 | 82.    Zavislak raises a number of challenges to Wagner's methodology, arguing that her

4 | testimony ignores material facts and relies on insufficient data, her testimony does not use legally

5 | sufficient methods, and her application of the methodology is not reliable.

6 | 83.    First, Zavislak contends that Wagner fails to disclose a test or methodology on

7 | which her opinions are based.  *Daubert* Mot. 20.  "[T]he test under *Daubert* is not the correctness

8 | of the expert's conclusions but the soundness of his methodology."  *Daubert*, 43 F.3d at 1318.

9 | Expert testimony must have "a reliable basis in the knowledge and experience of the relevant

10 | discipline."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  A court must consider

11 | four non-exclusive factors when assessing reliability: "(1) whether the theory or technique used by

12 | the expert 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected

13 | to peer review and publication'; (3) 'the known or potential rate of error'; and (4) whether there is

14 | 'general acceptance' of the theory or technique in the 'relevant scientific community.'"

15 | *Kanellakopoulos v. Unimerica Life Ins. Co.*, No. 15-CV-04674-BLF, 2018 WL 984826, at *2

16 | (N.D. Cal. Feb. 20, 2018) (quoting *Daubert*, 509 U.S. at 593–94).

17 | 84.    In addition, the Ninth Circuit has recognized that testimony based on "knowledge

18 | and experience" that is "not contingent upon a particular methodology or technical framework"

19 | may satisfy the reliability inquiry.  *Hangarter*, 373 F.3d at 1018.  For example, courts in this

20 | district have found that expert testimony based on 40 or more years of professional experience and

21 | familiarity with industry standards is an appropriate methodology to form the basis of the expert's

22 | opinion.  *See, e.g.*, *Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 792 (N.D. Cal.

23 | 2021); *Kanellakopoulos*, 2018 WL 984826, at *2.

24 | 85.    Here, Wagner's testimony is based on her 35-years of professional experience

25 | working in the area of employee benefits law and her considerable knowledge of the industry,

26 | which she acquired through advising and representing hundreds of clients, including plan

27 | sponsors, plan administrators, fiduciaries, and services providers, and serving as an independent

United States District Court
Northern District of California

28 | Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

1  fiduciary for employee benefit plans.  Wagner Report ¶ 1 ("My observations and opinions are

2  based on my extensive years advising and representing welfare benefit plan fiduciaries."); *id.* ¶¶

3  1–3, 5.  She has counseled these clients on issues concerning mandatory fiduciary disclosures to

4  plan participants and beneficiaries.  *Id.* ¶ 6.

5       86.     Second, Zavislak contends that Wagner's analysis is based on insufficient data.

6  Wagner's opinion is based on her review of the documents and materials in the case.  *Id.* ¶¶ 9, 42,

7  46, 51, 54; Wagner Decl., Ex. B ("Wagner Dep.") 23:14–17, 23:24–24:3.  ECF No. 188-3.

8  Wagner reviewed the materials provided to her which included the Court documents, transcripts,

9  the seven Plan documents furnished to Zavislak, the claims administration agreements,

10 interrogatory responses, and the communications between Zavislak and Netflix.  *See* Appendix D.

11      87.     Zavislak asserts that Wagner failed to actually review the deposition testimony

12 Collective Health or it's Plan Matrix such that she cannot "reasonably make an assertion about the

13 sufficiency" of the furnished documents.  *Daubert* Mot. at 12–13.  "But an argument that an expert

14 should have addressed different evidence at best, goes to the weight or credibility of the expert's

15 analysis, not its admissibility."  *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1033

16 (S.D. Cal. 2023) (quotation marks and citations omitted) (collecting cases).  Even so, Wagner

17 states, since filing her expert report she has reviewed the deposition transcript of Collective Health

18 and reports that her opinion remains unchanged.  Wagner Decl. ¶ 12.

19      88.     Zavislak generally takes issue with Wagner's conclusion that the seven documents

20 Netflix provided to Plaintiff "create a valid ERISA plan and a valid written plan for ERISA

21 purposes" because her opinion focuses on whether the furnished documents are sufficient to

22 inform him of his benefits and obligations under the Plan and not whether the documents that

23 Netflix failed to disclose (*i.e.*, the claims administration agreements, the Plan Matrix, the Prior

24 Authorization List) also describe his benefits and obligations under the Plan and therefore they

25 *should have been* furnished upon his request.  Balloun MSJ Decl."), Ex. 38 ("Wagner Dep.")

26 34:25–37:6, ECF No. 144-38; Wagner Report ¶ 42 ("Based on my review, the seven documents

27 that Netflix furnished to the Plaintiff are the only documents that a participant or beneficiary of the

Plan would need to interpret and understand where they stand with respect to benefits under the Plan."). According to Zavislak, the sufficiency of the furnished documents (such as the SPDs) is not at issue in this case; the issue is whether the undisclosed documents fall into one of the categories under § 1024(b)(4)—meaning they are "contract[s]" or "other instruments under which the plan is established or operated"—such that he was entitled to them under the statute. *Daubert* Mot. 5–6, 10–11, 14. This argument forms the basis of the parties' disagreement over which documents must be disclosed under § 1024(b)(4). However, Plaintiff's disagreement with Wagner's conclusion is not a proper basis for the exclusion of her testimony. *Daubert*, 43 F.3d at 1318 ("[T]he test under Daubert is not the correctness of the expert's conclusions."); *Yu-Santos v. Ford Motor Co.*, No. 1:06-CV-01773-AWI-DLB, 2009 WL 1392085, at *10 (E.D. Cal. May 14, 2009) ("[M]ere disagreement with [the expert's] conclusion is not a sufficient reason to exclude his opinion under Rule 702."). Because this is a bench trial, the Court, as the fact finder, may determine the appropriate weight to give to Wagner's testimony.

89.     In sum, Wagner's methodology is sufficiently sound, and based on sufficient and reliable information for admission of her report.

### c.     Wagner's Testimony is Relevant.

90.     Next, Zavislak contends that Wagner's opinions will not assist the Court in resolving the legal issues before it because her testimony is irrelevant. For relevance, a court must determine "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quotation marks and citation omitted). One legal issue before the Court is whether Netflix "furnish[ed] a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated" upon Zavislak's Section 104 request. 29 U.S.C. § 1024(b)(4). The second issue is whether Netflix maintains the plan pursuant to a written instrument. In her report, Wagner opines whether the Plan documents provided by Netflix comprehensively describe Zavislak's benefits, rights, and claims and appeals procedures under the Plan and whether the Plan

United States District Court
Northern District of California

1   was operated in accordance with its written documents.  Because Wagner's testimony speaks

2   directly to the two legal issues before the Court, her opinions are relevant.

3               **d.**        **Wagner's Testimony is Not Improper Legal Opinion.**

4         91.     Finally, Zavislak contends that Wagner improperly proffers opinions interpreting

5   statute and the agreements at issue.  *Daubert* Mot. at 7.

6         92.     "[A]n expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an

7   opinion on an ultimate issue of law." *Hangarter*, 373 F.3d at 1016.  However, "expert testimony

8   that is otherwise admissible is not objectionable because it embraces an ultimate issue to be

9   decided by the trier of fact." *Id.* (quotation marks and citation omitted).  An expert may testify

10  that an individual "failed to comport with industry standards." *Id.*; *Karla Terraza v. Safeway Inc.*,

11  No. 16-CV-03994-JST, 2019 WL 1059688, at *3 (N.D. Cal. Mar. 6, 2019) ("[E]xpert witnesses, in

12  all types of litigation, render an opinion as to what the applicable standard of care is and whether it

13  has been complied with.") (citation omitted).  In doing so, an expert may also "refer to the law in

14  expressing an opinion without that reference rendering the testimony inadmissible." *Hangarter*,

15  373 F.3d at 1017 (quoting *Specht v. Jensen,* 853 F.2d 805, 809 (10th Cir. 1988)).

16        93.     Here, the Wagner Report opines as to the standard of care and practices of

17  fiduciaries charged with administration of a welfare plan and whether Netflix met this standard of

18  care in administering the Plan and furnishing Plan documents pursuant to Zavislak's Section 104

19  request.  Wagner concludes that Netflix's response to Zavislak's request for information was

20  consistent with the standard of care in the industry and that Netflix did meet the prevailing

21  industry standards for maintaining a written Plan.  Wagner Report ¶¶ 2–3, 12.  While this

22  conclusion supports a finding that Netflix satisfied the applicable requirements of ERISA, it does

23  not actually reach a legal conclusion on the ultimate issues of law.[6]  *Hangarter*, 373 F.3d at 1016;

24  

_____

25  [6] Indeed, the Ninth Circuit has recognized that "there may be instances in rare, highly complex, and technical matters where a trial judge, utilizing limited and controlled mechanisms, and as a

26  matter of trial management, permits some testimony seemingly at variance with [the] general rule." *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008), *rev'd on other grounds, Horne v.*

27  *Flores*, 557 U.S. 433 (2009).  A case concerning a Defendant's fiduciary obligations under ERISA is one such instance where courts have permitted expert testimony to assist the court in

28

1   *see Terraza*, 2019 WL 1059688, at *3.  Thus, the Wagner Report does not improperly usurp the

2   Court's role as Zavislak suggests.

3       94.     Furthermore, because this is a bench trial, there is a decreased risk that testimony

4   going to the factual and legal issues will result in prejudice.  *See F.T.C. v. BurnLounge, Inc.*, 753

5   F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are

6   mindful that there is less danger that a trial court will be unduly impressed by the expert's

7   testimony or opinion in a bench trial.") (quotation marks omitted).

8               **3.     Conclusion**

9       95.     The Court finds that Wagner's opinions satisfy the *Daubert* requirements, and

10  therefore Plaintiff's motion is DENIED.

11      **B.     Plaintiff's Request to Strike Netflix's "Sham Affidavits"**

12      96.     Zavislak also asserts that Wagner's opinion should excluded because it is based on

13  unreliable testimony from 1) Melissa Bass, VSP's Rule 30(b)(6) corporate designee; 2) Therese

14  Nielsen, Anthem's Rule 30(b)(6) corporate designee; and 3) Sharen Stanek-Lowe, Delta Dental's

15  Rule 30(b)(6) corporate designee.  *See* ECF No. 208 ("Pl.'s FFCL") ¶¶ 228–66.  Zavislak argues

16  that the deposition testimony and declarations of these individuals are "sham affidavits" because

17  their testimony contains unexplained contradictions, discrepancies, and/or non-holographic

18  typewritten signatures from the declarants and evinces bad faith on Netflix's part.  With respect to

19  Lopez, Zavislak contends that Netflix did not specifically designate her under Rule 26.  For these

20  reasons, Zavislak asks the Court to strike the testimony of these individuals from the record.  Pl.'s

21  FFCL ¶¶ 267–71.  The Court addresses each argument in turn.

22              **1.     Legal Standard**

23      97.     The sham affidavit rule was developed in the context of motions for summary

24  judgment to prevent a party from making "'sham' testimony that flatly contradicts earlier

25  _____

26  understanding the complicated factual and legal issues presented by ERISA's fiduciary
    requirements.  *See, e.g.*, *Marshall v. Northrop Grunman Corp.*, No. 16-CV-06794-AB-JCX, 2019
27  WL 6354371, at *2 (C.D. Cal. Oct. 16, 2019).

28  Case No.: 5:21-cv-01811-EJD
    AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). The rule applies with equal force to "sham" deposition transcript corrections, which, while permitted under Fed. R. Civ. P. 30(e), are likewise not permitted to contradict a witness's prior deposition testimony. *Ochoa v. McDonald's Corp.*, No. 14-CV-02098-JD, 2015 WL 13079032, at *1 (N.D. Cal. June 2, 2015). This is because "Rule 30(e) is to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005). Although the rule arose in the context of summary judgment, its application has since been extended outside this context to evidentiary motions. *See, e.g.*, *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, No. C08-04990 JW (HRL), 2011 WL 2940289, at *1 (N.D. Cal. Jul. 20, 2011); *Tourgeman v. Collins Fin. Servs., Inc.*, No. 08-CV-01392, 2010 WL 4817990 * 3 (S.D. Cal., Nov. 22, 2010).

### 2. Discussion

#### a. Bass Testimony

98. First, Zavislak contends that, after her deposition, Bass submitted a "sham" errata sheet purporting to clarify her deposition testimony. Pl.'s FFCL ¶ 233.

99. During the deposition, Bass testified that the EOC is "essentially a form document," Bass Dep. 50:10, that VSP provides to all of its clients which can be used to create their SPD "and [the client] may do with it what they choose to communicate to their employees," *id.* at 49:8–10, 50:13–15, although Netflix's communications with its members would not constitute the formal plan or otherwise "bind" VSP, *id.* at 77:21–78:2. In her errata, Bass clarified that her answer "no" at page 78 line 2 should say "yes" in response to Plaintiff's question that Netflix's communications *would bind* VSP, "to the extent the primary agreement between VSP and Netflix is in place (*i.e.*, Netflix pays its fees and it's not terminated), then VSP would be legally obligated to provide these benefits in the evidence of coverage." *Id.* at 30. According to Zavislak, this erratum suggests that the VSP EOC controls over the VSP Group Vision Care Plan and that Netflix *could* unilaterally change the EOC without informing VSP, which allegedly contradicts Bass's previous testimony that the EOC is a "form document" provided to all VSP's

1    clients.  Pl.'s FFCL ¶ 234.

2         100.    The Court does not agree that Bass's erratum to her deposition testimony invokes

3    the sham affidavit rule.  "[T]o trigger the sham affidavit rule, the district court must make a factual

4    determination that the contradiction is a sham, and the inconsistency between a party's deposition

5    testimony and subsequent affidavit must be clear and unambiguous to justify striking the

6    affidavit."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quotation marks and citation

7    omitted).  However, "the 'sham affidavit' rule does not preclude the non-moving party 'from

8    elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on

9    deposition' and that 'minor inconsistencies that result from an honest discrepancy, a mistake, or

10   newly discovered evidence afford no basis for excluding an opposition affidavit.'"  *Nelson v. City*

11   *of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (quoting *Scamihorn v. Gen. Truck Drivers*, 282 F.3d

12   1078, 1086 n.7 (9th Cir. 2002)).  Here, the Court does not find that the errata sheet is a "sham."

13        101.    Bass's testimony that the EOC is akin to a "form document" is not inconsistent

14   with her overall testimony.  Bass testified that it is VSP's standard practice to provide the EOC

15   and member benefit summary to the Group, and the client makes changes to them to by adding

16   more specific information regarding the client's relationship with their employees and how the

17   client determines eligibility, which does not involve VSP.  *Id.* at 49:6–14; 51:23–24; 50:13–14

18   ("As a courtesy, [VSP] provide[s] the EOC to all of our clients."); *id.* at 51:23–24 ("We do

19   provide the evidence of coverage and the member benefit summary as a standard practice.").  Bass

20   explained that the VSP Agreement is binding on VSP, not the EOC, which only contains the

21   member benefits.  Bass Dep. 95:24–96:15.  The VSP Agreement describes VSP's relationship

22   *with the client* (in this case, Netflix) while the EOC describes the benefits available to *the covered*

23   *person*.  *Id.* at 52:12–16; 52:23–53:2 (agreeing that "the EOC and the member benefit summary is

24   only intended to summarize the terms and conditions of the 45-page contract as they apply to the

25   covered person").  Bass's erratum clarifies that the EOC is binding on VSP only to the extent that

26   VSP must provide the benefits to covered persons as provided in the EOC.  The errata sheet is

27

28   Case No.: 5:21-cv-01811-EJD
     AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW
                                        30

therefore a permissible clarification of her testimony.[7]  *See Scamihorn v. Gen. Truck Drivers*, 282 F.3d 1078, 1086 (9th Cir. 2002) (concluding that a declaration seeking to clarify statements made during the witness's deposition is not a sham and therefore should not be excluded).

102.    The same goes for Bass's declaration dated July 8, 2022—Zavislak asserts that two statements in her declaration contradict testimony made during her deposition without explanation for the discrepancy.  ECF No. ¶ 238.  The first allegedly contradictory statement concerns authentication of different versions of the 2021 VSP EOC.  Pl.'s FFCL ¶¶ 239–40.  During discovery, Bass had authenticated a VSP EOC updated as of March 11, 2021 as the 2021 VSP EOC.  *Id.* ¶ 240; Decl. of O. Shane Balloun ISO Pl.'s Reply on his Mot. for Summ. J. ("Second Balloun Decl.") Ex. 40, ECF No. 196-1.  Bass later filed a declaration in support of Netflix's cross-motion for summary judgment in which she declared that "A true and correct copy of the 2021 VSP EOC is attached to Netflix's Cross Motion for Summary Judgment as Exhibit K."  Decl. of Melissa Bass ISO of Netflix Inc.'s Cross-Mot. for Summ. J. ("Bass Decl.") ¶ 7, ECF No. 186-8.  The VSP EOC filed as Exhibit K mentions the Adoption Agreement while the VSP EOC updated as of March 11, 2021 does not.  Pl.'s FFCL ¶ 241.  Months later, during her deposition, Bass allegedly authenticated the VSP EOC updated as of March 11, 2021 rather than the version at Exhibit K.  Pl.'s FFCL ¶ 244.  Zavislak contends that Bass's failure to provide an explanation for her authentication of a different version of the 2021 VSP EOC invokes the sham affidavit rule.

103.    The Court is unpersuaded that Bass's authentication of the 2021 VSP EOC rises to the level of a sham affidavit.  Plaintiff specifically queried Bass during her deposition about the different versions of the EOC.  Plaintiff asked Bass to identify a document marked as Exhibit 8— the EOC updated as of March 2021—and Bass simply identified the document as "the evidence of coverage."  Bass Dep. 62:9–11.  When asked about the differing dates on Exhibit 8 and Exhibit K, Bass explained that there were "no material changes" and the 2021 VSP EOC was updated

---

[7] The VSP Agreement supports Bass's testimony that any inaccuracies in Netflix's communication materials would not constitute a part of the Plan because the VSP Agreement provides that "[c]ommunication materials prepared by Group for distribution to Enrollees do not constitute a part of this Plan."  VSP Agreement ¶ 10.01.

United States District Court
Northern District of California

because there was a change of contact; the plan administer changed from Johnny Martinez to Dana Armanino.  *Id.* at 63:12–23.  As explained by Bass and Netflix, it is not uncommon for VSP to make updates, which are sent to Netflix for review.  Bass Dep. 41:19–21; Armanino Dep. 121:20–23.  Bass confirmed that "March 11, 2021" refers to the date Netflix requested the update and that both documents are effective as of January 1, 2020, with the update being effective retroactively.  Bass Dep. 63:24–64:9.  Bass's testimony clarifies the discrepancy identified by Plaintiff, and therefore it is not "sham" testimony.

104.    The second allegedly contradictory statement concerns Bass's declaration that the Adoption Agreement and the VSP EOC "are and have always been the primary documents that should be consulted to determine a Netflix Plan participant's governing terms and conditions and are contractually binding on benefits as long as Netflix meets its obligations to pay premiums."  Bass Decl. ¶ 7.  Zavislak asserts that this averment is contradicted by Bass's deposition testimony.  Pl.'s FFCL ¶ 247–48.  However, the testimony Plaintiff cited in support does not contradict Bass's assertion.  For example, Zavislak cites Bass's statement that "[t]he plan document dictates our relationship between VSP and the plan," Bass Dep. 30:1–2, and her statement that the VSP Agreement "is the binding agreement" although "[t]here are other materials that are member facing that also provide this information that are provided to the client and for distribution, such as the evidence of coverage and member benefits summary,"  *id.* at 47:8–12.  This testimony is in line with Bass's declaration and her other statements on the record.[8]

105.    Accordingly, the Court will not strike the deposition testimony or July 8, 2022 declaration of Melissa Bass.

### b.    Nielsen Testimony

106.    Next, Zavislak asserts that Nielsen's July 14, 2022 declaration should be stricken because her statement that "[t]he Medical Management Form is controlled by the Prior

---

[8] Bass's statement reiterates what is stated in the 2021 VSP EOC: "This [EOC] along with the Netflix, Inc. [Adoption Agreement] should be consulted to determine governing terms and conditions of coverage."  Bass Decl., Ex. K at 1, ECF No. 186-3.

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW
32

United States District Court
Northern District of California

Authorization List and does not override it" is allegedly contradicted by her deposition testimony.[9] Nielsen Decl. ¶ 5.  During her testimony, Plaintiff queried whether the Medical Management Form or the Prior Authorization List controls when there is a conflict between the two documents, and Nielsen testified that the Medical Management Form would control.  Nielsen Dep. 99:14–18; 136:14–17.  Counsel objected to Plaintiff's question as ambiguous because "control" could have a different meaning in different contexts.  *Id.* at 136:18–24 ("So I'm just going to object that it's vague and ambiguous. Would control for whom and what purpose[?]").  Later, by way of specific example, Nielsen testified that certain implants listed as requiring prior authorization under the Prior Authorization List would not, in fact, require authorization because the Medical Management Form did not require it, and she also answered in the affirmative to Plaintiff's question that the Medical Management Form supersedes the Prior Authorization List.  *Id.* at 145:17–146:4.  Earlier in the deposition, however, Nielsen testified that any service on the Prior Authorization List which indicates that authorization is required *does* require medical authorization.  *Id.* at 139:18–21.

107.    Plaintiff's point is well-taken—Nielson's testimony that the Medical Management Form "controls" and "supersedes" the Prior Authorization List is at odds with her declaration that the Prior Authorization List "overrides" the Medical Management Form, and Netflix's reply brief does little to clarify this inconsistency.  *See* Def. Netflix, Inc.'s Reply IFSO its Cross Mot. for Summ. J. ("Netflix Surreply") 10–11, ECF No. 197.  However, the Court does not agree that this inconsistent statement warrants wholesale exclusion of Nielson's declaration.

---

[9] Plaintiff also argues that exclusion of the declaration is warranted because Nielsen's signature is a "non-holographic typewritten name on a signature line."  Pl.'s FFCL ¶¶ 256–57.  According to Plaintiff, Nielsen's signature raises "significant doubts" as to the authenticity of the declaration.  *Id.* ¶ 258.  Plaintiff's attempt to strike the declaration on this basis is unfounded.  Rule 901 provides that witness evidence may be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(4).  Here, the Court has no reason to doubt the authenticity of Nielsen's signature, and "[c]ourts generally view objections based on authentication skeptically in the absence of an indication that the document's authenticity is genuinely in dispute."  *Johnson v. Sweeney*, No. 1:14-CV-01526-LJO-SAB, 2015 WL 6082061, at *9 (E.D. Cal. Oct. 13, 2015), *report and recommendation adopted sub nom. Vance Edward Johnson v. Sweeney & J. Hardin*, No. 1:14-CV-01526-DAD-SAB, 2016 WL 8731209 (E.D. Cal. July 29, 2016).

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

108.     The Ninth Circuit has cautioned that the sham affidavit rule should be applied judiciously because "[a]ggressive invocation of the rule [] threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). Generally, "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995). With this understanding in mind, the Court finds that the appropriate remedy is to strike Nielson's statement that "[t]he Medical Management Form is controlled by the Prior Authorization List and does not override it" from her July 14, 2022 declaration. *See* Nielsen Decl. ¶ 5.

### c.     Stanek-Lowe Testimony

109.     Finally, Zavislak contends that Stanek-Lowe's declaration dated July 14, 2022 contains a statement which is contradicted by her deposition testimony.[10] Pl.'s FFCL ¶ 261. In her declaration, Stanek-Lowe states that the first seven pages of the Delta Dental Agreement "address services that Delta Dental provides to Netflix, such as claims administration services and printing of documents for plan participants" and that "[t]hese provisions affect only Delta Dental's relationship with Netflix and neither provide nor discuss any Plan benefits to participants or beneficiaries." Second Stanek-Lowe Decl. ¶ 4, ECF No. 186-7. During her deposition, Plaintiff referred to the Delta Dental Employee Benefit Book, which provides that "[t]he benefits explanations contained in this booklet are subject to all provisions of the [Delta Dental Agreement] . . . and do not modify the terms and conditions of the contract in any way." Stanek-Lowe Dep. 33:17–21. Plaintiff's counsel interpreted this language as meaning that the "the explanations in this booklet do not modify the terms of the Delta [Dental Agreement]" and asked

---

[10] Plaintiff once again argues that exclusion of the declaration is also warranted because Stanek-Lowes's signature is a "non-holographic typewritten name on a signature line." Pl.'s FFCL ¶ 264. For the reason already explained, the Court has no reason to doubt the authenticity of Stanek-Lowes's signature and will not strike her declaration based on this unfounded assertion. *See supra* at 32, n.8.

Stanek-Lowe whether, in the case of a variance between the Employee Benefit Book and the Delta Dental Agreement, the Delta Agreement would control, to which Stanek-Lowe answered in the affirmative.  *Id.* at 34:1–4, 34:16–20.

110.    Notwithstanding Stanek-Lowe's answer to Plaintiff's question, the Court does not agree that Stanek-Lowe's deposition testimony contradicts her declaration to the extent that it warrants exclusion of her declaration.  Later in the deposition, Stanek-Lowe clarified that the Employee Benefit Book is the resource for benefits while the Delta Dental Agreement does not address the benefits provided to covered persons.  *See, e.g.*, *id.* at 67:13–15 ("The Employee Benefit Booklet would be the resource that the representative would quote for the specific benefits such as, again, the exam."); *id.* at 68:7–9 ("[A]s I mentioned in my example, that they're going to refer to the employee handbook—benefit booklet."); *id.* at 80:22–81:7 (agreeing that there is nothing in the first seven pages of Delta Dental Agreement that provides any benefits to Netflix Plan participants); *id.* at 81:17–22 (confirming that "if a participant was to ask for the Administrative Services Contract, all the information on benefits that he or she would get is what's already contained [] in the benefit booklet.").  This testimony is consistent with her declaration, which states that the first seven pages of the Delta Dental Agreement do not discuss Plan benefits, and the second half of the Delta Dental Agreement consists of the Employee Benefit Booklet which is already provided to Netflix participants and beneficiaries.  Second Stanek-Lowe Decl. ¶¶ 4–5.

111.    Accordingly, the Court finds that the single inconsistent statement in Stanek-Lowe's deposition does not rise to the level of "clear and ambiguous" contradiction to justify striking her declaration.  *See Van Asdale*, 577 F.3d at 998–99.

### 3.    Conclusion

112.    In sum, the testimony of Bass, Nielsen, and Stanek-Lowe are not subject to the sham affidavit rule.  To the extent Nielson's statement that "[t]he Medical Management Form is controlled by the Prior Authorization List and does not override it" is inconsistent with her deposition testimony, this sentence is STRICKEN from paragraph five of her July 14, 2022

1    declaration.  The Court otherwise DENIES Plaintiff's request to strike their testimony.

2         To the extent Plaintiff also asks the Court to exclude Wagner's opinion because it is based

3    on testimony from these declarants, Plaintiff's request is likewise DENIED.

4         **C.      Plaintiff's Request to Strike the Lopez Declaration**

5         113.    Zavislak asserts that Netflix did not mention Heather Lopez as a witness in any of

6    its disclosures and she was not specifically designated by Collective Health as a Rule 30(b)(6)

7    corporate representative.  Pl.'s FFCL ¶ 267.  Zavislak asks the Court to strike Lopez's declaration

8    in its entirety.  *Id.* ¶ 271.

9         114.    In Netflix's Rule 26(a) amended disclosures, Netflix indicated that a "corporate

10   representative" for Collective Health would be made available to testify about "services performed

11   and whether their agreements provide benefits to participants."  Second Balloun Decl. Ex. 47,

12   ECF No. 196-9.  Other courts in this circuit have held that failing to identify a corporate

13   representative by name is harmless where "there is no evidence Plaintiffs were deprived of the

14   opportunity to take depositions of Defendants' corporate representatives or 30(b)(6) designees

15   during discovery, and Plaintiffs should not have been surprised by Defendants' reliance on

16   testimony from a corporate representative."  *Acunis-Graham v. Select Portfolio Servicing, Inc.*,

17   No. CV-17-3143-CBM, 2020 WL 1625018, at *2 (C.D. Cal. Jan. 15, 2020).

18        115.    Netflix contends that Zavislak suffered no harm because he subpoenaed Collective

19   Health on December 1, 2021 and received a response, and Zavislak deposed Collective Health

20   Rule 30(b)(6) corporate designee, Jessica Nelson, on March 7, 2022.  Decl. of Heather Lopez ISO

21   of Netflix Inc.'s Cross-Mot. for Summ. J. ("Lopez Decl.") ¶ 10, ECF No. 186-10.  Because

22   Plaintiff had the opportunity to depose a Collective Health corporate representative and it would

23   not be surprising that Netflix would rely on testimony from a Collective Health corporate

24   representative, the Court agrees that this error was harmless.  *See, e.g.*, *Hoffman v. Cnty. of Los*

25   *Angeles*, No. CV-15-3724 FMO-ASX, 2017 WL 3476772, at *2 (C.D. Cal. Feb. 18, 2017)

26   (collecting cases); *B.A. by & through Adinolfi v. Omni La Costa Resort & Spa, LLC*, No. 18-CV-

27   1657 JLS-WVG, 2020 WL 5535027, at *3 (S.D. Cal. Sept. 14, 2020).

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    116.    Accordingly, the Court will not strike Lopez's declaration.

**IV.    ANALYSIS & LEGAL CONCLUSIONS**

    **A.    Whether Netflix Furnished All Plan Documents Upon Written Request**

117.    "ERISA is a federal statute designed to regulate 'employee benefit plan[s].'" *Wit v. United Behav. Health*, 79 F.4th 1068, 1081 (9th Cir. 2023) (quoting 29 U.S.C. § 1003(a)). "Congress enacted ERISA to promote the interests of employees and their beneficiaries in employee benefit plans . . . by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.* (quotation marks and citations omitted).  Employers are not required to establish employee benefit plans under the statute, "[n]or does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  Rather, "ERISA induces employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quotation marks and citations omitted).

118.    "ERISA's comprehensive legislative scheme includes an integrated system of procedures for enforcement." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quotation marks and citation omitted).  "Accordingly, 29 U.S.C. § 1132(a) 'set[s] forth a comprehensive civil enforcement scheme.'" *Wit*, 79 F.4th at 1082 (quoting *Aetna Health*, 542 U.S. at 208).  In pertinent part, Section 1132(a) permits a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(b).

119.    Plaintiff alleges that Netflix refused to supply Plaintiff with the required information within 30 days of his Section 104 request and therefore seeks the statutory penalty of $110 per day for failure to provide such documents pursuant to 29 U.S.C. §§ 1132(a)(1)(A) and (c)(1)(B).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

120.    Following a participant or beneficiary's Section 104 request:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, **contract, or other instruments under which the plan is established or operated**.

29 U.S.C.A. § 1024(b)(4) (emphasis added).  The primary purpose of ERISA's disclosure requirements is to ensure that "the individual participant knows exactly where he stands with respect to the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989) (quoting H.R. Rep. No. 93-533, p.11 (1973), reprinted in 1974 U.S.C.C.A.N. 4649).

121.    Section 1132(c)(1)(B) entitles a claimant to receive penalties of up to $110 per day if the plan administrator "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . .  within 30 days after such request."  29 U.S.C. § 1132(c)(1)(B); 29 C.F.R. § 2575.502c-l.

122.    Plaintiff alleges that Netflix failed to comply with Section 1132(c)(1)(B) by refusing to furnish all the Plan "contract[s]" and "other instruments under which the plan is established or operated."  Pl.'s MSJ at 4; 29 U.S.C. § 1024(b)(4).  In response to Plaintiff's Section 104 request, Netflix provided seven 2020 Plan documents consisting of: 1) the Adoption Agreement; 2) the Collective Health SPD; 3) the Delta Dental Employee Benefit Booklet; 4) the VSP EOC; 5) the VSP SBC; 6) the Collective Health SBC; and 7) the Delta Dental SBC.  Balloun MSJ Decl. at 3; Armanino Decl., Exs. A-G, J.  Plaintiff contends that, pursuant to § 1132(c)(1)(B), Netflix is also required to furnish "at least twenty-one [additional] Plan documents," including: the four claims administration agreements (*i.e.*, the Anthem Agreement, the Collective Health Agreement, the Delta Dental Agreement, and the VSP Agreement); Collective Health's Plan Matrix; at least one PDCC, "meaning there was also [] at least one formal amendment to the Plan matrix;" Collective Health's four CSPDs "because discovery has indicated at least . . . four Collective Health HSA SPDs for 2021;" Collective Health's Preventive Care Guidebook; Anthem's Prior Authorization List; Anthem's Medical Management Form; and "Anthem's three Plan-governing policies."  Pl.'s MSJ at 22.

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

123.    For simplicity of analysis, the Court groups these Plan documents into the following four categories:

- Category I: Claims Administration Agreements.

- Category II: Collective Health Internal Documents (e.g., the Plan Matrix, the PDCC, and the CSPDs).

- Category III: Incorporated Documents (Preventative Care Guide and the Prior Authorization List).

- Category IV: Anthem Internal Documents (e.g., the Medical Management Form and the Plan-governing policies).

The Court will analyze the documents by category.

### 1.    The Ninth Circuit's Narrow Interpretation of the Statute

124.    The Court is guided by the Ninth Circuit opinions narrowly interpreting the disclosure requirements of Section 104(b)(4), 29 U.S.C. § 1024(b)(4).  *See, e.g.*, *Metaxas v. Gateway Bank F.S.B.*, No. 20-CV-01184-EMC-DMR, 2022 WL 972039, at *2 (N.D. Cal. Mar. 31, 2022) ("The Ninth Circuit narrowly construes the disclosures required by [] section [1024(b)(4)]."); *Gurasich v. IBM Ret. Plan*, No. 14-CV-02911-DMR, 2016 WL 362399, at *11 (N.D. Cal. Jan. 29, 2016).

125.    In *Hughes Salaried Retirees Action Comm. v. Adm'r of Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686 (9th Cir. 1995), the Ninth Circuit explained that the panel's original interpretation of the statute's mandated disclosures in response to a Section 104 request—which initially required "disclosure of *all* documents that are critical to the operation of the plan"—was too broad because it essentially mandated "a generalized disclosure obligation" by requiring a plan administrator "to disclose virtually everything in its plan files upon request."  *Hughes*, 72 F.3d at 690 (quotation marks and citations omitted; emphasis added).  The *Hughes* panel rejected this reasoning and declined to interpret Section 104 as mandating generalized disclosure subject only to specified exceptions.  *Id.* at 691.  In doing so, the panel reasoned that such an interpretation would render it "impossible to conceive of any documents even tangentially related to an

United States District Court
Northern District of California

1    employee benefit plan which would not fall within [§ 104(b)(4)]'s scope." *Id.* (quotation marks

2    and citation omitted; alteration in original).

3         126.    Although "documents that provide individual participants with information about

4    the plan and benefits" are relevant documents to any plan, "the documents contemplated by §

5    104(b)(4) are those that *allow the individual participant [to] know[ ] exactly where he stands with*

6    *respect to the plan*—what benefits he may be entitled to, what circumstances may preclude him

7    from obtaining benefits, what procedures he must follow to obtain benefits, and who are the

8    persons to whom the management and investment of his plan funds have been entrusted." *Id.* at

9    690 (emphasis added).  With respect to Section 104's language requiring disclosure of "other

10   instruments under which the plan is established or operated," the *Hughes* panel concluded that

11   "other instruments" are "limited to documents that are *similar in nature* to the documents

12   specifically listed in § 104(b)(4)," meaning those "which describe the terms and conditions of the

13   plan, as well as its administration and financial status."  *Id.* at 689–90 (emphasis added).

14        127.    In *Shaver v. Operating Engineers Loc. 428 Pension Tr. Fund*, 332 F.3d 1198 (9th

15   Cir. 2003), the Ninth Circuit reinforced its narrow interpretation of Section 104(b)(4), applying the

16   interpretive principle of *ejusdem generis* and holding that "other instruments should be limited to

17   the class of objects that specifically precedes it," *i.e.*, "legal documents that describe the terms of

18   the plan, its financial status, and other documents that restrict or govern the plan's operation."

19   *Shaver*, 332 F.3d at 1202.  The *Shaver* court thus concluded that statute does not mandate the

20   disclosure of itemized expenditure lists, which at most relate "only to the manner in which the

21   plan is operated."  *Id.*

22                           a.        **Category I Documents**

23        128.    Plaintiff contends that the claims administration agreements are Plan "contract[s]"

24   or "other instruments" under § 104(b)(4) that should have been disclosed to him in response to his

25   Section 104 request.

26        129.    Although § 1024(b)(4) includes the term "contract" in its enumerated list of

27   documents that must be furnished, it does not necessarily encompass all contracts between a plan

United States District Court
Northern District of California

1   and third-party administrators that render services to the plan.  Wagner Report ¶ 29 (citing DOL

2   Advisory Opinion 97-11A (April 10, 1997)).  While the Ninth Circuit has not ruled decisively on

3   the question of whether claims administration agreements fall within the ambit of § 1024(b)(4), it

4   has affirmed a district court's conclusion that an administrative services agreement was not subject

5   to disclosure where the agreement governed only the relationship between the plan provider and

6   claims administrator, and not the relationship between the plan participants and the provider.

7   *Hively v. BBA Aviation Ben. Plan*, 331 F. App'x 510 (9th Cir. 2009).  The Ninth Circuit explained

8   that "the district court correctly concluded that the Administrative Services Agreement between

9   United Health Care and BBA does not fall within the documents subject to disclosure under 29

10  U.S.C. § 1024(b)(4)," noting that "[d]ocuments which 'relate only to the manner in which the plan

11  is operated'" need not be disclosed under the statute.  *Id.* at 511 (quoting *Shaver,* 332 F.3d at

12  1202). [11]

13          130.    Turning to the four claims administration agreements at issue, Plaintiff has failed to

14  show that any of these agreements govern the relationship between the plan provider and the plan

15  participants.  *Hively*, 331 F. App'x at 511.  Rather, as discussed below, they appear to "relate only

16  to the manner in which the plan is operated" and need not be disclosed under the statute.  *Shaver*,

17  332 F.3d at 1202.  The Court addresses each agreement in turn.

18                              **i.     Delta Dental Agreement**

19          131.    As explained by Delta Dental's corporate designee, the Delta Dental Agreement is

20  a two-part document comprised of the agreement itself (the first seven pages) plus Appendix A

21  and Appendix B.  Second Stanek-Lowe Decl. ¶¶ 3–5.  The first seven pages of the agreement

22  addresses the services provided by Delta Dental under the contract.  *Id.* ¶ 4.  These pages include

23

24  _____

    [11] Plaintiff's argument relies on case law from other circuits to assert that claims administration
25  agreements are "contracts" that must be furnished under § 1024(b)(4).  Pl.'s FFCL ¶ 381 (citing
    *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996); *Heffner v. Blue Cross and Blue*
26  *Shield of Alabama*, 443 F.3d 1330, 1343 (11th Cir. 2006), and *Mondry v. Am. Fam. Mut. Ins. Co.*,
    557 F.3d 781, 797–98 (7th Cir. 2009)).  The Court need not look outside this circuit given the
27  Ninth Circuit's guidance in *Hively*.

28

the following: Section 1 provides the contract definitions; Section 2 enumerates Delta Dental's duties under the contract; Section 3 enumerates the duties of the Plan Sponsor (or Collective Health on behalf of the Plan Sponsor); Section 4 governs the relationship of the parties; Section 5 contains general provisions such as selection of the law governing the contract; Section 6 addresses termination and renewal of the contract; and Section 7 references the agreement's attachments, Appendices A and B. *See generally* Delta Dental Agreement. Appendix A addresses administrative contract variables. *Id.* at 8. None of these provisions discuss Plan benefits to covered persons, nor does Appendix A.[12]

132. Conversely, Appendix B attaches the Employee Benefit Booklet which describes the rights of participants and beneficiaries. *Id.* ¶¶ 2, 5. The Employee Benefit Booklet is provided to all participants and beneficiaries of the Plan as the Delta Dental SPD. *Id.* ¶ 5. Delta Dental's corporate designee testified that the Employee Benefit Booklet is the resource which is consulted and referred to in answering participant questions. Stanek-Lowe Dep. 67:13–15 ("The [Employee Benefit Booklet] would be the resource that the representative would quote for the specific benefits such as, again, the exam"); 68:7–9 ("[A]s I mentioned in my example, that they're going to refer to the employee handbook—benefit booklet,"); 81:17–22 (explaining that "if a participant was to ask for the Administrative Services Contract, all the information on benefits that he or she would get is what's already contained [] in the benefit booklet . . . and that's also attached to the administrative agreement as an attachment"). Thus, Appendix B—the only part of the Delta Dental Agreement that pertains to the relationship between the plan participants and the provider—is separately provided to covered persons. Second Stanek-Lowe Decl. ¶¶ 5, 6. It is undisputed that Zavislak received the Employee Benefits Booklet in response to his February 2021 request. *Id.* ¶ 2; Balloun MSJ Decl. Ex. 10; Undisputed Facts at 2.

---

[12] The same goes for the Delta Dental 2022 Amendment, which is not provided to participants and does not raise costs or change benefits, "nor does it provide detailed benefits information" Second Stanek-Lowe Decl. ¶ 7, 9; *see* Balloun MSJ Decl. ("2022 Amendment") Ex. 20, ECF No. 144-20. Delta Dental's corporate designee also notes that the 2022 Amendment was not part of the Delta Dental Agreement. Second Stanek-Lowe Decl. ¶ 8.

133.   Plaintiff argues, however, that the Delta Dental Agreement "contains other Plan provisions not available anywhere else," such as that "Delta Dental may suspend claims for Enrollees," Delta Dental Agreement at 2, § 2.01(e); the terms for appeals to Netflix as Plan Sponsor, *id.* at 2, § 2.01(h); and the terms for "Termination and Renewal," *id.* at 6, § 6.  Pl.'s FFCL ¶ 419.  As discussed below, the Court does not agree that any of this information is necessary to Plaintiff's determination of benefits or his understanding of where he stands with respect to the Plan.  *See Penwell v. Providence Health & Servs.*, No. 2:19-CV-01786-RAJ, 2021 WL 1222663, at *5 (W.D. Wash. Mar. 31, 2021) (distinguishing cases where requested documents were "essential to the determination of benefits").

134.   With respect to Section 2.01(e) and (h), these subsections discuss Delta Dental's responsibilities regarding claim payments and the appeals process for denied benefits.  When read in its full context, § 2.01(e) releases Delta Dental of its obligation to process claims if Netflix fails to pay "all amounts due, in the amount and manner required by Section 3 and Appendix A."  Delta Dental Agreement § 2.01(e).  Thus, if Delta Dental does not "receive all amounts due" under the contract, then it may suspend claims for enrollees.  *Id.*  This provision does not inform Zavislak of the Plan and his benefits, i.e., "what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted." *Hughes*, 72 F.3d at 690.

135.   Section 2.01(h) provides, *inter alia*, that Delta Dental must notify enrollees when claimed benefits are denied, that an enrollee must appeal the notice of denial within 180 days of receipt, and Delta Dental must review denials "in accordance with the Plan and render a decision." Delta Dental Agreement § 2.01(h).  Again, this provision does not inform Zavislak of the Plan and his benefits.  In any event, to the extent that appeals information affects Plan participants and beneficiaries, this information is provided in the Employee Benefit Booklet under the "Claims Appeal" section.  *See* Delta Dental Agreement, Appendix B at 11 ("You have at least 180 days after receiving a notice of denial to request an appeal or grievance by writing to us giving the

reasons why you believe the denial was wrong.").  Thus, Zavislak has not shown that he is missing this information, as he was already provided it in the Employee Benefit Booklet.  *See e.g.*, *Corby v. Unum Life Ins. Co. of Am.*, No. C 09-5890 WHA, 2010 WL 3768040, at *9 (N.D. Cal. Sept. 21, 2010) (concluding in part that there is "no evidence" that plaintiff "is missing any information); *Penwell*, 2021 WL 1222663, at *3 (noting that "information on pricing, including out-of-pocket limits, co-pays, deductibles, and other relevant calculations was made available to Plaintiffs through summary plan descriptions that were provided").

136.    Finally, the "Termination and Renewal" provisions of the agreement sets forth the term of the contract, the exclusive causes on which termination may be based, when Delta Dental must notify Netflix about renewal, and the parties' obligations following termination of the contract.  *See* Delta Dental Agreement § 6.  These provisions "relate only to the manner in which the plan is operated."  *Shaver*, 332 F.3d at 1202.

137.    Accordingly, Netflix was not required to disclose the Delta Dental Agreement pursuant to § 1024(b)(4).

### ii.    Anthem Agreement

138.    Under the Anthem Agreement, "Anthem provides claims utilization review and performs appeals services to Collective Health and leases the Anthem provider network to Netflix."  Nielsen Decl. ¶ 2.  Anthem does not provide any benefits to covered persons.  *Id.*; Nielsen Dep. at 173:1–23.  Nor does the Anthem Agreement provide any terms or benefits to participants or beneficiaries.  Nielsen Dec. ¶ 3.

139.    Zavislak contends that the Anthem Agreement is a Plan contract because it "specifies the basis upon which payments are made to and from the Plan as well as a funding policy and method."  Pl.'s FFCL ¶ 401.  This information, however, does not inform Plaintiff of his benefits under the Plan and is beyond the scope of § 1024(b)(4).  *See Hively v. BBA Aviation Benefit Plan*, No. 3:05-CV-214 TMB, 2007 WL 9718331, at *3 (D. Alaska June 28, 2007) (rejecting plaintiff's argument that an administrative services contract falls within § 1024(b)(4) because it establishes how claims will be paid and how beneficiaries will be treated), *aff'd*, 331 F.

United States District Court
Northern District of California

1    App'x 510 (9th Cir. 2009).

2         140.    Accordingly, the Anthem Agreement "relate[s] only to the manner in which the

3    plan is operated." *Shaver*, 332 F.3d at 1202.

4                        **iii.    VSP Agreement**

5         141.    The VSP Agreement governs the relationship between Netflix and VSP and it

6    addresses the parties' responsibilities and obligations.  Bass Decl. ¶ 4.  The agreement is

7    comprised of the following sections: Section 1 defines the key terms; Section 2 addresses the

8    contract term, termination of the contract, and renewal; Section 3 discusses VSP's obligations with

9    respect to the contract; Section 4 discusses Netflix's obligations with respect to the contract;

10   Sections 5 and 6 provide the obligations of covered persons under the Plan and the eligibility

11   criteria for coverage; Section 7 addresses VSP's obligation to make the statutorily mandated

12   continuation of coverage available for purchase; Section 8 provides for arbitration of disputes;

13   Section 9 discusses required notices; and Section 11 contains miscellaneous provisions, such as

14   indemnity, liability, and the governing law.  *See generally* VSP Agreement.  The agreement also

15   attaches Exhibit A, or the schedule of benefits.  *Id.* at 21; Bass Decl. ¶ 5.  The only sections of the

16   VSP Agreement that discuss the relationship between the plan participants and the provider are

17   Sections 5 and 6.  *See generally* VSP Agreement.

18        142.    The VSP corporate designee testified that the VSP Agreement is not provided to

19   participants and beneficiaries.  Bass Decl. ¶ 6.  Rather, VSP prepares and distributes the VSP EOC

20   upon each renewal, which "contains a full explanation of the Plan provisions, including coverage,

21   schedule of benefits for services, and beneficiary and participant responsibilities."  Bass Decl. ¶ 3.

22        143.    Netflix argues that the VSP Agreement is a third-party claims administration

23   agreement that does not provide additional benefits to participants, and to the extent it references

24   some benefits information, it is the same information that is already provided to Plaintiff in the

25   VSP EOC.  ECF No. 207 ¶¶ 41–42; *see also* Bass Decl. ¶ 5 ("Exhibit A replicates much of the

26   information from the VSP EOC, but the VSP EOC provides a much more detailed explanation of

27   these subjects.").

28   Case No.: 5:21-cv-01811-EJD

144.    First, Zavislak contends that the VSP Agreement contains Plan provisions that are not provided elsewhere.  Pl.'s FFCL ¶ 407.  He provides one example of information that is contained in § 5.04 of the VSP Agreement but that is not provided in the VSP Plan Summary or the VSP EOC.  Section 5.04 provides in part that "[i]f Non-Member Provider coverage is indicated in Exhibit A (Schedule of Benefits), written proof . . . of all claims for services received from Non-Member Providers shall be submitted by Covered persons to VSP within three hundred sixty-five (365) days of the date of service."  VSP Agreement § 5.04; *see* Bass Dep. 37:5–9.  In addition to the 365-day claim submission deadline, VSP's corporate designee also identified two other pieces of information that are contained in the VSP Agreement but not included the VSP EOC: that a participant who is not reasonably able to submit a claim within the required 365 days may sill submit the claim within the year, and that a participant has six years to initiate legal action against VSP for non-provision of benefits.  Bass Dep. 38:2–8; 39:5–14.

145.    Netflix contends that that these three exceptions relate only to claims processing and need not be furnished in response to a Section 104 request.[13]  Def.'s FFCL at 15 ¶ 42; 23 ¶ 81.  The Court agrees, particularly where, as is the case here, Plaintiff's request for such document is not tied to any benefit claim.  *See Penwell*, 2021 WL 1222663, at *4; *see Allinder v. Inter-City Prods. Corp.*, 152 F.3d 544, 549 (6th Cir. 1998) (holding that "other instruments" does not include ministerial documents used in day-to-day claims processing under an employee benefit plan).

---

[13] Rather, Netflix contends that documents relating to claims processing are furnished pursuant to a Section 503 request in response to an appeal of a denied benefit, and Zavislak has not made such a request.  Def.'s FFCL at 20 ¶ 33; 23 ¶ 81.  ERISA addresses a plan's claims procedures and production of claims documents under Section 503, 29 C.F.R. § 2560.503–1.  In this circuit, "a failure to follow claims procedures imposed on benefits plans, as outlined in 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1, cannot give rise to a penalty under 29 U.S.C. § 1132(c)(1)." *Lee v. ING Groep, N.V.*, 829 F.3d 1158, 1161 (9th Cir. 2016).  Penalties under § 1132(c)(1) "can only be assessed against 'plan administrators' for failing to produce documents that they are required to produce as plan administrators." *Id.* at 1162.  District courts have concluded that claims-related documents are to be provided under Section 503, and § 1132(c)(1) does not authorize statutory penalties against an administer for failure to provide documents under this section (although there are other penalties for failure to do so).  *See Ferree v. Life Ins. Co. of N. Am.*, No. 1:05-CV-2266 WSD, 2006 WL 2025012, at *5–6 (N.D. Ga. July 17, 2006) (explaining that "[t]o the extent claims-related documents are required to be provided, the obligation arises by federal regulation" under 29 C.F.R. § 2560.503-1(g) and that "[t]his regulation does not provide for strict liability for violation of the regulation and does not impose a per-diem fine").

United States District Court
Northern District of California

146.    Second, Zavislak concludes that, because the VSP SBC states that "[i]n the event of a conflict . . . the terms of the contract will prevail," the VSP Agreement is therefore the "controlling the provision of the vision portion of the Plan." Pl.'s FFCL ¶ 409. The Court disagrees. As explained by Netflix, this reference to the VSP Agreement simply provides that the Plan document is dependent upon VSP and Netflix being in a contractual relationship. Def.'s FFCL at 14 ¶¶ 38–39; *see* Bass Dep. 56:20–57:10 (explaining that "the intent of referring back to the vision -- the group plan document is to know if it's still in force and in effect" and that it is "a disclaimer to refer back to the enforced document in case . . . it's been terminated"). It does not alter the fact that the VSP EOC is binding and refers to the Adoption Agreement to determine the terms and conditions of coverage. Def.'s FFCL at 14 ¶ 40; *see generally* VSP EOC 2 ("The plan contract itself should be consulted to determine the governing terms and conditions of coverage.").

147.    To the extent Zavislak argues that the VSP Agreement must be furnished under § 1024(b)(4) because it specifies the basis upon which payments are made to and from the Plan, the Court likewise rejects this argument for the same reasons discussed above. *See supra* ¶ 139.

148.    Accordingly, Plaintiff has not shown that he is entitled to the VSP Agreement under § 1024(b)(4).

### (i)    BSA

149.    Finally, Zavislak asserts that he is entitled to the BSA under § 1024(b)(4). The BSA governs the relationship between Netflix and Collective Health. Lopez Decl. ¶ 2. Pursuant to the agreement, Netflix "delegates" authority to Collective Health to act as the Plan fiduciary for processing and adjudicating all claims. BSA at 1–2. The BSA does not address benefits provided by the Plan. Lopez Decl. ¶ 4. Information on benefits is provided in the SPD that is furnished to participants and beneficiaries. *Id.*

150.    As with the Anthem Agreement, Zavislak contends that the BSA is a Plan contract because it "specifies the basis upon which payments are made to and from the Plan as well as a funding policy and method." Pl.'s FFCL ¶ 395. For the same reasons already discussed, this information does not inform Zavislak of his benefits under the Plan. *See supra* ¶ 139.

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW
47

#### iv.     Conclusion

151.    In sum, the Court finds that Netflix's administrative services agreements with Anthem, Collective Health, Delta Dental, and VSP relate "only to the manner in which the plan is operated," as they govern the relationships between Netflix and its third-party service providers and need not be disclosed pursuant to Zavislak's Section 104 request.  *Shaver*, 332 F.3d at 1202; *see Hively*, 331 F. App'x at 511.

### b.     Category II Documents

152.    In addition to the four claims administration agreements, Zavislak contends that Collective Health-maintained internal documents that are also contracts or other instruments under which the Plan is established or operated.  For the reasons explained below, the Court remains unconvinced,

#### i.     Plan Matrix and PDCCs

153.    Zavislak argues that the Plan Matrix and the PDCC should have been furnished upon his Section 104 request because they are instruments under which the Plan is established and operated.  Pl.'s FFCL ¶¶ 441, 444.  With respect to the Plan Matrix, Zavislak argues that it must be furnished because it "controls any SPD in the event of an inconsistency between the Plan Matrix and the SPD" and because it is the only document that contains an exhaustive list of the Plan benefits.  *Id.* ¶ 440.  He further asserts that, because the "Plan Matrix is a furnishable Plan-governing instrument," and because each PDCC is an "amendment to the Plan Matrix," the PDCC must also be furnished.  *Id.* ¶ 441.  The Court is unpersuaded.

154.    The Plan Matrix and the PDCC are Collective Health's internal documents that form a part of its system to maintain and update client benefit information.  Lopez Decl. ¶¶ 9, 11.  Neither document "governs" the Plan in a legal sense.  The Plan Matrix is a document that Collective Health creates and maintains for each of its clients that contains all benefit information and is used to populate downstream systems, such as the SPD.  Nelson Depo. 9:2–6.  It is created by plugging in the benefits that the client, in this case Netflix, has chosen to include in their benefit Plan.  *Id.* at 55:15–17.  Collective Health then uses PDCC forms to amend the Plan Matrix.

1   *Id.* at 25:13, 25:18–19.  This is a purely administrative process—when a client such as Netflix

2   wants to change their benefits, the client puts in a request via a Jira ticket; Collective Health uses

3   the Jira ticket to fill out a PDCC form; the client signs the PDCC; the information in the Plan

4   Matrix is changed; and the update is made to the Plan Matrix and the corresponding SPD and

5   other documents.  *Id.* at 25:16–20; 25:22–26:5; 26:2–5.  The PDCC is simply an internal

6   mechanism to update a client's benefits in Collective Health's system.

7         155.    The Plan Matrix and the PDCCs do not grant or deny a claim for benefits, nor do

8   they provide additional benefits; they form an internal system to enable Collective Health to keep

9   track of all benefits and effectively implement changes across all systems as needed.  *Id.* at 9:10–

10  12 (describing the Plan Matrix as Collective Health's "system for entering plan data so we can

11  keep track of all the benefits that the client is opting into.").  The Plan Matrix and the PDCC

12  therefore "relate only to the manner in which the plan is operated" and need not be furnished

13  under the statute.  *Shaver,* 332 F.3d at 1202.

14        156.    Moreover, because the SPD is generated from the Plan Matrix and any updates to

15  the Plan Matrix are reflected in the downstream documents such as the SPD, they are, in essence,

16  one and the same in terms of the accuracy of the information they contain.  Nelson Dep. 31:12–16

17  (describing the process of updating the "downstream" information after the matrix is updated).  To

18  say that there is an "inconsistency" between the Plan Matrix and the SPD is to comment on a mere

19  processing delay, and Collective Health's corporate designee testified that downstream processing

20  typically occurs in a day.  *Id.* at 31:17–20.  While it is certainly not impossible that a discrepancy

21  between the Plan Matrix and an SPD would occur, an inconsistency seems unlikely given the

22  processing speeds, and Plaintiff has not identified any discrepancy between the Plan Matrix and

23  the Collective Health SPD such that it could be determined he needs the Plan Matrix to understand

24  his benefits and where he stands with respect to the Plan.  *See Hughes*, 72 F.3d at 691 (declining

25  to interpret the statute as requiring "general disclosure" in response to a Section 104 request).

26           **ii.**    **CSPD**

27        157.    The CSPD is a one-page implementation document that bears Netflix's signature.

28  Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   *See generally* 2021 CSPD; Lopez Decl. ¶ 12.  Zavislak contends that, because it is signed, it

2   evidences intent by the plan administrator to establish the SPD and is a "means by which the Plan

3   is formally operated between Netflix and Collective Health."  ECF No. 445.

4         158.    The CSPD it simply a signature page; it does not contain *any* benefits or any other

5   information to assist Plaintiff in understanding "where he stands in respect to the plan."  *Hughes*,

6   72 F.3d at 690 (quotations and citation omitted).  Accordingly, the CPSD need not be furnished

7   under the statute.

8             **c.**      **Category III Documents**

9         159.    Zavislak contends—and it is undisputed—that Collective Health's Preventative

10  Care Guide is incorporated by reference into the Plan because it is referenced in the Collective

11  Health SPD.  Pl.'s FFCL ¶ 450; Lopez Decl. ¶ 7 ("The PCG is incorporated by reference into

12  Netflix's SPD.").  Because the SPD incorporates by reference the Preventative Care Guide,

13  Zavislak argues that Netflix was required to provide it upon his Section 104 request.  Pl.'s FFCL

14  ¶¶ 450–51.

15        160.    Zavislak also asserts that the Prior Authorization List is an instrument under which

16  the Plan is operated or established because it "controls whether certain benefits are paid out and

17  the circumstances that may preclude a beneficiary . . . from obtaining them as well as the

18  procedures a beneficiary must follow to obtain benefits."  *Id.* ¶ 452.  It is likewise undisputed that

19  the Prior Authorization List is incorporated by reference into the Collective Health SPD.  *Id.* ¶¶

20  454–55; Def.'s FFCL at 19–20 ¶¶ 61–62.

21        161.    Netflix points out that both documents are "extensive schedules of benefits" and

22  that neither document is authored or controlled by Netflix.  Def.'s FFCL at 19 ¶ 61.  Because the

23  Preventative Care Guide and the Prior Authorization List are "extensive schedules of benefits,"

24  Netflix argues that Collective Health's SPD properly incorporated these schedules pursuant to

25  regulation.  *Id.* ¶ 62 (citing 29 C.F.R. § 2520.102-3(j)(2)).  A summary plan must contain, in part,

26  "the plan's requirements respecting eligibility for participation and benefits," and the

27  "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  29

28  Case No.: 5:21-cv-01811-EJD

United States District Court
Northern District of California

U.S.C. § 1022(b).  The Code of Federal Regulations interpreting this statute provides that SPDs should "include a statement of the conditions pertaining to eligibility to receive benefits, and a description or summary of the benefits" unless the plan "provid[es] extensive schedules of benefits . . . [then] only a general description of such benefits is required if reference is made to detailed schedules of benefits which are available without cost to any participant or beneficiary who so requests."  29 C.F.R. § 2520.102-3(j)(2).

162.    Plaintiff received copies of the Preventative Care Guide and the Prior Authorization List free of charge once he contacted Collective Health to request them, as instructed in the SPD.  Def.'s FFCL at 20 ¶ 62; Netflix's Cross-MSJ Ex. G ("Zavislak Dep.") 296:21–25, ECF No. 186-4; *see* Collective Health SPD 16 ("The prior authorization requirements change from time to time. The current list of services requiring prior authorization will always be available from Anthem Blue Cross of California.  Please contact Collective Health for help accessing this list.").

163.    Accordingly, because the Collective Health SPD references the "detailed schedule[s] of benefits," *i.e.*, the Preventative Care Guide and Prior Authorization List, which Zavislak received free of charge upon request, Plaintiff has failed to show that either document was improperly withheld.

### d.    Category IV Documents

164.    Finally, Zavislak contends that Anthem's Medical Management Form contains information that is not available elsewhere and that the form "overrides some of the standard functions" of the Prior Authorization List such that it constitutes an instrument under which the Plan is established or operated.  Pl.'s FFCL ¶ 456.  Zavislak's argument is based on the testimony of Anthem's corporate designee who noted two instances where the Prior Authorization List indicated that prior review was necessary where the Medical Management Form did not.  One instance concerned an implant that required prior review under the Prior Authorization List but not the Medical Management Form.  Nielsen Dep. 145:8–146:2. When the discrepancy between the documents was discovered during her deposition, Plaintiff's counsel queried whether the "MMF supersedes" the Prior authorization Form, and Anthem's corporate designee answered in the

affirmative, explaining that prior authorization would *not* be required for that particular implant. *Id.* at 146: 3–8.

165.    Zavislak also contends that Netflix failed to furnish Anthem's Utilization Review Process Document and other "Plan-governing policies," referring to the Grievance & Appeals for Health and Plan Members Policy and the Enterprise Grievances and Appeals Operational Guideline.  Pl.'s FFCL ¶¶ 458–60.  According to Plaintiff, each of these documents set forth procedures that Zavislak must follow to obtain benefits and are therefore instruments under which the Plan is established or operated.  *Id.* ¶¶ 459–62.

166.    The Court notes that Anthem is not a provider of benefits to Plan participants and beneficiaries, and it does not process claims for Netflix.  Nielsen Decl. ¶ 2.  Rather, in addition to leasing its network to Netflix, Anthem provides claims utilization and review for medical necessity.  *Id.*; Nielsen Dep. 29:25–30:1; *id.* at 26:13–19 (explaining that Anthem provides "utilization management services and case management services," such as claims pricing, while Collective Health adjudicates the claims).  The Medical Management Form and the Utilization Review Process Document are examples of internal documents used by Anthem for utilization management and pricing of claims.  Nielsen Decl. ¶¶ 6, 11.  The appeals policies address "grievances and appeals responses to its members and health care providers."  *Id.* ¶ 11.

167.    It is not apparent how Anthem's internal Medical Management Form, the Utilization Review Process Document, or documents concerning Anthem's appeals policies could provide Plaintiff with information about the plan and benefits when Anthem does not actually approve or deny any benefits.  *See* Nielsen Dep. 18:23–19:3 ("[W]e don't administer benefits."); 20:18 ("[W]e don't review for benefits.").  Anthem receives participants' and beneficiaries' claims, prices them, and then sends them to Collective Health to adjudicate the claim and apply the benefit.  Nielsen Dep. 16:25–17:4; 182:24–183:2 ("Our role is to price the claim and to determine medical necessity, and then from there, it's up to Collective Health to administer the benefits of the plan."); *see also* Nelson Dep. 56:20–23.  To the extent that Anthem's prior authorization determinations could affect the outcome of Collective Health's adjudication of the

United States District Court
Northern District of California

1  claim and application of the benefit, Plaintiff does not seek these documents to assist him in

2  understanding an adverse benefit determination.

3  168.    Zavislak has not specifically explained how these documents inform him of where

4  he stands with respect to the Plan.  *See Penwell*, 2021 WL 1222663, at *5 (distinguishing a case

5  where the requested documents were "essential to the determination of benefits").  Anthem's

6  corporate designee testified that these documents do not establish Plan features, "rather, they rely

7  on the Plan documents already provided to participants for pricing and claims processing."

8  Nielsen Decl. ¶ 9.  Netflix contends that these documents do not govern the Plan, that they do not

9  provide any new benefits information, and that they are "claims documents" that—if they were to

10  be disclosed—they would be furnished pursuant to a Section 503 request after an appeal of an

11  adverse benefit.  Def.'s FFCL ¶ 29.  According to Defendant, these documents therefore fall

12  outside the scope of Plaintiff's Section 104 request.  The Court agrees.

13  169.    Accordingly, the Court finds that Netflix was not required to furnish these

14  documents in response to Plaintiff's Section 104 request.

15  ### 2.    Netflix Furnished the Most Up to Date Versions of the SPDs

16  170.    Zavislak also contends that Netflix failed to comply with § 1024(b)(4) by not

17  furnishing the latest version of the SPDs.  Pl.'s FFCL ¶¶ 375–76.  In response to Plaintiff's

18  Section 104 request, Netflix furnished the 2020 SPDs even though "Netflix had a copy of the then-

19  currently effective [2021] SPD at the time."  Pl.'s MSJ 15.  According to Plaintiff, Netflix

20  furnished outdated SPDs.

21  171.    An administrator need only to provide the "currently operative, governing plan

22  documents" at the time of the request.  *Schoonejongen*, 514 U.S. at 84.  Netflix contends that

23  Netflix's corporate designee testified that the 2021 SPDs were not finalized at the time of

24  Zavislak's request, and that Netflix does not provide drafts of Plan documents to participants or

25  beneficiaries.  Armanino Dep. 43:20–44:1; Second Armanino Decl. ¶ 8.  Netflix contends that,

26  because the 2021 SPDs were still in draft form, the 2020 SPDs were the "currently operative

27  document."  Def.'s FFCL ¶ 33.

28  Case No.: 5:21-cv-01811-EJD

United States District Court
Northern District of California

172.     To the extent Plaintiff asserts that Netflix was nonetheless required to furnish the draft SDPs, the Court disagrees.  Plaintiff cites no case law that mandates disclosure of plan documents that are in draft form.  While one district court found that an employer complied with ERISA disclosure by providing documents in draft form and not the finalized versions, it did *not* conclude that ERISA *required* disclosure of draft documents.  *Jones v. Aetna Life Ins. Co.*, No. CIV.A. 01-2476, 2002 WL 1870469, at *9 (E.D. Pa. Aug. 14, 2002) ("I find that an employee or beneficiary who receives information responsive to his or her request, albeit in draft form, cannot complain that a Plan administrator failed or refused to comply with a request for information.").  The Court can conceive of valid reasons why an administrator would not want to furnish SPDs that have not been subject to final approval, and in any event, Netflix's corporate designee testified that Netflix would provide a specific section of the draft 2021 Plan documents if Plaintiff had specific questions regarding a certain coverage or benefit—which he did not.  Second Armanino Decl. ¶ 8.

173.     Accordingly, Netflix properly furnished the most up to date, finalized versions of the SPDs at the time of Plaintiff's request.

### 3.     Penalties for Netflix's Untimely Response to the January 2021 Request

174.     Zavislak seeks the maximum amount of statutory penalties ($110/day) measured from February 26, 2021 to the date of this Court's Order for Netflix's untimely response to his Section 104 request pursuant to 29 U.S.C. § 1132(c)(1).[14]  Pl.'s FFCL ¶ 536.

175.     Whether to impose penalties under § 1132(c) and the amount of those penalties is discretionary.  *Barling v. UEBT Retiree Health Plan*, 145 F. Supp. 3d 890, 895 (N.D. Cal. 2015).  The factors courts have considered in making an award under § 1132(c) include:

> [B]ad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary . . . . Other circuits have studied the role of prejudice or damages to the inquiry and have concluded that although they are often factors, neither is a *sine qua non* to a valid claim under [Section

---

[14] At the time of filing his FFCL, Plaintiff's request amounted to $76,120.

United States District Court
Northern District of California

1132(c)(2)].

*Hemphill v. Est. of Ryskamp*, 619 F. Supp. 2d 954, 976 (E.D. Cal. 2008) (quotation marks omitted; alteration in original) (quoting *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3rd Cir. 2002)); *see also id.*

176.    Plaintiff made his first Section 104 request in January 2021.  He sent a letter addressed to "Netflix, Inc." at Netflix's corporate headquarters dated January 1, 2021 and postmarked January 4, 2021.  Armanino Decl., Ex. H at 3; Balloun MSJ Decl., Ex. 3.  Plaintiff did not receive a response to his January 2021 letter; however, Plaintiff sent a follow up letter on February 11, 2021, to which Netflix responded by furnishing documents on February 24, 2021. Balloun MSJ Decl. at 3; Armanino Decl., Exs. A-G, J.  At the time of Plaintiff's January 2021 letter, Netflix's Los Gatos office was open on a limited basis due to the COVID-19 pandemic and many employees were working from home.  Armanino Decl. ¶¶ 4–6.  Netflix's Benefits Manager did not receive the January 2021 letter.  Armanino Decl. ¶ 7.

177.    Netflix contends that, although its response was more than 30 days after the original request, Netflix's response was timely because the Department of Labor suspended all time deadlines contained in Title I, including the deadlines to produce documents articulated in section 104, under its EBSA Disaster Relief Notice 2020-01.[15]  Def.'s FFCL ¶ 6.

178.    Plaintiff alleges that Netflix acted in bad faith and has engaged in intentional misconduct evidenced by the length of the delay, the number of requests made, and purported misrepresentations made during depositions and in its declarations.  Pl.'s FFCL ¶¶ 517–35.  The Court has considered Plaintiff's allegations with respect to Netflix's alleged bad faith and is not persuaded that Netflix has engaged in such behavior.

179.    Plaintiff also alleges that he was prejudiced by Netflix's untimely disclosure because he was denied coverage for a doctor-prescribed preventative test that was considered nonpreventative under the Plan.  Pl.'s FFCL ¶ 532.  Plaintiff asserts that it was unknowable to him

---

[15] Netflix also notes that in his first request Plaintiff stated that he was a beneficiary but did not identify his wife, Cheng Zheng, who does not have the same last name as Plaintiff, nor did he identify his status with the Plan.  Def.'s FFCL ¶ 5.

United States District Court
Northern District of California

that the test was considered nonpreventative under the Plan because he had not received the Plan Matrix, although the Court notes that Netflix was not required to furnish the Plan Matrix pursuant to Plaintiff's Section 104 request.  *Id.*; *see infra* IV.A.1.b.

180.    It is undisputed that Plaintiff sent a Section 104 request via letter in January 2021, but it appears that, at the very least, the correct personnel never became aware of the letter. However, Plaintiff sent a follow up letter on February 11, 2021, to which Netflix responded by furnishing documents on February 24, 2021.  Due to the exceptional circumstances created by the COVID-19 pandemic, and in consideration of the DOL's suspension of deadlines during this time, the Court, exercising discretion, will not award the requested penalties.  *See Hewko v. Coffman Engineers, Inc.*, 556 F. Supp. 3d 1036, 1040 (D. Alaska 2021) (declining to impose ERISA penalties due in part to the COVID-19 pandemic).

181.    However, bearing in mind that "[t]he Ninth Circuit has mandated that district courts should liberally construe ERISA, in light of its remedial purpose, 'in favor of protecting participants in employee benefit plans,'" the Court will award a penalty of $15/day measured by the date of Plaintiff's first Section 104 request postmarked January 4, 2021, to the date Netflix furnished the Plan documents in response on February 24, 2021, totaling 51 days.  *Crew Inc. v. Walker*, No. 5:20-CV-00200-SVW-SP, 2022 WL 2162931, at *2 (C.D. Cal. Jan. 6, 2022) (quoting *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984)); *see Chaganti v. Sun Microsystems*, No C 03–05785 CRB, 2004 WL 2677169, at *7 (N.D. Cal. Nov. 23, 2004) (awarding $12 per day for total award of $2,292 based on lack of bad faith by defendant and minimal prejudice suffered by plaintiff).

182.    Accordingly, Plaintiff will be awarded statutory penalties amounting to $765.

### 4.    Conclusion

183.    In sum, Plaintiff has shown that Netflix did not timely furnish Plan documents in response to his first January 2021 request, and the Court awards him statutory penalties amounting to $765 pursuant to § 1132(c)(2).

184.    However, Plaintiff has not shown that Netflix failed to furnish Plan-governing

United States District Court
Northern District of California

documents under § 1024(b)(4) responsive to his second request, but he seeks a permanent injunction in the form of specific relief ordering Netflix to furnish the document discussed herein. "The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (explaining that this factor is most significant when a party "seeks a mandatory injunction, she must establish that the law and facts clearly favor her position"). "Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, [the court] 'need not consider the remaining three *Winter* elements.'" *Id.* (quotation marks and citation omitted). Here, Plaintiff has not shown a likelihood of success on the merits, and therefore, the Court need not consider the remaining *Winter* factors. *Id.* Accordingly, Plaintiff's request for injunctive relief with respect to this claim is denied.

### B.     Whether Netflix Operates its Plan According to a Written Instrument

185.    Zavilslak also seeks permanent injunctive relief for Netflix's alleged failure to operate its plan according to a written instrument.

186.    One of "ERISA's core functional requirements" is that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (quoting 29 U.S.C. § 1102(a)(1)). This is so that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Schoonejongen*, 514 U.S. at 83 (quotation marks and citations omitted). There are no rigid formalities imposed on the "written instrument" requirement. *Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125, 127 (9th Cir. 1991) (explaining that an employee benefit plan need not be formally labelled as such).

187.    Pursuant to § 1102(a)(1), the "instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). The statute imposes four requirements on an employee benefit plan, providing that every plan must:

> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter, (2) describe any procedure under the plan for the allocation of responsibilities for the operation and

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW
57

> administration of the plan (including any procedure described in section 1105(c)(1) of this title), (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and (4) specify the basis on which payments are made to and from the plan.

29 U.S.C.A. § 1102(b)(1)–(4). "[A]n SPD may constitute a formal plan document . . . so long as the SPD neither adds to nor contradicts the terms of existing Plan documents." *Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1170 (9th Cir. 2015).

188.    Section 502 of ERISA allows plan participants or beneficiaries to bring a civil action and sets forth certain remedies available to them. 29 U.S.C. § 1132. Specifically, Section 502(a)(3) allows a participant or beneficiary to bring a civil action for equitable relief in the form of permanent injunction against the plan administrator "to enforce the provisions of this subchapter of the terms of the plan." 29 U.S.C. §§ 1132(a)(3). Section 502(a)(3) is, in essence, a "catchall" provision[] [that] act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

189.    Netflix contends that its Adoption Agreement—the written instrument under which the Plan operates—complies with all § 1102(b)'s requirements.[16] Def.'s FFCL 45 ¶ 53. Zavislak argues, however, that Netflix failed to operate the Plan pursuant to a written instrument because (i) erroneous references to outdated insurance policies contained in the Appendix renders the document invalid and (ii) Netflix made changes to the Plan that were material amendments that did not follow specific Plan procedures. The Court addresses each argument in turn.

### 1.    Scrivener's Errors[17]

190.    First, Netflix contends that the erroneous references to outdated insurance policies

---

[16] Netflix also asserts that Plaintiff lacks Article III standing with respect to claim III because he has not shown that he suffered any harm, as "want[ing] to understand his benefits Plan is not a downstream consequence" from his lack of information. Def.'s FFCL at 44 ¶¶ 43–49; *see also id.* at 26–27 ¶¶ 95–106. Plaintiff contends that, by failing to operate the Plan in accordance with a written instrument, Netflix has prevented Zavislak from obtaining the governing documents underlying the Plan pursuant to his Section 104 request. Pl.'s FFCL ¶¶ 511–12. The Court notes that this standing argument is intertwined with the merits, and in any event this argument is resolved by the Court's conclusions herein.

[17] It appears that Plaintiff has since abandoned his argument that the three references to outdated

in Appendix 5 are merely scrivener's errors that do not invalidate the Plan.

191.    Defendant's expert testified that, under prevailing industry standards, scrivener's errors generally do not invalidate a plan, particularly "where the scrivener's error does not reflect participants' and beneficiaries' reasonable expectations of substantive benefits under the plan." Wagner Report ¶ 55.  Indeed, multiple circuits have considered the application of the scrivener's error in the context of ERISA and have found it appropriate in certain cases.  *See Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992) (concluding that, although "[a]llowing the doctrine of scrivener's error to apply in ERISA cases would seem at odds with this statutory purpose," the doctrine may be appropriate in particular cases).  In *Cinelli*, the Ninth Circuit declined to apply the doctrine of mistake where it "would be used to alter the ambiguous written terms of a formal plan document." C*inelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1445 (9th Cir. 1995).  Conversely, the Third Circuit reformed a scrivener's error where the error resulted in a windfall to the plaintiff, *Int'l Union*, 980 F.2d at 907, and the Seventh Circuit affirmed the district court's grant of equitable reformation of the plan to correct the error, concluding that "ERISA's rules not so strict as to deny an employer equitable relief from the type of 'scrivener's error' that occurred here," *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 812 (7th Cir. 2010).  Both circuits concluded that ERISA "authorizes equitable reformation of a plan that is shown, by clear and convincing evidence, to contain a scrivener's error that does not reflect participants' reasonable expectations of benefits." *Young*, 615 F.3d at 819; *Int'l Union*, 980 F.2d at 907.

192.    Here, the errors in Appendix 5 led Plaintiff to believe that there were three policies incorporated by reference into the Plan.  Appendix 5 of the Netflix 2020 Wrap Plan Document references three insurance policies: (1) Collective Health + Anthem STRM: 3328649, (2) Delta Dental STRM: 3328649, and (3) VSP 12130543.  Armanino Decl., Ex. A at 48–49.  The plan

---

policies in Appendix 5 have been incorporated by reference and must be disclosed in response to his Section 104 request, as there is no mention of it in his MSJ or FFCL.  Because Plaintiff has not explicitly stated so, and to ensure completeness of the record, the Court will address this argument.

United States District Court
Northern District of California

number "3328649" listed with "Collective Health + Anthem STRM: 3328649" and "Delta Dental STRM: 3328649" referred to the "old" self-insured Cigna medical and dental plan Netflix in effect in 2019. Armanino Decl. ¶ 11. Netflix's corporate designee explained that the "3328649" plan number should have been deleted and updated with the new 2020 plan numbers for Anthem and Delta Dental, 282474 and 20164 respectively. *Id.*; Balloun MSJ Decl. at 4, Ex. 7. She also explained that the VSP "12130543" plan number listed in Appendix 5 remains current, but it is a plan designation and does not refer to an underlying insurance policy. Armanino Decl. ¶¶ 11, 17. Once Zavislak requested production of the three policies, Netflix promptly informed him that the "documents referenced in that appendix are no longer available and not in use; and as such, we need to update the Adoption Agreement." Armanino Decl., Ex. J at 2, ECF No. 144-6. Netflix also confirmed that all the Plan documents had been disclosed to Plaintiff. *Id.*

193.    Plaintiff does not deny that these inclusions are scrivener's errors, and there is no evidence that Zavislak relied on the existence of these documents, *i.e.*, that they "misle[d] an employee into believing he had rights or obligations that he did not." *Int'l Union*, 980 F.2d at 907. The error was limited to the Adoption Agreement and did not affect Plaintiff's rights or benefits under the SPDs.[18] Moreover, the error was promptly clarified by Netflix when Zavislak requested these plan policies.

194.    Accordingly, the Court finds that the references to the three outdated policies in Appendix 5 are scrivener's errors and that the Plan should be reformed to exclude these references.

## 2.    Plan Amendments

195.    Zavislak asserts that Netflix made a number of "amendments" to the Plan without following Plan amendment procedure. Pl.'s FFCL ¶¶ 488, 502. He specifically alleges that Netflix made the following amendments: laser hair removal was offered for in and out of network

---

[18] In a discovery Order addressing Netflix's Requests for Production, Magistrate Judge Cousins similarly concluded that "[b]ecause Netflix only modified the Wrap Plan (not the SPD) and the modification did not change Zavislak's benefits, the Court finds that it was not 'material'" under 29 U.S.C. § 1022(a). ECF No. 69 at 2.

Case No.: 5:21-cv-01811-EJD
AMENDED FINDINGS OF FACT & CONCLUSIONS OF LAW

at the end of 2021, Nelson Dep. 28:1–14; and a formal amendment was made to the Delta Dental

Agreement as of January 1, 2022, Balloun MSJ Decl. Ex. 20A ("2022 Amendment"), ECF No.

235-1.[19] Pl.'s FFCL ¶ 6; *see also* Pl.'s MSJ 19.

196.    "Section 402 of ERISA requires employee benefit plans to specify both an

amendment procedure and a procedure for identifying persons with authority to amend."

*Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 937 (9th Cir. 2003) (citing 29 U.S.C. §

1102(b)(3)).  An employer may not amend the plan by other means than those set forth in the

benefit plan.  *Id.* (citing *Schoonejongen*, 514 U.S. at 85 ("[W]hatever level of specificity a

company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that

level.")).  The purpose of § 402 is to "increase[] the likelihood that proposed plan amendments,

which are fairly serious events, are recognized as such and given the special consideration they

deserve."  *Schoonejongen*, 514 U.S. at 82.

197.    ERISA only requires that the plan: (1) specify an amendment procedure and a

procedure for identifying persons with authority to amend, and (2) adhere to that procedure.  29

U.S.C. § 1102(b)(3); *Schoonejongen*, 514 U.S. at 80 ("[T]he literal terms of § 402(b)(3) are

ultimately indifferent to the level of detail in an amendment procedure, or in an identification

procedure for that matter. The provision requires only that there *be* an amendment procedure.").

198.    Here, the 2020 Adoption Agreement furnished to Zavislak provides an amendment

procedure.  Section 8 provides that "[t]he Plan Sponsor . . . in its absolute sole and unlimited

discretion may amend or terminate the Plan in whole or in part by written instrument signed by an

authorized officer of the Plan Sponsor upon prior approval by the Plan Sponsor's governing body

with or without written notice to the Plan Participants . . . . In terminating or amending the Plan

---

[19] Plaintiff also notes that "[s]ince January 1, 2019, the Plan has changed four of its claims administrators, [and] completely replaced its medical and dental benefits" in reference to the fact that Netflix dropped Cigna as a provider in 2019 and switched to a self-funded plan with Collective Health, Anthem, and Delta Dental.  Pl.'s FFCL ¶ 6; Pl.'s MSJ 19.  Netflix points out that these changes are outside the scope of this litigation, Def.'s FFCL at 24 ¶ 86, and Plaintiff does not allege that these changes were improper or otherwise noncompliant with Plan amendment procedure.

the Company cannot retroactively reduce the benefits to which a Plan Participant is entitled prior to the termination or amendment of the Plan."  Adoption Agreement § 8.  Indeed, Zavislak does not dispute that the Plan contains an amendment procedure, nor does he argue that this procedure is deficient under ERISA.  *See* Pl.'s FFCL ¶ 486; *see also* Pl.'s MSJ 19.

199.    With respect to the Delta Dental Agreement, a formal amendment was implemented as of January 1, 2022.  *See* 2022 Amendment, ECF No. 235-1.  The amendment is signed by Armanino on behalf of Netflix and the Executive Vice President and CLO on behalf of Delta Dental.  *See* Second Armanino Decl. ¶ 23 ("I have been delegated authority to sign off on changes to the Plan and Plan Amendments.").  Accordingly, this amendment adhered to the Plan's amendment procedure, and Plaintiff raises no specific allegations that the amendment does not.

200.    As to the expanded laser hair removal coverage that occurred at the end of 2021, Netflix contends that it gave proper notice to participants and beneficiaries by publishing the changes in the updated 2021 SPD (within 210 days).[20]  Def.'s FFCL at 24 ¶ 87.  Material modifications to an SPD must occur "not later than 210 days after the close of the plan year in which the modification or change was adopted."  29 C.F.R. § 2520.104b-3(a)–(d).  Accordingly, Plaintiff has not shown that Netflix failed to comply with Plan amendment procedure or federal regulations.

### 3.    Conclusion

201.    In conclusion, Plaintiff has not shown that Netflix failed to operate its Plan pursuant to a written instrument or that any amendments to the Plan did not adhere to the Plan's amendment procedure.

202.    Plaintiff seeks a permanent injunction with respect to this claim.  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three *Winter* elements.'"  *Garcia*, 786 F.3d at 740

---

[20] Netflix asserts that the expansion of laser hair removal is not a material change since it is not a reduction or termination of benefits, but notes that even if it was considered a material modification to the Plan, Netflix timely discharged its duty to disclose them when it disclosed the updated SPD within 210 days of any change.  Def.'s FFCL at 47 ¶ 61.

(quotation marks and citation omitted).  Because Plaintiff has not shown a likelihood of success on the merits, the Court need not consider the remaining *Winter* factors.  *Id.*

**V.     CONCLUSION**

Based on the foregoing, the Court rules as follows:

- Count I:  Plaintiff's request for monetary damages for Administrator's failure to timely supply requested information under 29 U.S.C. § 1132(a)(1)(A), (a)(3), and (c) is **GRANTED IN PART**.  The Court awards Plaintiff statutory penalties amounting to $765 pursuant to § 1132(c)(1).

- Count II:  Plaintiff's request for injunctive relief under 29 U.S.C. § 1132(a)(3) compelling Netflix to provide all plan documents pursuant to § 1024(b)(4) is **DENIED**.

- Count III:  Plaintiff's request for injunctive relief under 29 U.S.C. § 1132(a)(3) compelling Netflix to maintain the Plan according to a written instrument pursuant to 29 U.S.C. § 1102(a)(1) is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 7, 2024

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California